**FILED**

OCT 19 2009

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

BEYOND SYSTEMS, INC.                 )
9501 Anchorage Place                 )
Bethesda, MD 20817                   )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )
                                     )
WORLD AVENUE USA, LLC,               )
Successor by merger to Niutech, LLC )
dba "TheUseful"                      )
1613 NW 136th Avenue, Suite 100      )
Sunrise, FL 33323                    )
                                     )
        and                          )
                                     )
World Avenue Holdings, LLC           )
1613 NW 136th Avenue, Suite 100      )
Sunrise, FL 33323                    )
                                     )
        Serve:  Corpdirect Agents, Inc.)
        515 East Park Avenue         )
        Tallahassee, Florida 32301   )
                                     )
        and                          )
                                     )
Niuniu Ji                            )
1613 NW 136th  Avenue, Suite 100     )
Sunrise FL 33323                     )
                                     )
        Defendants.                  )
                                     )
_____)

09 mc 557

(Captioned Action Case No. PJM 08 cv 0921
pending in the U.S. District Court for the
District of Maryland)

**MOVANT WORLD AVENUE USA, LLC'S NOTICE OF MOTION AND MOTION TO**
**COMPEL WILLIAM J. WAGNER'S COMPLIANCE**
**WITH SUBPOENA DUCES TECUM**

**FILED**

OCT 1 9 2009

Clerk, U.S. District and
Bankruptcy Courts

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BEYOND SYSTEMS, INC. | ) |
|  | ) |
| Plaintiff | ) |
| v. | ) |
|  | ) |
| WORLD AVENUE USA, LLC, et al. | ) |
| Defendants | ) |
|  | ) |

Case: 1:09-mc-00557
Assigned To : Kennedy, Henry H.
Assign. Date : 10/19/2009
Description: Miscellaneous

pending in the U.S. District Court for the
District of Maryland)

## MOVANT WORLD AVENUE USA, LLC'S NOTICE OF MOTION AND MOTION TO COMPEL WILLIAM J. WAGNER'S COMPLIANCE WITH SUBPOENA DUCES TECUM

WORLD AVENUE USA, LLC, a named Defendant in Case Number PJM 08 CV0921

pending in the U.S. District Court for the District of Maryland, does hereby move the Court for

an Order compelling compliance by WILLIAM J. WAGNER with a Subpoena Duces Tecum

issued to him in this Judicial District in connection with the Maryland Action.

DATED:  October 19, 2009

GREENBERG TRAURIG, LLP

By:

Sanford M. Saunders, Jr
D.C. Bar #376098
Attorneys for Movant
WORLD AVENUE USA, LLC

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | |
|---|---|
| BEYOND SYSTEMS, INC. )<br>)<br>   Plaintiff )<br>   v. )<br>)<br>WORLD AVENUE USA, LLC, et al. )<br>   Defendants )<br>_____ ) | (Captioned Action Case No.PJM 08 cv 0921 pending in the U.S. District Court for the District of Maryland) |

## MOVANT WORLD AVENUE USA, LLC'S NOTICE OF MOTION AND MOTION TO COMPEL WILLIAM J. WAGNER'S COMPLIANCE WITH SUBPOENA DUCES TECUM

WORLD AVENUE USA, LLC ("World Avenue"), a named Defendant in *Beyond Systems, Inc. v. World Avenue USA, LLC*, Case Number PJM 08 CV0921 pending in the U.S. District Court for the District of Maryland ("Maryland Action"), by its undersigned counsel and pursuant to Rule 45, Fed. R. Civ. P. and Rule 7, District of Columbia Civil Local Rules, hereby moves to compel compliance by WILLIAM J. WAGNER ("William Wagner") with a Subpoena Duces Tecum issued to him in this Judicial District in connection with the Maryland Action, and states in support thereof:

### I.    INTRODUCTION

This is an action to enforce a subpoena issued to an individual, William Wagner, in this Judicial District, in connection with the Maryland Action.  The Maryland Action is a case brought by a serial spam litigator masquerading as an internet service provider, BEYOND SYSTEMS, INC. ("BSI"), a Maryland corporation, for $134 million in supposed damages that,

in actuality are self-inflicted.[1]  BSI posits itself as a victimized internet service provider burdened by the added time and expense spent processing unsolicited commercial e-mail ("UCE"), and asserts that it did nothing to bring such UCE upon itself.  The discovery in the Maryland Action is demonstrating that BSI is far from an internet service provider, and that most of the e-mails at issue were sent to invented email addresses created for purposes of manufacturing a claim.

Importantly, the discovery in the Maryland Action is demonstrating that BSI, a corporation headed by one Paul Wagner, conspired with a California based corporation, Hypertouch, Inc. ("Hypertouch") headed by Paul Wagner's brother, James Joseph Wagner a/k/a Joe Wagner ("Joseph Wagner"), and other members and friends of the Wagner family, to funnel hundreds of thousands of e-mails from Hypertouch's computer servers in California to BSI's computer servers allegedly located in Maryland or elsewhere for the very purpose of manufacturing spam litigation.  Hypertouch, like BSI, is a spam litigation manufacturer masquerading as an internet service provider.  World Avenue has evidence that some of the e-mails alleged to be actionable in the Maryland Action were not sent to Maryland, but re-transmitted to Maryland or elsewhere through Hypertouch's servers in California.  World Avenue believes that but for Hypertouch's voluntary and intentional re-transmittal of the e-mails to Maryland or elsewhere, the vast majority of the e-mails would have never been received by BSI.

The subpoenaed individual, William Wagner, is the father of Paul Wagner, President of BSI, and of Joe Wagner, the principal of Hypertouch.  The discovery produced to date by BSI in the Maryland Action, together with documents readily available to the public, demonstrates

---

[1] In the main, the claimed damages are based on statutory awards made on a per email basis for each allegedly non-compliant email.

William Wagner's involvement in this matter, including without limitation, his ownership of property where a BSI "office" purportedly operates, BSI's equipment is store, and various Internet Protocol ("IP") Addresses relating to BSI that are registered in his name. Thus, documents relevant and material to the Maryland Action are certainly in William Wagner's possession, custody or control. Instead of producing documents responsive to the Subpoena, William Wagner served a one sentence, handwritten response stating that he has no materials responsive to the Subpoena, necessitating the filing of this Motion to require him to disgorge such materials.

Prior to filing this Motion, World Avenue tried to resolve the Motion as detailed in the Declaration, but this effort was to no avail. *See* Declaration of John L. McManus (the "Declaration") at ¶¶ 12-13 , attached as Exhibits P and Q.

## II.    **FACTUAL BACKGROUND.**

### A.    **The Amended Complaint In The Maryland Action.**

BSI alleges that World Avenue initiated, conspired in the initiation, or assisted in the transmission of at least 68,300 commercial electronic mail messages to its alleged server(s) in Maryland between July 20, 2004, and September 3, 2005, and continuing to date. *See* Declaration, Exhibit A at ¶¶ 62, 67. BSI seeks relief under the Maryland Commercial Electronic Mail Act, Section 14-3001 *et seq.* ("MD-CEMA"), and the Florida Electronic Mail Communications Act, Section 668.60 *et seq.*, Fla. Stat. ("FEMCA"). MD-CEMA, among other things, regulates e-mail "sent to an electronic mail address that the sender knows or should have known is held by a resident of the state [of Maryland]." *See* Md. Stat. § 14-3002(b)(1). FEMCA, among other things, regulates e-mail sent "from a computer located in this state [of Florida]." *See* § 668.603(1), Fla. Stat. Both MD-CEMA and FEMCA regulate such UCE if it,

among other things, contains false or misleading information in the subject lines or contains false information in the routing information of the UCE.

However, MD-CEMA and FEMCA only protect *bona fide* internet service providers ("ISP"), and not businesses that re-direct e-mails for the purpose of churning spam litigation. *See* § 668.601, Fla. Stat. (stating FEMCA is "... intended to promote the integrity of electronic commerce and shall be construed liberally in order to protect the public and *legitimate* businesses from deceptive and unsolicited commercial electronic mail") (emphasis added). In an analogous context, the Ninth Circuit recently instructed district courts to closely scrutinize the "individual characteristics of the plaintiffs on a case-by-case basis and make a reasoned decision on whether a purported IAS [internet access provider] is truly the type of bona fide IAS provider adversely affected by commercial e-mail messaging..." *See Gordon v. Virtumundo, Inc.*, Case No. 07-35487, 2009 WL 2393433, at *1, *10 (9th Cir. Aug. 6, 2009) (slip opinion) (affirming grant of summary judgment against another serial spam litigator who was not a *bona fide* ISP).[2]

**B.      BSI's Claim To Reside In Maryland.**

BSI has engaged in an elaborate charade to place itself in Maryland in order to make claims under MD-CEMA. In an effort to invoke the protections of MD-CEMA, BSI's President and Sole Shareholder, Paul Wagner -- a resident of *this* Judicial District living at 1837 R Street, NW,

---

[2] The Ninth Circuit stated:

> Where, by comparison, a private plaintiff's status as an IAS provider is questionable and reasonably contested, courts should not only inquire into the plaintiff's purported Internet-related service operations but also closely examine the alleged harms attributable to spam. We have confidence in our district courts to review the individual characteristics of the plaintiffs on a case-by-case basis and make a reasoned decision whether a purported IAS provider is truly the type of *bona fide* IAS provider adversely affected by commercial e-mail messaging that Congress envisioned when it enacted the CAN-SPAM Act.

*Gordon*, 2009 WL 2393433, at *10.

Washington, D.C. 20009[3] (the "Paul Wagner Residence") -- listed with the State of Maryland the

address of "11160 Veirs Mill Road, Suite L15-1000, Wheaton, Maryland 20902" as the

"principal office" of BSI as of June 3, 2003.[4]  The listed address is not a "principal office" at all

but a Mail Boxes, Etc. mail box Store in Maryland.[5]  The Mail Boxes, Etc. Store was under

instructions from Paul Wagner to forward BSI's mail to the Paul Wagner Residence in

Washington, D.C.[6]  The Mail Boxes, Etc. records contain an Application -- signed under penalty

of criminal sanctions -- that the "business address" of the "Applicant" (Beyond Systems, Inc.) is

in Washington, D.C.[7]  These representations are inconsistent and this discrepancy belies BSI's

claim to be a Maryland ISP.   Moreover, BSI sought to invoke the provisions of MD-CEMA by

having Hypertouch redirect certain of the e-mails at issue in the Maryland Action to BSI.  BSI

alone has filed in excess of twenty lawsuits alleging that it is the victim of UCE.  *See* Declaration,

Exhibit E.

### C.    The Scheme To Forward E-Mails From Hypertouch To BSI To Manufacture Spam Litigation.

Joseph Wagner, the principal of Hypertouch in California, and Paul Wagner, the President

of BSI (which purports to be based in Maryland), are brothers who conspire to file litigation over

UCE.  *See* Declaration, Exhibit F (reflecting e-mail communications between Paul Wagner and

Joseph Wagner relating to UCE litigation).   Since at least 2004, Joseph Wagner/Hypertouch

operated email servers located in California. Joseph Wagner/Hypertouch configured some or all

---

[3] *See* Declaration, Exhibit B, containing Property Tax Records for Residence owned by Paul A. Wagner, and reflecting that Residence is classified as receiving Homestead Exemption.

[4] *See* Declaration, Exhibit C (containing Resolution to Change Principal Office or Resident Agent filed June 3, 2003).

[5] *See* Declaration, Exhibit D (containing excerpted documents produced by The UPS Store f/k/a Mail Boxes, Etc. in response to a Subpoena Duces Tecum dated August 14, 2009 in the Maryland Action).

[6] *Id.*, Exhibit D, p. 1.

[7] *Id.*, Exhibit D, pp. 2-3.

of the mail servers to, among other things, collect, receive, transmit, and/or store the emails over which it is suing in other litigation and, upon information and belief, at least a minimum of 98.4% of the emails over which BSI is suing in the Maryland Action.

Sometime, prior to January 2005, Joseph Wagner approached Paul Wagner and asked Paul Wagner/BSI to receive and store certain emails that would be received by Joseph Wagner/Hypertouch.[8] Paul Wagner agreed to Joseph Wagner's request.[9] Joseph Wagner then configured the Joseph Wagner/Hypertouch email servers to send certain of the emails it received to Paul Wagner/BSI in Washington, D.C. and/or Maryland.[10] Specifically, Joseph Wagner configured the Hypertouch servers so that all e-mails sent to the hypertouch.com domain that were not specifically addressed to an actual Hypertouch.com account user or excluded by a pre-determined rule (the so-called "wild card account") were automatically sent to the beyondsystems.com domain.[11] Paul Wagner/BSI received and stored those emails.[12]

To further their scheme, Joseph Wagner created thousands of "wild card" e-mail addresses used to collect e-mail to churn spam litigation. As found by another Court in granting summary judgment against BSI's sister company, Hypertouch, 95% of the e-mails at issue by Hypertouch in that case "were sent to e-mail addresses not being utilized by a 'bona fide recipient,'" but were sent to "so-called 'wild card' e-mail addresses to collect commercial electronic mail sent to nonexistent e-mail addresses (i.e., e-mail addresses that were not created by Hypertouch for its end users)." *See* Notice of Entry of Order Granting Summary Judgment and Order Granting

---

[8] *See* Declaration, Exhibit G, Excerpted Deposition of Paul Wagner dated October 28, 2008 ("Paul Wagner Deposition"), p. 9: 9-22, p. 69: 5-21, p. 142: 18-22, p. 143: 1-14; Declaration, Exhibit H, Excerpted Deposition of Joseph Wagner dated October 7, 2008 ("Joseph Wagner Deposition"), p. 192: 12-20, p. 198: 21-25, p. 199: 1-25, p. 200: 1-3, p. 301: 4-25, p. 302: 1-16, p. 309: 13-21.

[9] *See* Declaration, Exhibit H, Joseph Wagner Deposition, p. 192: 6-20.

[10] *Id.*

[11] *See id.*, p. 190: 7-20; p. 192: 6-20.

[12] *Id.*, p. 192:17-25.

Summary Judgment in *Hypertouch, Inc. v. Valueclick, Inc. etc.,* Case No. LC081000, Superior Court of the State of California for the County of Los Angeles, filed June 18, 2009, at p. 20, attached as Exhibit 2.

The emails that Paul Wagner/BSI agreed to receive and store from Joseph Wagner/Hypertouch consisted of "at least" 99% alleged "spam" since at least January 2005, according to Joseph Wagner.[13] Joseph Wagner/Hypertouch generally knew the content of the e-mails, and specifically, that the emails Joseph Wagner/Hypertouch sent and/or caused to be sent to Paul Wagner/BSI in Washington, D.C. and/or Maryland consisted of at least 99% alleged "spam" when Joseph Wagner/Hypertouch sent them to Paul Wagner/BSI.[14]

**D.    William Wagner's Role In The Business of BSI And Hypertouch.**

The facts place William Wagner, the father of Paul Wagner (President of BSI) and Joseph Wagner (principal of Hypertouch), at the center of the re-direction of e-mails from Hypertouch to BSI. William Wagner:

- owns one residence housing the server(s) where the e-mails at issue were allegedly received (*see supra.*, pp. 8-9);

- is the account owner for the provider of internet bandwidth for the residence (*see supra.*, p. 9; Declaration, Exhibit K);

- routinely receives deliveries for BSI (*see* Declaration, ¶ 9, Exhibit L); and

- owns the second residence purportedly housing the server(s) where more of the e-mails at issued were allegedly received (*see supra.*, p. 9).

Yet, despite this, William Wagner claims to have no documents whatsoever.[15]

Specifically, Paul Wagner -- the resident of this Judicial District (*see supra*, p. 5 (*citing* Declaration, Exhibit B)) -- purports to have an office to house the computer server for his

---

[13] *See* Declaration, Exhibit H, Joseph Wagner Deposition, p. 195: 8-12.

[14] *Id.*, p. 189, 8-25; p. 195: 8-12.

[15] See *id.*, Exhibits O, Q.

business at 1612 Sherwood Road, Silver Springs, Maryland 20902 (the "William Wagner Residence").[16] This property is not owned by BSI or its President, Paul Wagner, but by his father, William Wagner, the recipient of the Subpoena.[17] BSI asserts that the William Wagner Residence houses its business computer equipment at its supposed "office." *See* Declaration, Exhibit G, p. 33, lines 1-2 ("As I understand it, BSI maintains offices in Rockville and Silver Spring").

Moreover, BSI purportedly maintains a second so-called "office" containing BSI servers (the "William Wagner Condo") at his parent's condominium located in Rockville.[18] William Wagner is the owner, together with his wife, of and lives at the William Wagner Condo.[19]

Paul Wagner testified as follows regarding the William Wagner Residence and the William Wagner Condo:

```
15    Q.   Mr. Wagner, let me go back to the Sherwood
16  Road residence for a second.  Is anybody currently
17  living in 1612 Sherwood Road?
18    A.   No.  It is still owned by my parents, but
19  nobody is living there at the moment.
    . . .
 7    Q.   Going back to 1997, were they living there
 8  continuously between 1997 and roughly 2006?
 9    A.   Yes.
10    Q.   At any point, were you living in the 1612
11  Sherwood Road residence during that period?
12    A.   No.  Not in that time period.
13    Q.   And I take it while they were -- while
14  your parents were living in the house, they had
15  access to the mail servers?
16    A.   Yes.  Sometimes they would reboot servers
17  for BSI, so it was actually an advantage to have them
18  with access to the servers.
```

---

[16] *See id.*, Exhibit G, Paul Wagner Deposition, p. 33: 3-15.

[17] *See id.*, Exhibit I.

[18] *See id.*, Exhibit G, p. 33: 1-2, p. 36: 6-18.

[19] *See id.*, Exhibit J.

. . .
12    Q.    The mail servers that are now -- and you
13  still have mail servers currently located in the
14  Maryland Avenue condo?
15    A.    Yes.
16    Q.    You mentioned the office -- the mail
17  servers were located in an office in the condo.
18          Were they always located in the office
19  since they've been in the condo?
20          MR. RING:  Objection.  Go ahead.
21          THE WITNESS:  I don't know if I ever moved
22  it out for a moment for maintenance.  There was a
0060
 1  server in the living room as well next to the TV,
 2  sort of video, among other things, other Internet
 3  services.  There's a closet where we intend to put
 4  some servers, but I don't think we've put them there
 5  yet.
. . .
19    Q.    Anybody in the condo would have access to
20  the servers?
21    A.    Yes.  Correct.

*See* Transcript of Paul Wagner, taken September 14, 2009, p. 56: 15-19; p. 59: 12-22; p. 57: 7-18;

p. 60: 1-5, 19-21, attached as Exhibit 5.

Due to the obvious importance of William Wagner's documents to the Maryland Action,

on July 20, 2009, World Avenue issued the Subpoena to him.[20]  The Subpoena seeks, *inter alia,*

records evidencing the services provided by BSI/Hypertouch to William Wagner, any services

provided by William Wagner to BSI/Hypertouch, the ownership, possession, maintenance and

operation of BSI/Hypertouch servers located at various addresses including the William Wagner

Residence, the William Wagner Condo, the lease arrangement between BSI and William Wagner

for the William Wagner Residence, and the general business activities conducted at the William

Wagner Residence and the William Wagner Condo.  On August 6, 2009, William Wagner served

his response upon World Avenue's counsel -- a one sentence, handwritten statement that he has

---

[20] *See id.,* Exhibit N.

10

"no materials that [World Avenue] asked for."[21]  To the contrary, William Wagner, as the owner of the William Wagner Residence and the William Wagner Condo where BSI purportedly maintain an office, certainly has documentation responsive to the Subpoena and thus, World Avenue respectfully requests that the Court compel his compliance with the Subpoena and require the production of such documentation.

### III.    SUMMARY OF ARGUMENT.

World Avenue properly served the Subpoena upon William Wagner in accordance with the provisions of Rule 45, Fed. R. Civ. P.  The documents and records sought by World Avenue in the Subpoena are relevant to the subject matter of the Maryland Action, or are otherwise reasonably calculated to lead to discovery of information that is relevant to the subject matter of the Maryland Action.  In response, William Wagner served a one sentence, handwritten statement that he has no materials sought by World Avenue.  The facts make evident, however, that William Wagner *has* documents responsive to the Subpoena in his possession, custody and/or control.  Accordingly, William Wagner should be compelled to comply with the Subpoena and to produce the requested documents within fourteen (14) days of the Court's decision on this Motion.

### IV.    ARGUMENT

**A.    The Subpoena Seeks Relevant Information.**

"The scope of discovery through a Fed. R. Civ. P. 45 subpoena is the same as that applicable to Fed. R. Civ. P. 34 and other discovery rules." *Negotiated Data Solutions LLC v. Dell, Inc.*, No. C09-80012MISC JF (HRL), 2009 WL 733876, at *2 (N.D. Cal. March 17, 2009); *see also* Advisory Committee Notes to the 1970 and 1991 Amendments to Rule 45. Fed. R. Civ. P. 26(b) provides that parties "may obtain discovery regarding any non-privileged matter that is

---

[21] *See* Declaration, Exhibits O, Q.

relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." The rules of discovery are "to be accorded a broad and liberal construction." *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *see also Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("pre-trial discovery is ordinarily "accorded a broad and liberal treatment") (citing *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947)); *Jackson v. CCA of Tennessee, Inc.*, 254 F.R.D. 135, 138 (D.D.C. 2008) (noting that "the scope of discovery in civil actions is broad, allowing for discovery regarding any nonprivileged matter that is *relevant* to a claim or defense); *U.S. Commodity Futures Trading Commission v. McGraw-Hill Companies, Inc.*, 507 F. Supp. 2d 45, 50 (D.D.C. 2007) (noting that the federal rules describe the permissible scope of discovery in "extremely broad" terms). "Courts must employ a liberal discovery standard in keeping with the spirit and purpose of the discovery rules." *Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273 (S.D. Fla. 2008). "This broad right of discovery is based on the general principle that litigants have a right to 'every man's evidence,' . . . and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen*, 5 F.3d at 1292 (citation omitted).

Accordingly, as is the case for all discovery under the Federal Rules, the standard of relevancy for a non-party subpoena under Fed. R. Civ. P. 45 is "exceedingly broad." *Cofield v. City of LaGrange*, 913 F. Supp. 608, 614 (D.D.C. 1996) ("Rule 45(d)(1) applies an 'exceedingly broad' standard of relevancy to a subpoena seeking material from a non-party."); *see generally Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995) (noting "extremely broad" scope of discovery permissible under Rule 45); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 607

(S.D. Fla. 1991) (granting motion to compel discovery based on broad scope of discovery). If there is a "possibility that the discovery sought may lead to information relevant to the subject matter of the action, then the discovery should generally be allowed." *Elm Energy and Recycling v. Basic*, 1996 WL 596456, at *1, *11 (N.D. Ill. 1996) ("If relevance is unclear, Rule 26(b)(1) indicates that the court should be permissive") (Magistrate Opinion).

In the Maryland Action, BSI claims that *it* is an internet service provider. Yet, the Internet Protocol (IP) address through which it purports to render its services, IP Address 71.126.148.133, was registered in William Wagner's name.[22]  And, just thirteen days after William Wagner represented that he had no responsive documents (*see* Declaration, Exhibit Q), the registration records for the IP were modified to try to mask his prior involvement.[23]  Yet, amazingly, William Wagner represents twice that he knows nothing about it.[24]

Here, the Subpoena seeks relevant information relating to, among other things, the relationship between William Wagner and BSI/Hypertouch and the business operations conducted by BSI out of the William Wagner Residence and the William Wagner Condo.  At bottom, BSI, in the Maryland Action, seeks purported damages due to alleged UCE.  BSI, however, has conspired with Hypertouch, as well as others, to solicit the subject e-mails and to have such e-mails funneled to BSI for the sole purpose of manufacturing spam litigation such as the Maryland Action.  BSI and Hypertouch purport to be legitimate internet service providers; however, both have few, if any active customers and both are run out of homes owned by members of the Wagner family or their friends.  Thus, BSI voluntarily inflicted the alleged damages upon itself as part of its sole business interest which is prosecuting UCE-related litigation.  Accordingly,

---

[22] *See id.*, Exhibit K.

[23] *See* Exhibit 3 (IP registration record as of August 7, 2009) and Exhibit 4 (IP registration record as of October 8, 2009 reflecting modification of data).

[24] See *id.*, Exhibits O, Q.

discovery of documents and records relating to William Wagner's involvement with BSI and BSI's purported use of the William Wagner Residence and the William Wagner Condo as an alleged office are relevant to the subject matter of the Maryland Action, and are otherwise reasonably calculated to lead to the discovery of information establishing the truth of World Avenue's position. *See Gordon v. Virtumundo, Inc.*, Case No. 07-35487, 2009 WL 2393433, at *1, *10 (9th Cir. Aug. 6, 2009) (slip opinion) (details of how and where self-described ISP operates are relevant to whether it has standing to bring CAN-Spam action).

Specifically, the Subpoena seeks information regarding services provided by and between William Wagner and Hypertouch and/or BSI. *See* Declaration, Exhibit N, Subpoena, ¶ 1. The Subpoena seeks information relating to the business operations of Hypertouch and/or BSI, including, but not limited to, personnel and information relating to email accounts associated with BSI and/or Hypertouch, including without limitation information concerning the creation and maintenance of such email accounts, the frequency of email correspondence on such accounts, the recipients of such email correspondence, and the types of email accounts. *Id.*, ¶¶ 3, 6-10, 14-16, 18. The Subpoena further seeks information relating to the methods, tools and software used to retrieve and send emails at BSI-related ISP's, servers and Domain Names, *Id.* at ¶ 17, and reporting of alleged unsolicited email received by BSI and/or Hypertouch. *Id.* at ¶ 19.

In addition, the Subpoena requests documentation specifically relating to William Wagner's connection to BSI and/or Hypertouch and the use of the William Wagner Residence and the William Wagner Condo as a purported BSI office. The Subpoena seeks information relating to, among other things, the ownership, maintenance, operation and specifications of servers maintained at various addresses, including the William Wagner Residence and the William Wagner Condo. *Id.* at ¶ 2. The Subpoena requests documentation evidencing the

14

existence and type of William Wagner's email accounts associated with BSI-related ISP's and Domain Names, *Id.* at ¶ 2, together with information relating to any service notifications, service disruptions or service reports in connection with William Wagner's email accounts, *Id.* at ¶ 12-13.

Moreover, the Subpoena calls for documentation evidencing the use of the William Wagner Residence and the William Wagner Condo as purported BSI offices. Particularly, the Subpoena requests correspondence between William Wagner and BSI and/or Hypertouch regarding the servers located at various addresses, including the William Wagner Residence, and the general use of the William Wagner Residence as a BSI office housing BSI servers. *Id.* at ¶ 11, 20. Furthermore, the Subpoena asks for documentation evidencing payment relating to BSI and/or Hypertouch services, including payments made in connection to the servers located at various addresses including the William Wagner Residence and payments made for BSI's use of the William Wagner Residence and the William Wagner Condo as an office. *Id.* at ¶ 4. The Subpoena also calls for documentation generally relating to and evidencing BSI's use of the William Wagner Residence and the William Wagner Condo as an office, including identification of those with access to the property and the business or occupational licenses for the property. *Id.* at ¶ 21-22.

Finally, the documents produced by BSI in the Maryland Action evidence multiple deliveries to William Wagner at the William Wagner Condo.[25] Further documents supposedly evidence the purported use of the William Wagner Residence for BSI purposes.[26]

---

[25] *See id.*, Exhibit L. The documents are designated "Confidential" pursuant to the Confidentiality Order in the Maryland Action, and thus, cannot be disclosed to this Court. However, since nothing in these particular documents is actually "Confidential," World Avenue assumes that BSI will de-designate them and thereby produce this evidence of William Wagner's involvement to the Court.

[26] See *id.*, Exhibit M.

Accordingly, the Subpoena seeks records and documents relevant to the subject matter of the Maryland Action, as it seeks information concerning the allegations asserted by BSI and the defenses alleged by World Avenue.

**B.      William Wagner Must Produce all Responsive Documents in his Possession, Custody or Control.**

Fed. R. Civ. P. 45(a)(1)(A)(iii) *requires* a non-party to produce documents in "that person's ***possession, custody or control***." (emphasis added); *see also Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 55 (D.D.C. 2005) ("Looking to Federal Rule of Civil Procedure 45(a) . . . a subpoena must 'command each person to whom it is directed . . . to produce and permit inspection and copying of designated books, documents or tangible things in the possession, custody or control of that person . . . .'"); *Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 1372954 (N.D. Tex. June 14, 2004) ("Rule 45(a) requires a person served with a subpoena to produce all responsive, non-privileged documents in his 'possession, custody or control.'"). *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (noting that "it is not necessary that the materials sought be in the physical possession of the non-party from whom discovery is sought").

"Control has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand." *Steele Software Systems Corp. v. DataQuick Information Systems, Inc.*, 237 F.R.D. 561 (D. Md. 2006); *see also Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960 (1980) (J. STEVENS concurring in part) (observing that "courts have rejected a narrow physical-possession test, focusing instead on whether the subpoenaed party has a legal right to custody or control of the documents in question"); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984) (noting that control is not defined as possession but rather as the legal right to obtain the

16

documents); *Hatfill v. New York Times Co.*, 242 F.R.D. 353 (E.D. Va. 2006) (noting that control is "defined as actual possession of a document or the legal right to obtain the document on demand"); *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (noting that "control" is broadly construed and that "it is not necessary that the materials sought be in the physical possession of the non-party from whom discovery is sought").

Accordingly, William Wagner is obligated to produce all responsive, non-privileged documents that are in his possession, custody or control.

## C.    William Wagner has Responsive Documents in his Possession, Custody or Control

William Wager certainly has certain documents responsive to the Subpoena in his possession, custody or control, despite his contention otherwise. This is evident due to William Wagner's unequivocal and intimate connection to BSI and Hypertouch. William Wagner is the father of Paul Wagner (President of BSI) and Joseph Wagner (principal of Hypertouch). Further, William Wagner owns the William Wagner Residence and the William Wagner Condo, where BSI purportedly maintains an office, which Paul Wagner has acknowledged in deposition testimony in a separate action.[27] In addition, Paul Wagner has acknowledged that a person residing at the Silver Springs property assisted BSI with the computers located there. Moreover, William Wagner has resided, and may continue to do so, at the William Wagner Condo where BSI purportedly maintains an office containing BSI servers. Furthermore, at least one IP address 71.126.148.133, which is associated with BSI and/or Hypertouch, was registered in William Wagner's name and is located at his Silver Springs property.[28]

Accordingly, William Wagner is certainly involved in the businesses of BSI and/or Hypertouch and thus, undoubtedly possesses or otherwise controls certain documents that are

---

[27] *See* Declaration, Exhibit G.

[28] *See* Declaration, Exhibit K; Exhibit 3.

responsive to the Subpoena. At a minimum, William Wagner, as the title owner to the William Wagner Residence, would unquestionably be in possession and/or control of documents evidencing (i) BSI's use of the property as a business, (ii) the lease arrangement, and any payments made thereto, between himself as owner of the property and BSI, (iii) those persons permitted to access the property, and (iv) all business or occupational licenses or permits for the property. In addition, because he had IP address associated with BSI and/or Hypertouch registered in his name, William Wagner clearly has possession and/or control over documents evidencing, among other things, ownership, possession, maintenance, disruption reports and operation of the same.

This material is certainly germane to the Maryland Action as it relates to the business operations of BSI and the legitimacy of BSI's alleged office at the William Wagner Residence and at the William Wagner Condo. As such, William Wagner should be compelled to comply with the Subpoena and produce responsive documents that are in his possession, custody or control. His one sentence, handwritten statement that he has no materials sought by World Avenue is clearly false, considering his connection to BSI and his ownership of two parcels of real property where BSI purports to maintain an office, and certainly evidences his failure to make a good faith attempt to locate responsive documents.

### D.    William Wagner Has Waived All Objections.

Moreover, as the time for objections to be filed has long since expired, William Wagner has waived any and all objections he may now concoct in response to the Subpoena. Pursuant to Rule 45(c)(2)(B), objections to a Subpoena "must be served before the *earlier* of the time specified for compliance or 14 days after the subpoena is served." *See* Fed. R. Civ. P. 45(c)(2)(B) (emphasis added). William Wagner never objected to the Subpoena to this date, and

thus, has waived all objections. *See In re Motorsports Merchandise Antitrust Litigation*, 186 F.R.D. 344, 350 (W.D. Va. 1999) (noting that "ordinarily, the failure to make timely objection to a subpoena duces tecum pursuant to this rule will waive any objection"); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44 (S.D.N.Y. 1996) (observing that "the failure to serve written objections to a subpoena within the time specified by Rule 45(c)(2)(b) typically constitutes a waiver of such objections"); *Tutor - Saliba Corp. v. U.S.*, 30 Fed. Cl. 155, 156 (Fed. Cl. 1993) (holding that "Rule 45(c)(2) implicitly requires that a motion to quash a subpoena be filed within fourteen days of service"); *see also Ultradent Products, Inc. v. Hayman*, 2002 WL 31119425 (S.D.N.Y. 2002) (observing that "objections or motions to quash are required to be served within 14 days of service of the Subpoena"); *In re Parikh*, 397 B.R. 518, 524 (Bankr. E.D.N.Y. 2008) (noting that "party subject to the subpoena may bring such a motion within fourteen days of service").

## V.    CONCLUSION

Based upon the foregoing, William Wagner should be compelled to comply with the Subpoena and produce the documents requested therein because the information requested is relevant to the subject matter of the Maryland Action and William Wagner has responsive documentation in his possession, custody or control.

**WHEREFORE,** World Avenue USA, LLC respectfully requests the entry of an Order compelling William Wagner's compliance with the Subpoena in accordance with its terms, and for such other and further relief that this Court deems just and proper

DATED:  October 19, 2009

Sanford M. Saunders, Jr. (D.C. Bar #376098)
Greenberg Traurig, LLP
2101 L Street, NW
Suite 1000
Washington, DC  20037
Tel. (202) 331-3100
Fax. (202) 331-3101
saunderss@gtlaw.com

*Counsel for Movant World Avenue USA, LLC*

<u>Of Counsel:</u>

Nicoleta Burlacu, Esq.
BurlacuN@gtlaw.com
*Admitted Pro Hac Vice in the Maryland Action*
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone:  202-331-3100
Facsimile:  202-331-3101

--and--

Kenneth A. Horky, Esq.
Florida Bar No. 691194
horkyk@gtlaw.com
John L. McManus, Esq.
Florida Bar No. 0119423
mcmanusj@gtlaw.com
*Admitted Pro Hac Vice in the Maryland Action*
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| BEYOND SYSTEMS, INC.      ) | |
|                   ) | |
|     Plaintiff           ) | |
|     v.                  ) | (Captioned Action Case No.PJM 08 cv 0921 |
|                   ) | pending in the U.S. District Court for the |
| WORLD AVENUE USA, LLC, et al. ) | District of Maryland) |
|     Defendants      ) | |

## <u>ORDER</u>

UPON CONSIDERATION of World Avenue USA, LLC's Motion to Compel William J. Wagner's Compliance With Subpoena Duces Tecum, and any response thereto, it is this _____ day of _____, _____, hereby,

ORDERED that WILLIAM J. WAGNER shall produce all responsive documents specified in the Motion within fourteen (14) days.

                                      _____
                                      Judge, U.S. District Court for the
                                      District of Columbia

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2009, a copy of the foregoing Movant World Avenue USA, LLC's Notice of Motion and Motion to Compel William J. Wagner's Compliance with Subpoena Duces Tecum was served on the following parties by first-class mail, postage prepaid:


Steven Wagner, Esq.
2522 Queen Annes Lane, NW
Washington, DC 20037

Steven Wagner, Esq.
International Finance Corporation
2121 Pennsylvania Ave, NW
Room F7K-326
Washington, DC 20433

*Counsel for William J. Wagner*

Józef S. Przygrodzki

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| BEYOND SYSTEMS, INC.     ) | |
|                         ) | |
|     Plaintiff          ) | |
|     v.                 ) | (Captioned Action Case No.PJM 08 cv 0921 |
|                         ) | pending in the U.S. District Court for the |
| WORLD AVENUE USA, LLC, et al. ) | District of Maryland) |
|     Defendants     ) | |
| _____ ) | |

## DECLARATION OF JOHN L. MCMANUS

I, JOHN L. MCMANUS, being of full age, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.      I am a shareholder in the law firm of Greenberg Traurig, P.A., counsel for World Avenue USA, LLC ("World Avenue") an action pending in the District of Maryland styled *Beyond Systems, Inc. v. World Avenue USA, LLC et al.*, Case No. PJM 08 CV 0921 ("Maryland Action"). I am licensed to practice law in the State of Florida, and have been admitted *pro hac vice* in the Maryland Action. I have personal knowledge of the following facts.

2.      True copies of the following documents are attached:

    (1)    A publicly-filed copy of the Amended Complaint without exhibits in the Maryland Action is attached as Exhibit A.

    (2)    Publicly-available records relating to property listed under an Owner named Paul A. Wagner retrieved at the website address https://www.taxpayerservicecenter.com/RP_Detail.jsp?ssl=0133%20%20 %20%200801 are attached as Exhibit B.

    (2)    Publicly-available records relating to a entity called Beyond Systems, Inc. retrieved on the Maryland Department of Assessments & Taxation website



at the website address http://sdatcert3.resiusa.org/UCC-Charter/ViewDoc.asp?Film=B%2000524&Folio=0497&Pages=0002&Date=06%2003%202003&Ack=1000361988463059&Domain=Charter&ID=D04552212&Name=BEYOND%20SYSTEMS,%20INC.&source=1 are attached as Exhibit C.

(3)    Excerpts of the production of documents made pursuant to Subpoena Duces Tecum served in the Maryland Action from The UPS Stores f/k/a Mailboxes, Etc. are attached as Exhibit D.

(4)    Publicly-available records at http://www.beyondsystems.net/spam_cases.html are attached as Exhibit E.

(5)    Publicly-available records filed in a separate action styled *Beyond Systems, Inc. v. Kraft Foods, Inc. et al.*, Civil Action No. PJM-08-409, pending in the District of Maryland, are attached as Composite Exhibits F, G, and H.

(6)    Publicly-available records relating to 1612 Sherwood Road, Silver Spring, Maryland 20902 at http://www.montgomerycountymd.gov/apps/OCP/Tax/taxSearchResult.asp?Pcode=01116453 are attached as Exhibit I.

(7)    Publicly-available records relating to 38 Maryland Ave, Unit 333, Rockville, MD 20850 located at http://www.montgomerycountymd.gov/apps/OCP/Tax/taxSearchResult.asp?Pcode=03593156 are attached as Exhibit J.

(8)    Excerpts of the production of documents made pursuant to Subpoena Duces Tecum served in the Maryland Action from Verizon are attached as Exhibit K.

(9)    Redacted documents designated Confidential by BSI in the Maryland Action are attached as Exhibit L.

(10)    Excerpts of the production of documents made pursuant to Subpoena Duces Tecum served in the Maryland Action from Network Solutions are attached as Exhibit M.

(11)    The Subpoena issued to Mr. Wagner (and Proof of Service) is attached as Exhibit N.

(11)    Mr. Wagner's response is attached as Exhibit O.

(12)    A letter seeking to resolve this matter is attached as Exhibit P.

(13)    Mr. Wagner's response is attached as Exhibit Q.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of October 2009 at Fort Lauderdale, Florida.

JOHN L. MCMANUS

## IN THE U.S. DISTRICT COURT FOR MARYLAND
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Beyond Systems, Inc.<br>9501 Anchorage Place<br>Bethesda, MD 20817 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 8:08-cv-00921-PJM |
| | * | |
| World Avenue U.S.A., LLC<br>successor by merger to Niutech, LLC<br>dba "TheUseful"<br>1613 NW 136th Avenue, Suite 100<br>Sunrise, FL 33323 | * | AMENDED COMPLAINT<br>AND JURY DEMAND |
| | * | |
| and | * | |
| | * | |
| World Avenue Holdings, LLC<br>1613 NW 136th Avenue, Suite 100<br>Sunrise, FL 33323 | * | |
| | * | |
| Serve: Corpdirect Agents, Inc.<br>515 East Park Avenue<br>Tallahassee, Florida 32301 | * | |
| | * | |
| Niuniu Ji<br>1613 NW 136th Avenue, Suite 100<br>Sunrise, FL 33323 | * | |
| | * | |
| and | * | |
| | * | |
| John Does 1-20 | * | |
| | * | |
| Defendants. | * | |

1



**AMENDED COMPLAINT**

Plaintiff BEYOND SYSTEMS, INC. ("BSI") files this Amended Complaint against

Defendants WORLD AVENUE U.S.A., LLC ("WAUSA") dba "TheUseful," successor by

merger to Niutech, LLC;  WORLD AVENUE HOLDINGS, LLC ("WAH"), NIUNIU JI ("JI"),

and JOHN DOES 1 THROUGH 20,  (collectively, "DEFENDANTS").

## I.    INTRODUCTION

1.    This action arises from the transmission of one or more unsolicited, commercial

electronic mail messages (hereinafter, "email") to the Plaintiff BSI in violation of the Maryland

Commercial Electronic Mail Act.  See Maryland Code Ann., Commercial Law §14-3001 et seq.

(hereinafter, "MD-CEMA") and the Florida Electronic Mail Communications Act, Florida

Statutes Annotated § 668.60 et seq. (hereinafter, "FL-CEMA").

## II.    THE PARTIES

2.    BSI is a corporation formed under the laws of the State of Maryland, and

maintaining its principal offices in Montgomery County, Maryland.  BSI is an "interactive

computer service provider" as defined under the MD-CEMA and an "interactive computer

service" as defined under FL-CEMA -- providing computer services and Internet access to

multiple users simultaneously.  Providers of Internet access and services, such as BSI, are known

as Internet Service Providers ("ISP").

3.    Defendant WAUSA is a limited liability company formed under the laws of

Delaware, and maintaining its principal business offices in Sunrise, Florida.  As a result of a

merger, WAUSA is the successor in interest to, and has assumed the liabilities of, NIUTECH,

LLC. WAUSA conducts business on a regular basis in Maryland.

    4.    Defendant WAH is a limited liability company formed under the laws of Florida,

and maintaining its principal offices in Sunrise, Florida. WAH conducts business on a regular

basis in Maryland.

    5.    Defendant JI is an individual residing in Sunrise, Florida. JI conducts business

on a regular basis in Maryland. Ji owns a controlling interest in, and exercises control over the

daily activities of, WAH and WAUSA and other entities through which he conducts business

with and for WAH and WAUSA, and conducts business on a regular basis in Maryland.

    6.    JI executed articles of merger as the sole representative for WAUSA and

NIUTECH, LLC. JI, and the entities controlled by JI, including WAUSA, WAH and some of

the JOHN DOE defendants to be identified specifically when their true names are known, are

referred to hereinafter in this Amended Complaint collectively as "WORLD AVENUE."

    7.    Defendants JOHN DOES 1 THROUGH 20 are persons, organizations, and/or

corporations who, along with the other Defendants, initiated, conspired in the initiation, or

assisted in the transmission of the emails at issue. The names, "JOHN DOES 1 THROUGH 20"

are fictitious. Plaintiff is now unaware of the true names of these defendants and will seek leave

to file another Amended Complaint alleging the true names of the John Doe Defendants once

ascertained. (Collectively, all the defendants in the present case will hereinafter be referred to as

"DEFENDANTS").

### III.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  Plaintiff is a resident of Maryland.  Defendant WAUSA is a limited liability company formed and existing under the laws of the State of Delaware;  Defendant WAH is a limited liability company formed and existing under the laws of the State of Florida, and Defendant JI is a resident of the State of Florida and regularly conducts business in the State of Maryland.  Plaintiff claims more than $75,000 in damages, exclusive of costs, interest and attorney's fees.

9.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(2), (3) and (c), as the events giving rise to the present claims occurred in the District of Maryland.

### IV.    UNSOLICITED, COMMERCIAL EMAIL

**A.    Unsolicited Commercial Email Unfairly Shifts the Cost Burden from Sender to Recipient.**

10.    Unsolicited advertising over the Internet is often referred to as "unsolicited commercial email" or "UCE," "unsolicited bulk email," "junk email," or "Spam."  See Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC, 388 Md. 1, 16 n. 12; 878 A.2d 567, 576 n.12 (quoting State v. Heckel, 143 Wn.2d 824, 24 P.3d 404, 406 n.1 (Wash. 2001)).

11.    The MD-CEMA defines "Commercial electronic mail" as "electronic mail that advertises real property, goods, or services for sale or lease."  See Maryland Code Ann., Commercial Law §14-3001(b)(1).

12.    The MD-CEMA prohibits the initiation of a transmission, any conspiracy to initiate a transmission, or any assistance of a transmission of commercial electronic mail that is

4

sent from a computer in the State or is sent to an email address is held by a resident of the State

and that (i) uses a third party's Internet domain name or email address without the permission of

the third party; (ii) contains false or misleading information about the origin of the transmission

path of the commercial email; or (iii) contains false or misleading information in the subject

line that has the capacity, tendency, or effect of deceiving the recipient. See Maryland Code

Ann., Commercial Law §14-3002(b).

13.    The FL-CEMA defines an "Unsolicited commercial electronic mail message" as

"any commercial electronic mail message that is not a transactional or relationship message and

is sent to a recipient without the recipient's affirmative or implied consent." See Florida Statutes

Annotated § 668.602(14).

14.    The State of Florida prohibits the initiation or the assistance in the transmission of

an unsolicited commercial electronic mail from a computer in the State or to an email address

held by a resident of the State that : (a) uses a third party's Internet domain name without

permission; (b) contains falsified or missing routing information or otherwise misrepresents,

falsifies, or obscures any information in identifying the point of origin or the transmission path of

the unsolicited commercial email message; (c) contains false or misleading information in the

subject line; (d) or contains false or deceptive information in the body of the message which is

designed and intended to cause damage to the receiving device of an addressee or of another

recipient of the message. See Florida Statutes Annotated § 668.603.

15.    Spam poses a serious threat to electronic communication over the Internet for

consumers and businesses because the messages are rife with deception and fraud. In 2003, the

5

Federal Trade Commission accurately estimated that about two-thirds of the spam analyzed

contained likely false claims in the "From:" line, "Subject:" line, or message text and nearly 85%

of the spam analyzed were deceptive on their face or advertised an illegitimate product. See

"National Do Not Email Registry: A Report to Congress." FTC, June 2004, p. 1 & n. 2,

available at http://www.ftc.gov/reports/dneregistry/report.pdf (last visited 12/21/08).

  16.  The FTC accurately stated the problem of Spam begins with the uniformly held

understanding that "spammers are essentially anonymous. The current email system enables

spammers to hide their tracks and thereby evade ISPs' anti-spam filters and law enforcement."

See id., p. 1 & section III (pp. 3-13).

  17.  In 2003, Congress accurately found that Spam accounted for over half of all

electronic mail traffic, up from an estimated 7 percent in 2001. See 15 USC § 7701(a)(2) (2003)

(CAN-SPAM Act). By 2007, notwithstanding the passage of the federal CAN-SPAM Act, the

amount of spam had risen to an estimated ninety to ninety-five percent of all email traffic. See

Exhibit 12, BARRACUDA NETWORKS, BARRACUDA NETWORKS SPAM REPORT at 4 (2007).

  18.  Such an enormous volume of unsolicited and unwanted email traffic places a

tremendous strain on resources, especially on private Internet Service Providers such as BSI. To

maintain the same level of service to its clients, ISP's must purchase more equipment, purchase

additional software, and hire more staff to handle the overwhelming volume of unsolicited and

unwanted email traffic to maintain the same level of service to its clients. These additional

maintenance costs are eventually passed on to ISP customers – both consumers and businesses –

in the form of higher costs and higher monthly access fees.

19.     In addition, recipients of unwanted spam often are required to bear additional costs for accessing their own email accounts when they connect remotely to their accounts using a network that charges for access on a per message or a per minute basis, which may occur when an individual uses a wireless network at a hotel, business, or residence.

20.     Spam represents an unwanted and non-consensual trespass by spammers into the email accounts and computers of recipients.  The flood of Spam can obscure legitimate email messages, which can be mistakenly filtered out as Spam, while deceiving recipients into opening an unsolicited email message disguised to appear legitimate.   In addition, Spam can actually prevent the delivery of legitimate email to a recipient by occupying valuable space in the computer's memory, impairing computer performance, or even rendering equipment inoperable.

21.     Most Spam contains or advertises offensive, fraudulent, and/or unlawful content such as pornography, prescription drugs, counterfeit software, counterfeit merchandise, bogus university degrees, fake gifts or pyramid schemes, while delivering and sometimes installing malicious viruses, spyware, or other software into the recipient's computer without their knowledge.

**B.     Recent Litigation.**

22.     On November 21, 2008, United States District Court Judge Fogel awarded the popular social networking site Facebook $ 873 million in damages from defendants Adam Guerbuez, a Canadian citizen, and his Internet marketing company, Atlantis Capital Blue.  After four months of litigation, the Court found that Guerbuez sent more than 4 million spam to subscribers of the website Facebook.  These Spam contained advertisements for products such as

marijuana, male enhancement pills, and sexually oriented material. Defendants were allegedly

able to complete the conspiracy by stealing logon names and passwords, and utilizing third

parties to transmit the messages. See Exhibit 13, Order, Facebook, Inc. v. Guerbuez, et al., Case

No. CO8003889 HRL (U.S. District Court, Northern District of California, November 10, 2008).

23.    On July 15, 2008, Adam Vitale of Brooklyn, New York was sentenced to 30

months imprisonment for his role in a conspiracy to send unsolicited commercial email over the

Internet to nearly 1.2 million subscribers of America Online during a six-day period in August

2005. In addition, Vitale was required to forfeit $ 183,000 in proceeds of his criminal activity.

According to Vitale's statements at sentencing, the defendant admitted to sending the spam

emails in a manner that deliberately obscured the origin of the emails, concealed defendant's

identity, and prevented recipients from tracing the spam and stopping it. See Exhibit 14, USDOJ

Press Release: "Brooklyn Man Sentenced to 30 months in Prison in Massive AOL Spam

Scheme."

24.    On October 12, 2007, the United States District Court for the District of Arizona

sentenced defendants Jeffrey Kilbride and James Schaffer to more than five years in prison for

organizing and running an international spamming business that grossed over $ 1 million. The

federal jury found defendants guilty of at least two counts of sending Spam using falsified header

information and domain names registered with materially false information. Defendants

admitted to earning a commission for each person they caused to subscribe to one of these web

sites. Defendants eventually moved their servers and equipment to Amsterdam, where they re-

routed their Spam to appear as if the messages originated abroad, when the messages were

8

actually being sent from Phoenix, Arizona. See Exhibit 15, USDOJ Press Release, October 12, 2007: "Two Men Sentenced For Running International Pornographic Spamming Business."

25.    Online advertiser ValueClick, Inc. paid a record $ 2.9 million to settle Federal Trade Commission ("FTC") charges that its advertising claims and emails were deceptive and violated federal law. The FTC alleged that ValueClick and its subsidiary Hi-Speed Media used deceptive emails, banner ads and pop-up advertisements to drive consumers to its websites. The emails and online advertisements claimed that consumers were eligible for "free" gifts, including laptops, iPods, and high-value gift cards. However, when consumers responded to the advertisements, the advertised items were not free and viewers were required to participate at their own expense to receive the promised "free" merchandise. See Exhibit 16A, FTC Press Release: "ValueClick to Pay $ 2.9 Million to Settle FTC Charges."

26.    Online advertiser Adteractive, Inc., agreed to pay a $ 650,000 civil penalty to settle FTC charges that it failed to disclose to consumers that they had to spend money to receive the "Free Gifts" advertised in its emails and websites. According to the FTC, Adteractive dba FreeGiftWorld.com and SamplePromotionsGroup.com, used deceptive spam and online advertising to lure consumers to its websites. The emails and online advertisements included inducements such as "Keep this Flat-Screen TV," and "Congratulations! Claim Your Choice of Sony, HP or Gateway Laptop." The FTC alleged that Adteractive lured customers to its websites using the promises of "Free" merchandise. However, customers desiring to claim their free merchandise were instead led through a maze of expensive and burdensome third-party offers.

9

See Exhibit 16B, FTC, "Major Online Advertiser Settles FTC Charges.  "Free" Gifts Weren't

Free; Settlement Calls for $650,000 Civil Penalty," Nov. 28, 2007.

<div align="center">

**V.    FACTUAL BACKGROUND**

</div>

**A.    PLAINTIFF BEYOND SYSTEMS, INC.**

27.    Under the Maryland Code, BSI is an "[i]nteractive computer service provider"

and under the Florida Code is an "[i]nteractive computer service."  BSI is also an information

service, system, and software provider enabling multiple users to access computer servers and a

variety of services simultaneously.

28.    BSI owns, operates, and maintains its computers and other equipment from its

multiple offices in Maryland.  As part of its services to clients, BSI operates specialized

computers with a dedicated connection to the Internet ("servers") that process email messages

and otherwise support its email services to multiple users at the same time.

**B.    WORLD AVENUE**

29.    JI, and the entities controlled by JI, including WAUSA, WAH and some of the

JOHN DOE defendants who initiated, transmitted, conspired to transmit, or assisted in the

transmission of Spam with JI and his companies in the events alleged herein, are referred to

hereinafter as "WORLD AVENUE."  See www.TheUseful.com.

30.    WORLD AVENUE has conducted business under many trade names, including

those compiled by the Florida Attorney General. See Exhibit 17, "News Release:  Internet

Company Sued for Deceptive Advertisements of "Free" Gifts." pp. 1-2.

<div align="center">

10

</div>

31.    The Better Business Bureau of Southeast Florida has also identified accurate information about NIUTECH, LLC, one of JI's companies and which later merged into WAUSA, listing various trade names, fictitious names, and domain names of Niutech, several of which appear in the emails at issue in this case.  See Exhibit 18, pp. 1-2.

32.    Exhibit 19 accurately depicts a San Francisco Chronicle article connecting "theUseful," a name that appears frequently in the emails at issue in this case, to WORLD AVENUE.

33.    Exhibit 20 shows the "Ripoff Report" for WORLD AVENUE, and accurately lists various Uniform Resource Locators ( or "URL's") and fictitious business names that the company uses, several of which appear in the emails at issue in this case.

**1.    Highly-Incentivized Lead Generation Business Model.**

34.    WORLD AVENUE is a large-volume participant in the highly incentivized lead generation industry.  See Exhibit 21;  see also Exhibit 22A. (http://www.theuseful.com/site/aboutus.html last visited December 21, 2008).

35.    WORLD AVENUE is a decentralized, online advertiser and marketer that generates business leads for its clients by hiring third party "affiliates" and/or "publishers" to drive traffic to its various websites and encouraging users to divulge their personal identifying information.  WORLD AVENUE is paid by its clients on a Cost Per Action basis ("CPA").  See Exhibit 21;  see also Exhibit 22B.

36.    In the emails at issue in this case, WORLD AVENUE targeted BSI'S personal information using Spam containing false and misleading claims and identifying information.

11

37.     For example, the most common identifier among the emails BSI received from Defendants promoted the trade name or domain name "Superbrewards." See Exhibit 23 (nearly 17,500 occurrences).

38.     In thousands of emails that Plaintiff received, WORLD AVENUE promoted the website located at the domain name "Superbrewards.com" using the promise of a "free laptop" or otherwise "Complimentary Laptop Computer." See Exhibit 24.

39.     Once at the website advertising the free product or merchandise, the consumer arrives at a landing page that is owned and operated by WORLD AVENUE. In order to collect the "free" gift, the consumer must provide personal information (name, address, email, credit card information) into a form.

40.     Once on the registration or survey path to qualify for the "free" gift, WORLD AVENUE required that the customer sign up for several different additional offers in order to qualify for the free item.

41.     However, as the investigators from the Florida Attorney General accurately noted, neither the "Program Details" nor "Terms and Conditions" sections found on WORLD AVENUE's websites associated with the "free" offers clearly disclosed important caveats to the promotions. See Exhibit 17, p.1.

42.     Rather, the Attorney General's Office accurately noted that WORLD AVENUE's disclaimers on its "free gift" or "free offer" websites should have stated that "every 'free' gift required the consumer to make one or more cash purchases, that the combined dollar amount of

12

purchases required to receive the gift could exceed the retail value of the 'free' gift" and that the "total cost necessary to obtain the 'free' gift should have also been disclosed." See id., p. 1.

43.     WORLD AVENUE then harvests the unsuspecting consumer's personal information to sell as a "lead."

44.     As the FTC has accurately noted, a list of active email addresses (not to mention street names and credit card numbers) would be a virtual "goldmine" for spammers and marketers alike.  Because there is no universal working directory of email addresses that are "born private," spammers cannot readily identify valid email addresses.  See Exhibit 22B.

### 2.     WORLD AVENUE Employs Third Party Marketing Agents to Send Spam on its Behalf

45.     WORLD AVENUE contracts with marketing agents ("affiliates" or "publishers") to send unlawful spam on its behalf advertising its various websites.  According to its Vice-President and General Counsel Homer Appleby, "The Useful is an Internet marketing company that promotes products and/or services to the consuming public through third party affiliate networks and e-mail marketing companies."  Exhibit 25.

46.     According to its website, WORLD AVENUE describes itself as a "Web-based marketing and technology company" and "[O]ne of the largest media buyers on the Internet" generating "3 million leads each month."  See Exhibit 22A.

47.     WORLD AVENUE provides the following services for its clients:  display/web advertising, lead generation marketing, email marketing, search engine marketing, and affiliate marketing.  See id.

### 3.     WORLD AVENUE Conducts Business Using Fictitious and/or Assumed Names to Conceal Its Identity.

13

48.    WORLD AVENUE conducts business using a number of fictitious or assumed

names, most of which are not registered to do business in the State of Maryland or Florida.

49.    WORLD AVENUE conducts business under hundreds of alternative domain

names and using identities not registered with the State of Maryland or Florida.

50.    By law, domain name registrars are required to keep and maintain a list of

registration and contact information for each domain name it registers.  This information is

available through a collectively maintained database known as "Whois."  See "Internet

Management:  Prevalence of False Contact Information for Registered Domain Names."  p. 23.

GAO Report to the Subcommittee on Courts, the Internet, and Intellectual Property, House of

Representatives, November 2005, available at http://www.gao.gov/new.items/d06165.pdf  (last

visited 12/21/08).

51.    Exhibit 26, shows true and correct copies of Whois queries and the results for a

sampling of the search terms listed in Exhibit 23, which appear in some of the emails at issue :

> *ConsumerIncentivePromotions.com* – 13900 Jog Road, Suite 203-251, Delray Beach, FL
> *eMarketResearchGroup.com* – 14545 J Military Trail #189, Delray Beach, FL
> *MyChoiceRewards.com* – 14545 J Military Trail #189, Delray Beach, FL
> *MyPremiumRewards.com* – 123 N. Congress Ave. #351, Boynton Beach, FL
> *NationalSurveyPanel.com* – 13900 Jog Road, Suite 203-251, Delray Beach, FL
> *YourSmartRewards.com* – 123 N. Congress Ave. #351, Boynton Beach, FL
> *SuperbRewards.com* – 123 N. Congress Ave. #351, Boynton Beach, FL
> *ExclusiveGiftCards.com* -- 13762 W. SR. 84, Suite 612, Davie, FL 33325

52.    Each of the domain names listed above, and the websites hosted at the Uniform

Resource Locator addresses or ("URL's"), belong to WORLD AVENUE.

14

53.     The "Terms and Conditions" hyperlinks of the websites listed above are identical in content, form, and trade dress, having the same colors, fonts, and text.

54.     The websites listed above are maintained and operated by a company called "Net Radiance", which is referenced in the "Terms and Conditions" section of each of these websites. Exhibit 27 shows true and correct copies of these Terms and Conditions.

55.     According to the Florida Secretary of State, Net Radiance LLC is an inactive limited liability company, owned by Niupercent, Inc. Exhibit 28 shows a true and correct copy of registration information regarding Net Radiance LLC from the Florida Secretary of State.

56.     Niupercent, Inc. owns WAH. Exhibit 29 shows a true and correct copy of information on World Avenue Holdings LLC from the Florida Secretary of State. World Avenue Holdings LLC, in turn, owns Defendant World Avenue U.S.A. LLC. Exhibit 30.

57.     Links on the *SuperbRewards.com* website redirect to *TheUseful.com*, and images appearing on the *SuperbRewards.com* website are actually hosted on *TheUseful.com*. Exhibit 31 shows a true and correct copy of the image properties of an image appearing on *SuperbRewards.com*.

58.     In June 2007, the *San Francisco Chronicle* published an article accurately describing WORLD AVENUE's tangled web of corporate ownership, as well as the corporate interrelationships between the entities in that web. See Exhibit 19.

**4.      WORLD AVENUE is Non-Compliant with Advertising Laws and Ethical Guidelines.**

59.     In August 2007, the Florida Attorney General sued WORLD AVENUE for its false advertising and deceptive business practices stemming from the company's Internet

15

marketing practices, including the use of spam in the manner alleged in this Amended Complaint

See Exhibit 17, Office of the Attorney General of Florida: "Internet Company Sued for

Deceptive Advertisements of "Free" Gifts."

60.   In January 2008, WORLD AVENUE settled the lawsuit with the State of Florida

for $ 1 Million.  See press release, McCollum's CyberFraud Task Force Reaches $1 Million

Agreement with Company over Internet Marketing Guidelines.  See Exhibit 32.

61.   In August 2007, the Direct Marketing Association published an accurate list of

advertisers who were not in compliance with its Guidelines for Ethical Business Practice.  This

list included the website "ExclusiveGiftCards.com," which is operated by WORLD AVENUE

and which uses the same operating address and telephone numbers as the call centers listed for

the domain names above.  This information is confirmed by the Florida Secretary of State.  See

Exhibit 33, "DMA Ethics Committees Call Attention to Non-Compliant Companies."

## C.   THE EMAILS AT ISSUE

62.   Between July 20, 2004 and September 3, 2005, Plaintiff received on its computer

servers in Maryland over 68,000 commercial electronic mail messages promoting products or

services offered by World Avenue and its agents.  Since July 3, 2005 Plaintiff has received

thousands of additional emails from WORLD AVENUE.

63.   As used herein, the term, "EMAILS AT ISSUE" means the unsolicited

commercial emails that Plaintiff received from WORLD AVENUE, including all emails received

up to the date of the entry of any final, non-appealable judgment. .

64.    BSI did not solicit or opt-in to receive any of the EMAILS AT ISSUE.  Plaintiff gave no direct or indirect consent to receive commercial email from Defendants, and had no business relationship with Defendants, its affiliates, or agents.

65.    Some of the EMAILS AT ISSUE are attached to the original Complaint as Documents 1-2, 1-3, 1-4 and 1-5, and are reproduced and attached hereto as Exhibit 34A, 34B, 34C, and 34D.

66.    Between July 20, 2004 and September 3, 2005, BSI received at least 68,300 emails from DEFENDANTS.  Of those emails, BSI received 61,543 emails between April 11, 2005 and September 3, 2005.

67.    The 68,300 EMAILS AT ISSUE to date promote WORLD AVENUE's numerous trade names and domain names; contain hyperlinks that direct the recipient to websites controlled by WORLD AVENUE or its agents, and/or contain hyperlinks that direct the recipient to web servers containing image or text files provided by WORLD AVENUE.

68.    Exhibit 23 is an Affidavit of Paul A. Wagner accurately listing the trade names and/or domain names of WORLD AVENUE that appeared in the EMAILS AT ISSUE identified to date and stating the number of emails containing each name.  Each of these names identifies with a unique website or domain name that belongs to WORLD AVENUE.

69.    Defendant JI directed, participated in, stood to derive revenue, and actually derived revenue, as a result of the transmission of the EMAILS AT ISSUE.  JI communicated with the managing agents and employees of WORLD AVENUE, and those entities under contract to him, on each of the dates of transmission of the EMAILS AT ISSUE, beginning on or

before July 20, 2004 and continuing up to the present, in furtherance of the campaigns to transmit those emails.

70.     These communications occurred via email, text message and telephone. JI sent and received funds to and from these entities and persons, pertaining to the email campaigns. JI also directed others to conduct the activities alleged in this paragraph on his behalf, and in his stead, and ratified those activities by endorsing, approving and confirming them afterward.

## VI.    **FALSITY AND DECEPTION**

71.     The EMAILS AT ISSUE sent by the Defendants have multiple elements of falsified, misrepresented, and forged information contained in or accompanying the email headers. These categories correspond directly to conduct prohibited in the MD-CEMA and the FL-CEMA. These categories are as follows :

- Deceptive Subject Lines
- Deceptive Sender Names
- Falsely Registered Sending Domain Names
- Deceptive Information about Origin or Transmission Path in Message Body
- Forged Mailserver Information

**A.    Deceptive Subject Lines**

72.     The Federal Trade Commission accurately reported that of the Spam containing signs of falsity in the "Subject:" line, nearly one-third contained a line that bore no relationship to the content of the message and nearly forty-two percent misrepresented that there was a personal or business relationship with the recipient. See "False Claims in Spam: A report by the FTC's Division of Marketing Practices." FTC, April 30, 2003, p. 6, available at http://www.ftc.gov/reports/spam/030429spamreport.pdf (last visited 12/21/08).

18

73. In addition, DEFENDANTS' emails contained false and/or misleading information in the subject lines, including that which has the capacity, tendency, or effect of deceiving the recipient. This includes, for example, "win a free gift card" when a purchase is required. The subject lines of Defendants' emails were designed by Defendants and/or their agents in attempt to deceive the recipient. (See Exhibit 34C.)

74. DEFENDANTS' failure to include any caveats to the use of the word "free" in the subject line is blatantly deceptive.

75. The Federal Trade Commission has created specific guidelines for advertisers' use of the word "free." See Exhibit 35.

76. To avoid falsity or deception, any contingencies to the "Free" offer should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. See Federal Trade Commission, FTC Guide Concerning Use Of The Word "Free" And Similar Representations 16 C.F.R. § 251.1(c), available at http://www.ftc.gov/bcp/guides/free.htm.

77. The FTC's general rules are expressly applicable to the Internet and email advertising. See Federal Trade Commission, Dot Com Disclosures at *5, available at http://www.ftc.gov/bcp/edu/pubs/business/ecommerce/bus41.pdf

**B.    Deceptive Sender Names**

78. DEFENDANTS used fictitious names and/or used email addresses from individuals without their permission in the EMAILS AT ISSUE.

79.     In addition, the EMAILS AT ISSUE contained false and/or misleading header information in the "From:" line about the origin and/or the transmission path of the email because each email contained one or more fictitious, false and/or misleading names and/or email addresses in the "From:" lines. For example, Exhibit 36B falsely states that the email was sent from "Sam's Club".

80.     On April 14, 2005, WORLD AVENUE sent hundreds of emails to BSI promoting a "free gift card" on behalf of Consumer Incentive Promotions purporting to be from over 500 different people. Exhibit 34C is one such email. The "From:" line in each message contained a unique and random display name (a.k.a. quoted name) that was gibberish.

81.     By varying the domain names where it appears that an email originates, DEFENDANTS could avoid spam filters that may focus on bulk mailings while increasing the chance that the Spam will reach its intended audience.

82.     Exhibit 34C indicates that the sender used a computer at IP address 204.13.17.33, but the machine at that address incorrectly identified itself as "mailpool.jriad.info," which the bulk emailer's own DNS server confirmed did not resolve to that IP address. This false identification masks the identity of the sender of the emails and prevents the recipient from finding or contacting the sender.

**C.    Falsely Registered Sending Domain Names**

83.     DEFENDANTS and/or their agents sent "Incentive Awards" emails to Plaintiff BSI that included domain names which were registered to false and/or non-existent entities, as well as entities using false addresses and/or false telephone numbers.

84.    DEFENDANTS registered hundreds of throw-away domain names in order to
send the EMAILS AT ISSUE to BSI.  DEFENDANTS also used fake names, addresses and/or
proxy services in the Whois Registry for the domain to conceal its identity.

85.    The URL combinations used in the thousands of EMAILS AT ISSUE redirect to
websites controlled by WORLD AVENUE.

**D.    Deceptive Information about Origin or Transmission Path in Message Body**

86.    The EMAILS AT ISSUE contained false or misleading information about the
origin or the transmission path of the commercial electronic mail in the message body itself.
Some of the EMAILS AT ISSUE falsely claim prior relationships with the recipient and/or that
the recipient had requested the email.  For example, Exhibit 34A,  falsely states in part that "you
were a official member of one of our range of online services."

87.    Exhibit 34C states the following in the message body:  "If you no longer wish to
receive Consumer Incentive Promotions emails, ... write us at: Consumer Incentive Promotions,
14545 J Military Tr. #189, Delray Beach, FL 33484, USA."  This implies that Plaintiff once
wished to receive Consumer Incentive Promotions emails, which is false.

88.    In addition, "Consumer Incentive Promotions" is not a corporate or trade name
recognized by the state of Florida.

**E.    Forged Mailserver Information**

89.    Standard email transmission protocol requires that the HELO/EHLO line in the
email headers identify the sending mailserver domain name.  See Exhibit 36, "National Do Not

21

Email Registry: A Report to Congress." FTC, June 2004, Section III (pp. 3-13), available at http://www.ftc.gov/reports/dneregistry/report.pdf (last visited 12/21/08).

90.    When an email arrives, the transmitting computer sends a "HELO," which is a parameter typically showing the computer's name and/or IP address so as to identify to the recipient computer who is sending the email and where it came from.  In the case of thousands of these emails, the identities of the transmitting computers given in the HELO did not match the IP addresses of the transmitting computers.

91.    One example of falsity is shown in Exhibit 34A, in which the sender of the email used a computer at IP address 63.243.148.219.  The sending machine identified itself as "PRODUCTTESTERSWEWANT.INFO", which DEFENDANTS' own DNS server confirmed resided at a completely different IP address.  This false identification was designed to mask the identity of the sender of the emails and to make it more difficult, if not impossible, to find or contact the sender.

92.    Plaintiff alleges the EMAILS AT ISSUE contained false and/or misleading header information about the origin or the transmission path of the email.  This includes, for example, that the email arrived at BSI's servers containing or accompanied by false information concerning the identities of the computers sending the emails.

## VII.    MD-CEMA

93.    DEFENDANTS violated the Maryland Commercial Electronic Mail Act, (MD-CEMA) §14-3001 et seq. of the Commercial Law Article of the Annotated Code of Maryland,

by initiating, conspiring to initiate, and/or assisting in the transmission to Plaintiff BSI of

commercial electronic mail having one or more of the following characteristics:

> i)    used a third party's Internet domain name or electronic mail address
>
> without that third party's permission;
>
> ii)    contained false or misleading information about the origin of the email or
>
> the path by which the email was transmitted; or;
>
> iii)    contained false or misleading information in the subject line.

94.    The false or misleading information in the electronic mail messages had the

capacity, tendency, or effect of deceiving the recipient.

95.    DEFENDANTS initiated, conspired to initiate, and/or assisted in the transmission

of the emails at issue to recipients in Maryland, including Plaintiff.

96.    The EMAILS AT ISSUE advertised property, goods or services for sale or lease,

to person in Maryland.  DEFENDANTS derived substantial revenue as a result of these email

messages to recipients in Maryland.  By this conduct, DEFENDANTS solicited sales and

conducted business in Maryland on a regular basis, engaged in a persistent course of conduct in

Maryland, and availed themselves of the protection of the laws of this State.

97.    DEFENDANTS planned, prepared, designed, executed, approved, modified,

condoned and ratified the sending of the emails referenced above.

98.    DEFENDANTS paid others for services related to the transmissions, and

received payment from advertisers and others for DEFENDANTS' services related to the

transmissions.  DEFENDANTS, either directly or indirectly, caused products and services to be

sold and/or delivered as a result of the transmissions. DEFENDANTS tracked the results of the

transmissions and all related services, sales and commissions. All of these activities generated

records that identify the participants in these activities, and the related times, dates, quantities

and payment amounts.

99.     All of the conduct alleged above was performed either directly by

DEFENDANTS or by persons acting as their agents. All persons who participated in the events

alleged above acted as agents for Defendants. All DEFENDANTS (including Does 1-20)

authorized, participated in, acquiesced to, consented to and/or were the agents of the other

DEFENDANTS in the acts alleged, and initiated, conspired, assisted, participated in, or

otherwise encouraged the conduct alleged in furtherance of one or more conspiracies to initiate

the emails. The transmissions of the emails identified herein were actions that each of the

DEFENDANTS authorized, controlled or directed, or had the ability to authorize, control or

direct, and were actions for which each of the DEFENDANTS is liable.

100.     As a recipient of the emails at issue, under MCEMA §14-3003(1) Plaintiff BSI is

entitled to the greater of $ 500 per violation or actual damages, plus attorney's fees and costs. As

an interactive computer service provider, under §14-3003(3) Plaintiff is entitled to the greater of

$1,000 per violation or actual damages, plus attorney's fees and costs.

## VIII.  FL-CEMA

101.     FL-CEMA provides in relevant part as follows:

**668.603 Prohibited activity.**

A person may not:

(1)     Initiate or assist in the transmission of an unsolicited commercial electronic mail message from a computer located in this state or to an electronic mail address that is held by a resident of this state which:

    (a)     Uses a third party's Internet domain name without permission of the third party;

    (b)     Contains falsified or missing routing information or otherwise misrepresents, falsifies, or obscures any information in identifying the point of origin or the transmission path of the unsolicited commercial electronic mail message;

    (c)     Contains false or misleading information in the subject line; or

    (d)     Contains false or deceptive information in the body of the message which is designed and intended to cause damage to the receiving device of an addressee or of another recipient of the message. However, this section does not apply to electronic mail messages resulting from or created by a computer virus which are sent or retransmitted from a computer or other electronic device without the senders knowledge or consent.

\*     \*     \*

668.606 Remedies.

\*     \*     \*

(3)     A prevailing plaintiff in an action filed under this part is entitled to:

    (a)     An injunction to enjoin future violations of s. 668.603.

    (b)     Compensatory damages equal to any actual damage proven by the plaintiff to have resulted from the initiation of the unsolicited commercial electronic mail message or liquidated damages of $500 for each unsolicited commercial electronic mail message that violates s. 668.603.

    (c)     The plaintiffs attorneys fees and other litigation costs reasonably incurred in connection with the action.

**Violations of Section 668.603.**

(1)     A violation of s. 668.603 shall be deemed an unfair and deceptive trade practice within the meaning of part II of chapter 501. In addition to any remedies or

penalties set forth in that part, a violator shall be subject to the penalties and remedies provided for in this part.

(2)     The remedies of this part are in addition to remedies otherwise available for the same conduct under federal or state law.

102.     The allegations in the preceding paragraphs of this complaint are hereby incorporated by reference.

103.     DEFENDANTS violated FL-CEMA by initiating or assisting in the transmission of unsolicited commercial electronic mail messages, including the emails at issue, from computers located in Florida. Each of these emails contained falsified or missing routing information or otherwise misrepresented, falsified or obscured information in identifying the point of origin or the transmission path of the unsolicited commercial electronic mail message; and contained false and misleading information in the subject lines, and contained false and deceptive information in the body of the messages, designed and intended to cause damage to the receiving device of an addressee or of another recipient of the message.

104.     In particular, DEFENDANTS caused email messages to be sent as described in the preceding paragraphs of this complaint.

### IX.     COUNTS

#### Count I - MCEMA

105.     The allegations above are incorporated by reference.

106.     DEFENDANTS initiated, conspired in the initiation, and assisted in the transmission, of the EMAILS AT ISSUE in this suit.

#### Count II - FL CEMA

26

107.    The allegations above are incorporated by reference.

108.    DEFENDANTS initiated, conspired in the initiation, and assisted in the transmission, of the EMAILS AT ISSUE in this suit.

## PRAYER FOR RELIEF

Plaintiff seeks judgment as follows:

A.    against all DEFENDANTS, jointly and severally, under §14-3003(1) of MD-CEMA, Plaintiff BSI seeks judgment in the amount of $ 500 for each of the commercial electronic mail messages at issue, in an aggregate amount of not less than Thirty-Four Million Dollars ($34,000,000);

B.    against all DEFENDANTS, jointly and severally, under §14-3003(3) of MD-CEMA, Plaintiff BSI seeks judgment in the amount of $1,000 for each of the commercial electronic mail messages at issue, in an aggregate amount of not less than Sixty-Eight Million Dollars ($68,000,000), in addition to the damages sought in paragraph (a) above;

C.    Plaintiff seeks an order enjoining DEFENDANTS under Md. Code Ann., Com. Law. MD-CEMA from making any false or misleading statements in commercial emails, and from engaging in any further conduct in violation of MD-CEMA.

D.    Under MD-CEMA, against all DEFENDANTS, Plaintiff BSI seeks an award of attorney's fees, and the reasonable costs of this litigation.

E.    against all DEFENDANTS, jointly and severally, under FL-CEMA, Plaintiff BSI seeks judgment in the amount of $ 500 for each of the commercial electronic mail messages at

27

issue, in an aggregate amount of not less than Thirty-Four Million Dollars ($34,000,000), in addition to the damages sought in the paragraphs above;

      F.    Plaintiff seeks an order enjoining DEFENDANTS under FL-CEMA 668.606(3)(a) from making any false or misleading statements in commercial emails, and from engaging in any further conduct in violation of FL-CEMA.

      G.    Under FL-CEMA, against all DEFENDANTS, Plaintiff BSI seeks an award of attorney's fees, and the reasonable costs of this litigation.

      H.    Plaintiff BSI seeks damages for any continuing violations up to the time of entry of judgment, not limited to the quantities of violations known as of the filing of this complaint, and such other and further relief as the Court deems appropriate.

                Respectfully submitted,

_____/s/_____           ____12/22/08____
Stephen H. Ring                    Date
**STEPHEN H. RING, P.C.**
20300 Seneca Meadows Parkway, Suite 200
Germantown, Maryland 20876
MD Bar Id. No. 04731764; USDC, MD: #00405
Telephone: 301-540-8180

_____/s/_____           ____12/22/08____
Michael S. Rothman               Date
401 E. Jefferson Street
Suite 201
Rockville, MD 20850
Phone: (301) 251-9660
Fax: (301) 251-9610

*Attorneys for Plaintiff*

28

**Jury Demand**

Plaintiff requests a trial by jury as to all issues so triable.

<div align="center">

/s/
_____
Michael S. Rothman

</div>

**EXHIBITS LIST**

Exhibit 12 -    BARRACUDA NETWORKS, BARRACUDA NETWORKS SPAM REPORT at 4 (2007).

Exhibit 13 -    Order in Facebook, Inc. v. Guerbuez, et al., Case No. CO8003889 HRL (U.S. District Court, Northern District of California, November 10, 2008).

Exhibit 14 -    USDOJ Press Release: "Brooklyn Man Sentenced to 30 months in Prison in Massive AOL Spam Scheme."

Exhibit 15 --   USDOJ Press Release, October 12, 2007: "Two Men Sentenced For Running International Pornographic Spamming Business."

Exhibit 16A -- FTC Press Release: "ValueClick to Pay $ 2.9 Million to Settle FTC Charges."

Exhibit 16B -- FTC, "Major Online Advertiser Settles FTC Charges. "Free" Gifts Weren't Free; Settlement Calls for $650,000 Civil Penalty," Nov. 28, 2007.

Exhibit 17 -    "News Release:  Internet Company Sued for Deceptive Advertisements of "Free" Gifts." pp. 1-2.

Exhibit 18 -    Better Business Bureau Company Report for Niutech, LLC listing alternative dba's.

Exhibit 19 -    Lazarus, David, "No Such Thing as a free laptop."  San Francisco Chronicle, June 15, 2007

Exhibit 20 --   RipOff Report on World Avenue, listing URLs and fictitious business names.

Exhibit 21 --   Royal Bank of Canada Capital Markets report on ValueClick & Lead Generation, April 26, 2007.

Exhibit 22A -- http://www.theuseful.com/site/aboutus.html, captured on 12/19/2008.

Exhibit 22B – FTC, Report to Congress, "A CAN-SPAM Informant Reward System," Sept. 2004, excerpt.

Exhibit 23 --   Affidavit of Paul A. Wagner Regarding Count of Emails Containing Certain Business Names and Domain Names, Dec. 22, 2008.

Exhibit 24 --   www.SuperbRewards.com and other World Avenue destination web pages (landing pages).

Exhibit 25 --   Declaration of Homer Appleby, Esq., Oct. 19, 2006.

Exhibit 26 -   Whois registration lookups of World Avenue domain names, June 2007.

Exhibit 27 –   Terms Of Service of World Avenye web sites, April 19, 2007.

Exhibit 28 –   Florida Secretary of State corporate listing for Net Radiance LLC, 12/19/2008.

Exhibit 29 --   Florida Secretary of State corporate listing for World Avenue Holdings, LLC, 12/19/2008.

Exhibit 30 --   Florida Secretary of State corporate listing for World Avenue U.S.A., LLC, 12/19/2008.

Exhibit 31 --   www.superbrewards.com image refers to theuseful.com, 6/19/2007.

Exhibit 32 –   Florida Attorney General, "McCollum's CyberFraud Task Force Reaches $1 Million Agreement with Company over Internet Marketing Guidelines," January 16, 2008.

Exhibit 33 --   DMA publication, "DMA Ethics Committees Call Attention to Non-Compliant Companies," August 28, 2007.

Exhibit 34A -- sample spam--$250 gift card--prefer Startbucks or Dunkin Donuts.

Exhibit 34B -- sample spam--Sams Club gift card.

Exhibit 34C -- sample spam--$250 gift card--prefer Startbucks or Dunkin Donuts.

Exhibit 34D -- sample spam--Target Gift Card.

Exhibit 35 --    "FTC Guide Concerning Use of the Word "Free" and Similar Representations,"
                 (38 Stat. 717, as amended; 15 U.S.C. 41 - 58), [36 FR 21517, Nov. 10, 1971].

Exhibit 36 --    FTC, "National Do Not Email Registry -- A Report to Congress," June 2004.

District of Columbia Property Detail

| DC HOME | DC GRADE | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT |

District of Columbia    Adrian M. Fenty 

CFO HOME

**TAXPAYER SERVICE CENTER**

**REAL PROPERTY SERVICES**
Property Tax Bills
Property Tax Rates and Calculation
Property Assessment Process
Property Assessment Appeals
Tax Relief Credits
Search Real Property Sales Database
Search Real Property Assessment Database

CFO / OTR Search

## Property Detail

**Address:** 1837 R ST NW
**SSL:** 0133 0801

### Record Details

| | | | |
|---|---|---|---|
| Neighborhood: | OLD CITY II | Sub-Neighborhood: | D |
| Use Code: | 11 - Residential-Row-Single-Family | Class 3 Exception: | No |
| Tax Type: | TX - Taxable | Tax Class: | 001 - Residential |
| Homestead Status: | ** Currently receiving the Homestead Deduction*. | | |
| Assessor: | REGINALD JACKSON | | |
| Gross Building Area: | | Ward: | 2 |
| Land Area: | 2,000 | Triennial Group: | 2 |

### Owner and Sales Information

| | |
|---|---|
| Owner, Name: | PAUL A WAGNER |
| Mailing Address: | 1837 R ST NW; WASHINGTON DC20009-1803 |
| Sale Price: | $645,000 |
| Sale Date: | 03/01/2000 |
| Instrument No.: | 20242 |

### Tax Year 2010 Preliminary Assessment Roll

| | Current Value | Proposed New Value (2010) |
|---|---|---|
| Land: | $446,440 | $448,960 |
| Improvements: | $1,307,540 | $1,255,470 |
| Total Value: | $1,753,980 | $1,704,430 |
| Taxable Assessment: | $777,167 | $854,884 |

* Taxable Assessment after Tax Assessment Credit and after $67,500 Homestead Credit, if applicable. (Click here for more information).

** This property is currently receiving tax relief through the Homestead deduction program. If you are not domiciled in the District or the property is not your principal place of residence, you are obligated to inform the Office of Tax and Revenue. This can be done by accessing the link below and completing the necessary form and returning it per the instructions. You may also write to the Office of Tax and Revenue, Real Property Administration, P.O. Box 176, Washington, DC 20044. For additional information regarding the Homestead program, call (202)727-4TAX. Click here to download the Homestead Deduction and Senior Citizen Tax Relief cancellation application *

**View Tax Information | View Property Features | View Payments**

https://www.taxpayerservicecenter.com/RP_Detail.jsp?ssl=0133%20%20%20%200801    7/27/2009



District of Columbia: Property Detail

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by
Topic | Agencies | DC
Council | Search |
Elected Officials

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Feedback | Translation
| Accessibility | Privacy
& Security | Terms &
Conditions

# CORPORATE CHARTER APPROVAL SHEET
## ** EXPEDITED SERVICE **          ** KEEP WITH DOCUMENT **

DOCUMENT CODE __80__     BUSINESS CODE _____

# __D9455232/2__

Close _____     Stock _____     Nonstock _____

P.A. _____     Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

_____

ID # D04552212 ACK # 1000361988463059
LIBER: B00924 FOLIO: 0497 PAGES: 0002
BEYOND SYSTEMS, INC.

06/03/2003  AT 03:24 P WO # 0000748413

New Name _____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | _10_ |
| Org. & Cap. Fee: | _____ |
| Expedite Fee: | _50_ |
| Penalty: | _____ |
| State Recordation Tax: | _____ |
| State Transfer Tax: | _____ |
| _____ Certified Copies | |
| Copy Fee: | _____ |
| _____ Certificates | |
| Certificate of Status Fee: | _____ |
| Personal Property Filings: | _____ |
| Other: | _____ |
| TOTAL FEES: | _60_ |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name _____
_____

_____ Other Change(s) _____
_____

Credit Card __/__     Check _____     Cash _____

_____ Documentation _____ Checks

Approved By: __Who 013__

Keyed By: _____

COMMENT(S):

Code _____

Attention: _____

Mail to Address:

_Alton Burton_
_9501 Anchorage Pl._
_Bethesda Md_
_20817_



Stamp Work Order and Customer Number (1181xx)

CUST ID: 0001130014
WORK ORDER: 0000748413
DATE: 06-05-2003 08:33 AM
AMT. PAID: $60.00

Jun 03 03 03:24p    ARLENE SHAFFER    (202)  14-8244    p.2

This Form is Used by Entity. The Fee is $10.00.

## RESOLUTION TO CHANGE PRINCIPAL OFFICE OR RESIDENT AGENT

The directors/stockholders/general partner/authorized person of __Beyond Systems, Inc.__

_____

(Name of Entity)

organized under the laws of __Maryland_____, passed the following resolution:

(State)

### [CHECK APPLICABLE BOX(ES)]

☒ The principal office is changed from:  (old address)

4612 Sherwood Road

Silver Spring, MD 20902

to:  (new address) _P.V._     *Beyond System's*
11160 Veirs Mill Road     *New telephone number: (301) 933-8070*     ✓
Suite LL-1000
Wheaton, MD 20902

☒ The name and address of the resident agent is changed from:

Paul A. Wagner
4612 Sherwood Road
Silver Spring, MD 20902

to:
Alton K. Burton, Esq.     ✓
9501 Anchorage Place
Bethesda, MD 20817

I certify under penalties of perjury the foregoing is true.

_____

Paul A. Wagner, Secretary or Assistant Secretary
General Partner
Authorized Person

I hereby consent to my designation in this document as resident agent for this entity.

SIGNED _____
Alton K. Burton, Esq., Resident Agent

Mail to: State Department of Assessments & Taxation, 301 W. Preston St., Room 801, Baltimore, MD 21201

Beyond Systems.max

6/28/06:               Beyond Systems, Inc.'s (Box L15-1000)

Please forward mail to: ~~⬤~~

Paul Wagner
1837 R Street, NW
Washington, DC 20009

~~⬤~~

Thanks,
Paul A. Wagner
tel: 301-933-8070

Paid 1        2/1/2008,    $ 120 °°   · ·d
              5/1/2009    finished



See Privacy Act Statement on Reverse

1. Date  2/6/2003

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of Form 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable postal rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| | |
|---|---|
| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate Form 1583 for EACH applicant. Spouses may complete and sign one Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*  BEYOND SYSTEMS, Inc. | 3. Address to Be Used for Delivery (include ZIP + 4  11160 Veirs Mill Rd. L-15   1000  Wheaton, Maryland 20902 |
| 4. Applicant Authorizes Delivery to and in Care of *(Name, address, and ZIP Code of agent)*  Mail Boxes Etc.  11160 Veirs Mill Rd. L-15  Wheaton, Maryland 20902 | 5. This Authorization is Extended to Include Restricted Delivery Mail for the Undersigned(s)   Yes, unless I notify to the contrary (mailbox, etc.) ahead of time |
| 6. Name of Applicant  PAUL WAGNER | 7. Applicant Home Address *(Number, street, city, state, and ZIP Code)*  1837 R Street NW  Washington DC 20009  Telephone Number ( 301 ) 351-3668   #1000 |
| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.  a.  DC Drivers License  b.  Visa Card | 9. Name of Firm or Corporation  Beyond Systems Inc. |
| | 10. Business Address *(Number, street, city, state and ZIP Code)*  Forward to Home   Telephone Number (    ) |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university or recognized corporate identification card; passport or alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 11. Kind of Business  Technology Consulting |
| 12. If Applicant is a Firm, Name Each Member Whose Mail is to Be Delivered. *(All names listed must have verifiable identification. A guardian must list the names and ages of minors receiving mail at their delivery address.)* | |

| | |
|---|---|
| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If Business Name of The Address *(Corporation or Trade Name)* Has Been Registered, Give Name of County and State, and Date of Registration. |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties). *(18 U.S.C. 1001)*

| | |
|---|---|
| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)*  Paul Wagner |

PS Form **1583**, August 2000 *(Page 1 of 2)*                This form on Internet at www.usps.com

** TX STATUS REPORT **       AS OF   MAY 19 2006 12:31   PAGE.01

UPS STORE

| | DATE | TIME | TO/FROM | MODE | MIN/SEC | PGS | CMD# | STATUS |
|---|---|---|---|---|---|---|---|---|
| 29 | 05/19 | 12:31 | 12403316407 | EC--S | 00'39" | 001 | 056 | OK |

## Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

**1. Date** 2/6/2003

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of Form 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable postal rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

**2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent.** (Complete a separate Form 1583 for EACH applicant. Spouses may complete and sign one Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)

BEYOND SYSTEMS, INC.

**3. Address to Be Used for _____ 4**
11160 Veirs Mill Rd. L-15 ___ 000
Wheaton, Maryland 20902

**4. Applicant Authorizes Delivery to and in Care of** (Name, address, and ZIP Code of agency)
Mail Boxes Etc.
11160 Veirs Mill Rd. L-15
Wheaton, Maryland 20902

**5. This Authorization is Extended to Include Restricted Delivery Mail for the Undersigned(s)**
Yes, unless I notify to the contra ahead of time

**6. Name of Applicant**
PAUL WAGNER

**7. Applicant Home Address** (Number, street, city, state, and ZIP Code)
1837 R Street NW
Washington DC 20009
Telephone Number ( 301 ) 351-3668

#100

**8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.**

a. DC Drivers License

b. Visa Card

Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university or recognized corporate identification card; passport or alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification.

**9. Name of Firm or Corporation**
Beyond Systems Inc.

**10. Business Address** (Number, street, city, state and ZIP Code)
Forward to Home

Telephone Number ( . )

**11. Kind of Business**
technology consulting

**12. If Applicant is a Firm, Name Each Member Whose Mail is to Be Delivered.** (All names listed must have verifiable identification. A guardian must list the names and ages of minors receiving mail at their delivery address.)

**13. If a CORPORATION, Give Names and Addresses of its Officers**

**14. If Business Name of The Address** (Corporation or Trade Name) Has Been Registered, Give Name of County and State, and Date of Registration.

**Warning:** The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties). (18 U.S.C. 1001)

**15. Signature of Agent/Notary Public**

**16. Signature of Applicant** (if firm or corporation, application must be signed by officer. Show title.)
Paul Wagner

PS Form **1583**, August 2000 (Page 1 of 2)       This form on Internet at www.usps.com

Shipment Receipt:    Page #1 of 1

This IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:
Mon, Nov 27 2006

EXPECTED DELIVERY DATE:
TUES, NOV 28, 2006 EOD

SHIP FROM:
THE UPS STORE #0478
THE U.P.S. STORE
11160 VIERS MILL RD
L-15
Wheaton MD 20902
(301) 942-6245
SHIP TO:
PAUL WAGNER
1837 R. ST. NW.
Washington DC 20009-1603
Residential

SHIPPED THROUGH:
THE UPS STORE #0478
WHEATON MD 20902-2582
(301) 942-6245

SHIPMENT INFORMATION:
UPS Ground Residential
0.18lbs / 1lbs Billed
Cust Pack: 14x10x2 in
Ship Ntfy

Tracking Number: 1Z99E6F60J49150169
Shipment ID: MM3MC0VPU1WBV
Or/Item#: - -
Ref#: - -

DESCRIPTION OF GOODS:
DOCS

| SHIPMENT CHARGES: | |
| --- | --- |
| Ground Residential | $7.15 |
| Service Options | $0.00 |
| Fuel Surcharge | $0.32 |
| | |
| Total | $7.47 |

COMPLETE ONLINE TRACKING:
Enter either of these addresses in your web browser to track:
http://theupsstore.com (select Tracking, enter Shipment ID #)
http://ups.com (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS?
Contact SHIPPED THROUGH above.

Customer Acknowledgement
I acknowledge & accept Terms & Conditions in force for tendering shipments
through this location and certify that address, contents and values provided
for this shipment are accurate in all respects.

ShipmentID: MM3MC0VPU1WBV

Powered by iShip(tm)
11/25/2006 01:44 PM  Pacific Time

International Shipping Notice – Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These Conventions, individually or collectively are referred from the U.S in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited. For shipping please, call 1-800-782-7892.
United Parcel Service, Louisville, KY

Shipment Receipt:    Page #1 of 1

THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:
, Nov 27, 2006

EXPECTED DELIVERY DATE:
TUES, NOV 28, 2006 EOD

SHIP FROM:
UPS STORE #0478
U.P.S. STORE
60 VIERS MILL RD
5
aton MD 20902
1) 942-6245
SHIP TO:
L WAGNER
7 R. ST. NW.
hington DC 20009-1603
idential

SHIPPED THROUGH:
UPS STORE #0478
ATON, MD 20902-2582
1) 942-6245

SHIPMENT INFORMATION:
UPS Ground Residential
0.18lbs / 1lbs Billed
Cust Pack: 14x10x2 in
Ship Ntfy

Tracking Number: 1Z99E6F60J49150169
Shipment ID: MM3MC0VPU1WBV
Or/Item#: - -
Ref#: - -

DESCRIPTION OF GOODS:
DOCS

SHIPMENT CHARGES:
Ground Residential    $7.15
Service Options       $0.00
Fuel Surcharge        $0.32

Total                 $7.47

ShipmentID: MM3MC0VPU1WBV

# Shipment Receipt:  Page #1 of 1

THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

**SHIP DATE:**
Thur  Feb 15, 2007

**SHIPMENT INFORMATION:**
UPS Ground Residential
0.82lbs / 1lbs Billed
Cust Pack: 12x10x3 in
Ship Ntfy

**EXPECTED DELIVERY DATE.**
FRI. FEB 16. 2007 EOD

**SHIP FROM:**
THE UPS STORE #0470
THE U.P.S. STORE
11.60 VIERS MILL RD
L-15
Wheaton MD 20902
(301) 942-6245

Tracking Number: 1Z99E6F60361362229
Shipment ID: MM3MC0V9DXTJ4
Or/Item#: - -
Ref#: - -

**SHIP TO:**
PAUL WAGNER
1837 R. ST. NW.
Washington DC 20009-1603
Residential

**DESCRIPTION OF GOODS:**
docs

| SHIPMENT CHARGES: | |
|---|---|
| Ground Residential | $7.69 |
| Service Options | $0.00 |
| Fuel Surcharge | $0.29 |

**SHIPPED THROUGH:**
THE UPS STORE #0470
WHEATON,MD 20902-2592
(301) 942-6245

| Total | $7.98 |
|---|---|

COMPLETE ONLINE TRACKING
Enter either of these addresses in your web browser to track:
http //theupsstore.com (select Tracking, enter Shipment ID #)
http //.mbe.com (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS?
Contact SHIPPED THROUGH above.

Customer Acknowledgement
I acknowledge & accept Terms & Conditions in force for tendering shipments
through this location and certify that address, contents and values provided
for this shipment are accurate in all respects.

ShipmentID: MM3MC0V9DXTJ4

Powered by iShip(tm)
02/15/2007 07:21 AM  Pacific Time

## Shipment Receipt:  Page #1 of 1
THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:
Mon. Oct 31, 2005

EXPECTED DELIVERY DATE:
TUES. NOV 1, 2005 10:30 AM

SHIP FROM:
BEYOND SYSTEMS INC
1006 VEIRSMI RD
Wheaton MD 20902
(301) 942-6245

SHIP TO:
BEYOND SYSTEMS INC
PAUL WAGNER
1837 R ST NW
WASHINGTON DC 20009-1603
Residential
(301) 942-6245

SHIPPED THROUGH:
THE UPS STORE #0470
Wheaton,MD 20902
(301) 942-6245

SHIPMENT INFORMATION:
UPS Next Day Air Res
0.2lbs ManWt/LTR Billed Weight,
Letter
E-mail Shipment Notification

Tracking Number: 1Z99E6F60149671065
Shipment ID: MM3MC0V0PQET3
Or/Item#: - -
Ref#: - -

DESCRIPTION OF GOODS:
LETTER

SHIPMENT CHARGES:
Next Day Air Res        $17.25
Service Options          $0.00
Fuel Surcharge           $2.16

Total                   $19.41

COMPLETE ONLINE TRACKING:
Enter either of these addresses in your web browser to track:
http://ireunskter.com (select Tracking, enter Shipment ID #)
http://abc.com (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS?
Contact SHIPPED THROUGH above.

Customer Acknowledgement
I acknowledge & accept Terms & Conditions in force for tendering shipments
through this location and certify that address, contents and values provided
for this shipment are accurate in all respects.

ShipmentID: MM3MC0V0PQET3

Powered by iShip(tm)
10/31/2005 12:40 PM  Pacific Time

International Shipping Notice - Coverage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.
United Parcel Service, Louisville, KY

## Shipment Receipt:  Page #1 of 1
THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:
Mon. Oct 31, 2005

EXPECTED DELIVERY DATE:
TUES. NOV 1, 2005 10:30 AM

SHIP FROM:
BEYOND SYSTEMS INC
1006 VEIRSMI RD
Wheaton MD 20902
(301) 942-6245

SHIP TO:
BEYOND SYSTEMS INC
PAUL WAGNER
1837 R ST NW
WASHINGTON DC 20009-1603
Residential
(301) 942-6245

SHIPPED THROUGH:
THE UPS STORE #0470
Wheaton,MD 20902
(301) 942-6245

SHIPMENT INFORMATION:
UPS Next Day Air Res
0.2lbs ManWt/LTR Billed Weight,
Letter
E-mail Shipment Notification

Tracking Number: 1Z99E6F60149671065
Shipment ID: MM3MC0V0PQET3
Or/Item#: - -
Ref#: - -

DESCRIPTION OF GOODS:
LETTER

SHIPMENT CHARGES:
Next Day Air Res        $17.25
Service Options          $0.00
Fuel Surcharge           $2.16

Total                   $19.41

COMPLETE ONLINE TRACKING:
Enter either of these addresses in your web browser to track:
http://ireunskter.com (select Tracking, enter Shipment ID #)
http://abc.com (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS?
Contact SHIPPED THROUGH above.

Customer Acknowledgement
I acknowledge & accept Terms & Conditions in force for tendering shipments
through this location and certify that address, contents and values provided
for this shipment are accurate in all respects.

ShipmentID: MM3MC0V0PQET3

Powered by iShip(tm)
10/31/2005 12:40 PM  Pacific Time

International Shipping Notice - Coverage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.
United Parcel Service, Louisville, KY

## Shipment Receipt:  Page #1 of 1

THIS IS NOT A SHIPPING LABEL. PLEASE SAVE FOR YOUR RECORDS.

SHIP DATE:
Tues, May 9, 2006

EXPECTED DELIVERY DATE:
WED, MAY 10, 2006 EOD

SHIP FROM:
BEYOND SYSTEMS
1106 VEIRSMILL RD
Wheaton MD 20902
(301) 942-6245

SHIP TO:
BEYOND SYSTEMS INC
1837 R ST NW
WASHINGTON DC 20009-1603
Residential

SHIPPED THROUGH:
THE UPS STORE #0478
WHEATON,MD 20902-2582
(301) 942-6245

SHIPMENT INFORMATION:
UPS Ground Residential
0.44lbs/1lbs Billed
Cent Pack: 12x10x2 in
E-mail Shipment Notification

Tracking Number: 1Z99E6F6037072304
Shipment ID: MM3MC0VYGGV9E
Or/Item#: - -
Ref#: - -

DESCRIPTION OF GOODS:
MAIL FORWARDING

SHIPMENT CHARGES:
Ground Residential      $7.15
Service Options         $0.00
Fuel Surcharge          $0.27

Total                   $7.42

COMPLETE ONLINE TRACKING:
Enter either of these addresses in your web browser to track:
http://theupsstore.com  (select Tracking, enter Shipment ID #)
http://abc.com  (select Tracking, enter Shipment ID #)

SHIPMENT QUESTIONS?
Contact SHIPPED THROUGH above.

Customer Acknowledgement
I acknowledge & accept Terms & Conditions in force for tendering shipments
through this location and certify that address, contents and values provided
for this shipment are accurate in all respects.

ShipmentID: MM3MC0VYGGV9E

Powered by iShip(tm)
05/09/2006 12:10 PM  Pacific Time

# Spam Cases

Beyond Systems, Inc. ("BSI") is a Maryland ISP. BSI has filed suit against the following entities, alleging that they sent or assisted in sending Unsolicited Commercial Email ("UCE" or "spam") to or through BSI. Some of these matters have been settled, while others are still pending.

Everyone should be presumed not liable unless/until proven liable.

If you have any additional information, please contact us at nospam_info@beyondsystems.net .

Below, CCMC means Circuit Court of Montgomery County (Maryland).

| # | Court and Case Number | Entity Name | Cited Strings in Emails |
|---|---|---|---|
| #1 | CCMC 248420-V | Adsaturation, Ltd.<br>6517 East Medalist Circle<br>Plano, Texas 75023<br><br>James Howard Majka<br>331 Violet Settlement Road<br>Fort Kent, ME 04743-2219 | success-groups.com<br>infinitypayline.com |
| #2 | CCMC 248499-V | Aesop Marketing Corporation<br>and<br>Mark Joyner<br>and<br>P&D Marketing, LLC<br>and<br>John Doe<br><br>ALSO OF INTEREST:<br><br>1.<br>Pure Marketing International, LLC<br>2807 Allen St, PMB 668<br>Dallas, TX 75204<br><br>2.<br>MBPAdvertising, LLC (Georgia Limited Liability)<br><br>263 Ridgeway Dr<br>Monroe, GA 30655<br><br>Brenda J Freeman, Chief Executive Officer<br><br>Registered Agent Agent Address Agent County<br>Brenda J. Freeman<br>263 Ridge Way Drive | roibot.com<br>nitrostats.com |

EXHIBIT 6

| | | Monroe, GA 30655 | |
|---|---|---|---|
| #3 | CCMC 248421-V | Michael Bonner<br>241 Blanchard Street<br>West Monroe, LA 71291<br><br>updated address...<br><br>Michael William Bonner<br>4121 Arizona Street<br>Sachse, Texas 75048-3233<br><br><br>ALSO OF INTEREST:<br><br>1.<br>OrgName:   Rackspace.com<br>Address:   112 E. Pecan St.<br>Address:   Suite 600<br>City:      San Antonio<br>StateProv: TX<br>PostalCode: 78205<br>Country:   US<br><br>OrgAbusePhone: +1-210-892-4000<br>OrgAbuseEmail: abuse@rackspace.com<br><br>OrgTechPhone: +1-210-892-4000<br>OrgTechEmail: ipadmin@rackspace.com | mbonnerenterprises.com<br>mbonnerhosting.com<br>mbonnerhosted.com |
| #4 | CCMC 248423-V | Confinity, Inc.<br>1840 Embarcadero Road<br>Palo Alto, California 94303<br>Serve:<br>   Max Luechin<br>   1840 Embarcadero Road<br>   Palo Alto, California 94303<br>and<br>John Doe<br>1840 Embarcadero Road<br>Palo Alto, California 94303<br><br>[Confinity operates eBay and PayPal] | paypal.com |
| | | Cordoba International<br>1007 North Federal Highway, Suite 254<br>Fort Lauderdale, Florida 33304<br>Serve: Guillermo A. Senmartin<br>   Cordoba International, Inc.<br>   19720 West 62nd Street<br>   Miami, Florida 33015<br>and<br>Elmars Brunenieks<br>Cordoba International, Inc.<br>19720 West 62nd Street | |

| | | | |
|---|---|---|---|
| | | Miami, Florida 33015<br>and<br>John Doe<br>1007 North Federal Highway, Suite 254<br>Fort Lauderdale, Florida 33304<br><br><br>Alternate address...<br><br>Elmar Brunenieks<br>1750 30th St Apt 437<br>Boulder CO 80301-1036<br><br><br>ADDITIONAL DEFENDANT(S):<br><br>1.<br>Company Name: FEESPLITS.COM<br>CORPORATION<br>Address: 1415 WASHINGTON ST, DENVER CO<br>80203<br>Phone: (303) 837-0855<br><br>2.<br>HOBOKEN WEB SERVICES, L.L.C.<br><br>Agent: MICHAEL D BROSS<br>Agent Address: 17 ACADEMY STREET SUITE<br>1200<br>  NEWARK, NJ 07102<br>Office Address Status: Deliverable<br>Main Business Address: 609 WASHINGTON ST<br>  HOBOKEN, NJ 07030<br>Principal Business Address: 609 WASHINGTON<br>ST<br>  HOBOKEN, NJ 07030<br>Associated Names<br>Name: DATAPIPE Type Description: Fictitious<br>Name<br>Name: HISPEED HOSTING Type Description:<br>Fictitious Name | |
| #5 | CCMC<br>248422-V | | recruit-professionals3.com<br>hiddenjobsecrets.com<br>sevenover.com<br>elevenover.com<br>smartjobfox.com<br>tableforty.com |
| | | Diverse Marketing Group, LLC<br>2247 Citrus Blvd #251<br>Leesburg, Florida 34748<br>Serve:<br>  Mark Ayoub<br>  2247 Citrus Blvd #251<br>  Leesburg, Florida 34748<br>and<br>Mark Christopher Ayoub<br>DBA Epro2000<br>33235 Kaylee Way | |

| #6 | CCMC 248500-V | Leesburg, Florida 34788-3831<br>Serve:<br>  Mark Christopher Ayoub<br>  DBA Epro2000<br>  33235 Kaylee Way<br>  Leesburg, Florida 34788-3831<br>and<br>Buster Media, LLC<br>1140N Highland Ave Ste 302<br>Manhattan Beach, California 90266<br>Serve:<br>  Mark D. Roah<br>  813 Duncan Avenue<br>  Manhattan Beach, California 90266<br>and<br>Verapass Group, LLC<br>124 Center Street, Suite 100<br>El Segundo, California 90245<br>Serve:<br>  Adam Rioux<br>  2406 Clark Lane, #A<br>  Redondo Beach, California 90278<br>and<br>Stram Corporation<br>18495 S Dixie Hwy #155<br>Miami, Florida 33157<br>Serve:<br>  Barnett Robinson, Jr., P.A.<br>  120 E. Palmetto Park Road<br>  Suite 150<br>  Boca Raton, Florida 33432<br>and<br>John Doe<br>618 S 14th Street<br>Leesburg, Florida 34748<br><br><br>Blue Pin Stripes Media shares the same address with Verapass.<br>Blue Stream Media is closely associated with Verapass as well. | iwbd.biz<br>disc0unt.biz |
| | | Dynamic Life Products, Inc.<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve:<br>  Jugal K. Taneja<br>  6950 Bryan Dairy Road<br>  Largo, Florida 33777<br>and<br>Dynamic Health Products, Inc.<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve: | |

| #7 | CCMC 248501-V | Jugal K. Taneja<br>6950 Bryan Dairy Road<br>Largo, Florida 33777<br>and<br>Dynamic Life Asia, LLC<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve:<br>  Jugal K. Taneja<br>  6950 Bryan Dairy Road<br>  Largo, Florida 33777<br>  and<br>Herbal Health Products, Inc.<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve:<br>  Jugal K. Taneja<br>  6950 Bryan Dairy Road<br>  Largo, Florida 33777<br>  and<br>Online Meds RX, Inc.<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve:<br>  Jugal K. Taneja<br>  6950 Bryan Dairy Road<br>  Largo, Florida 33777<br>  and<br>Pharma Labs RX, Inc.<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br>Serve:<br>  Jugal K. Taneja<br>  6950 Bryan Dairy Road<br>  Largo, Florida 33777<br>  and<br>Jugal K. Taneja<br>6950 Bryan Dairy Road<br>Largo, Florida 33777<br>and<br>John Doe<br>12399 Belcher Rd. S #160<br>Largo, Florida 33773<br><br>ADDITIONAL DEFENDANT(S):<br><br>1.<br>OTB PRODUCTS, LLC<br><br>and<br><br>2. | 3buymeripren.biz |

| | | | |
|---|---|---|---|
| | | KEVIN M. BRINKWORTH<br>1001 West Ocean Drive, #2-205<br>Marathon, Florida 33050 | |
| #8 | CCMC<br>248502-V | EyeFive, Inc.<br>16742 Stagg Street #101<br>Van Nuys, California  91406<br>Serve:<br>  Doug G. Roberts<br>  16742 Stagg Street #101<br>  Van Nuys, California  91406<br> and<br>Stram Corporation<br>18495 S Dixie Hwy #155<br>Miami, Florida 33157<br>Serve:<br>  Barnett Robinson, Jr., P.A.<br>  120 E. Palmetto Park Road<br>  Suite 150<br>  Boca Raton, Florida 33432<br> and<br>John Doe<br>16742 Stagg Street #101<br>Van Nuys, California  91406<br><br>ALSO OF INTEREST:<br><br>1.<br>Victor Tam<br>1638 West 61st Avenue<br>Vancouver, British Columbia<br>Canada  V6P 2C3<br>Phone: (604) 263-1687<br>    (604) 803-1687<br>Email: candyman@telus.net<br><br><br>2.<br>Corporation<br>GLOBAL ENERGY, INC.<br>Number: C2151396 Date Filed: 12/2/1999 Status: active<br>Jurisdiction: California<br>Address<br>12145 MORA DRIVE, SUITE 13<br>SANTA FE SPRINGS, CA 90670<br>Agent for Service of Process<br>HASSAN M. MOURAD<br>17109 SANTA LUCIA<br>FOUNTAIN VALLEY, CA 90670<br><br>3. | prosize-health.biz<br>buyherbalsonline.com<br>specialitystore.info |

| | | | |
|---|---|---|---|
| | | spamvertised web link: www.specialitystore.info -- not yet identified<br><br>www.earthdepot.com appears to be the same operation<br><br>I received a package containing the ordered product from "Mr. Kumar,"<br>apparently shipped from India. | |
| #9 | CCMC<br>248503-V | Frontline Learning, LLC<br>2 Carlson Pkwy #350<br>Minneapolis, Minnesota 55447<br>Serve:<br>  Paula Rust, President<br>  Frontline Learning, LLC<br>  2 Carlson Pkwy #350<br>  Minneapolis, Minnesota 55447<br> and<br>The Rainmaker Group, Inc.<br> and<br>John Doe<br>2 Carlson Pkwy #350<br>Minneapolis, Minnesota 55447 | From: Frontline Learning<br><wow_at_work@yahoo.com><br>From: Frontline Learning<br><wow_at_work03@yahoo.com><br>From: Frontline Learning<br><wow_at_work2003@yahoo.com><br>From: Frontline Learning<br><remove@frontlinelearning.net><br>From: Frontline Learning<br><workplace_wow@yahoo.com><br><br>or else in the message body:<br><br>frontlinelearning.com<br>frontlinelearning.net<br>teamrainmaker.com |
| #10 | Removed from CCMC (248504-V) to US District Court, Greenbelt Div. | Global Management Solutions, Inc.<br>13858 SW 190 Ave, Suite 208<br>Miami, Florida 33176<br>Serve:<br>  David Caruana<br>  13858 SW 190 Ave, Suite 208<br>  Miami, Florida 33176<br> and<br>John Doe<br>13858 SW 190 Ave, Suite 208<br>Miami, Florida 33176<br><br><br>ADDITIONAL DEFENDANT(S):<br><br>1.<br>Efficient Systems, Inc.<br>2148 SW 38th Street<br>Dania, FL 33312<br>888 232-8107 x 206<br><br>Director and Registered Agent:<br>Richard Schuler<br>954-536-9448<br>954-650-3364<br><br><br>ALSO OF INTEREST: | lovingtouches.org<br>pearlrx.com<br>drugdoctors.net |

| | | | |
|---|---|---|---|
| | | 1.<br>Domains By Proxy, Inc.<br>15111 N. Hayden Road/Suite 160<br>PMB 353<br>Scottsdale, AZ 85262<br><br>Assisted Global, KWU and Gevalia with their spamming. | |
| #11 | CCMC<br>248424-V | Robert Michael Hager<br>836 43rd Street<br>West Palm Beach, Florida 33407<br>and<br>John Doe<br>836 43rd Street<br>West Palm Beach, Florida 33407 | 1stcomputerbusiness.com<br>safelist-haven.com<br>qualityhosting4u.com |
| #12 | | Harvard.net, Inc.<br>500 Rutherford Avenue<br>Boston, Massachusetts 02129<br>Serve:<br>  The Corporation Trust, Inc.<br>  300 East Lombard Street<br>  Baltimore, Maryland 21202<br>  and<br>The Pajo Networks, Inc.<br>700 Wilshire Boulevard<br>6th Floor<br>Los Angeles, California 90017<br>Serve:<br>  John Carter, President<br>  700 Wilshire Boulevard<br>  6th Floor<br>  Los Angeles, California 90017<br><br>and<br>John Doe ??? | |
| | Originally<br>filed as<br>248425-V in<br>CCMC.<br>Removed to<br>US District<br>Court,<br>Greenbelt | ADDITIONAL DEFENDANT(S):<br><br>1.<br>Corporation<br>PARIDOX VENTURES, INC.<br>Number: C2325898 Date Filed: 1/5/2001 Status: active<br>Jurisdiction: California<br>Address<br>39016 BLACOW RD<br>FREMONT, CA 94538<br>Agent for Service of Process<br>S CHRISTOPHER WINTER<br>8917 RANGELY AVE<br>LOS ANGELES, CA 90048 | bluedolphin.com<br>emailboys.net<br>safelistboys.com<br>or else in the message header:<br><br>208.179.45.17<br>web9.internetwebhosting.com<br><br>216.31.141.143<br>bebop.myultimatehosting.com<br>216.31.141.147<br>bebop.myultimatehosting.com<br>216.31.141.158<br>bebop.myultimatehosting.com |

| | | | |
|---|---|---|---|
| | Div.;<br>now USDC<br>No.<br>04 CV 711<br>AW | 2.<br>LP/LLC<br>OC3 NETWORKS & WEB SOLUTIONS, LLC<br>Number: 200105110022 Date Filed: 2/2/2001<br>Status: active<br>Jurisdiction: CALIFORNIA<br>Address<br>19802 VICTORY BLVD<br>WOODLAND HILLS, CA 91367<br>Agent for Service of Process<br>AMY LAMPI<br>2730 GATEWAY OAKS DRIVE STE 100<br>SACRAMENTO, CA 95833<br><br>ALSO OF INTEREST:<br><br>1. Jeremy Martinez<br><br>2.<br>Blue Dolphin Group<br>526 BOSTON POST RD SUITE 200<br>Wayland, MA 01778<br>508-358-7373<br>508-358-6800<br><br>Pajo is AKA TierZero and NetComplete, Inc.<br><br>Harvard.net was bought by Allegiance Telecom,<br>Inc. | 216.31.141.159<br>bebop.myultimatehosting.com<br><br>64.239.140.171        www.globalteam1.net<br><br>64.239.138.59        mail1.hostcloud.com<br><br>66.63.160.137<br>ensim.myultimatehosting.com<br>                          [oc3networks.com] |
| #13 | Removed to<br>USDC<br>from CCMC;<br>USDC -<br>Greenbelt<br>No. 40 686<br>PJM | Keynetics, Inc. T/A ClickBank,<br>Click Sales, Inc.<br>917 S Lusk Street<br>Boise, ID 83706<br>    and<br>Rackspace, Ltd.<br>T/A Rackspace Managed Hosting and<br>RACKSPACE.COM, Inc., and<br>Macro Holding, Inc.<br>112 E. Pecan Street, Suite 600<br>San Antonio, Texas 78205<br>    and<br>Jeffrey Mulligan<br>T/A HIGHTECHMARKETING.COM and<br>CBMALL.COM, and<br>HIGHTECHMARKETING.COM, LLC<br>    and<br>[28 named affiliates redacted]<br>    and<br>ClickBank Affiliates 1-500 | clickbank.net<br>clickbank.com |

| | | and<br>CBMall Affiliates 1-500<br>  and<br>Bulk Emailers 1-100 | |
|---|---|---|---|
| #14 | CCMC<br>248427-V | Sabrina Markon trading as Markon Digital<br>Industries<br>1350 Bothe Road<br>Kelowna, British Columbia, Canada V1W3N2<br> and<br>John Doe<br>1350 Bothe Road<br>1350 Kelowna, British Columbia<br>Canada V1W3N2 | pearlsofwealth.com |
| #15 | CCMC<br>248428-V | Richard D. Hall, Jr.<br>3428 Pueblo Court<br>Lexington, Kentucky 40509<br> and<br>Nexpoint Technologies, Inc.<br>560 Neff Avenue<br>Harrisonburg, Virginia 22801-8017<br> Serve: Tom Honec, Agent<br>  560 Neff Avenue<br>  Harrisonburg, Virginia 22801-8017<br> and<br>World Leadership Group, Inc.<br>3975 Johns Creek Court, Suite 100<br>Swanee, Georgia 30024<br> Serve: Eric Iriate, Agent<br>  4209 St. Jerome Drive<br>  Annandale, Virginia 22003<br> and<br>John Doe<br>560 Neff Avenue<br>Harrisonburg, Virginia 22801-8017<br><br><br>ALSO OF INTEREST:<br><br>1.<br>OrgName:  Everyones Internet, Inc. (upstream<br>provider to Nexpoint)<br>Address:  2600 Southwest Freeway<br>Address:  Suite 500<br>City:   Houston<br>StateProv: TX<br>PostalCode: 77098<br>Country:  US<br><br><br>2.<br>OrgName:  Verio, Inc. (upstream provider to<br>Nexpoint, Harvard.net and Pajo) | 64.246.42.121<br>makemoneysafelists.com<br>goldminesafelist.com<br>myultimatehosting.com<br>w1b.net |

| | | | |
|---|---|---|---|
| | | Address: 8005 South Chester Street<br>Address: Suite 200<br>City: Englewood<br>StateProv: CO<br>PostalCode: 80112<br>Country: US<br>[See also verio.net]<br><br>TechPhone: +1-303-645-1900<br>TechEmail: vipar@verio.net<br><br>OrgAbusePhone: +1-800-551-1630<br>OrgAbuseEmail: abuse@verio.net<br><br>OrgTechPhone: +1-303-645-1900<br>OrgTechEmail: vipar@verio.net<br><br><br>3.<br>Eric Iriate<br>4209 St. Jerome Drive<br>Annandale, Virginia 22003 | |
| #16 | CCMC | ALAN MOORE, AKA GEORGE ALLISON MOORE,<br>GEORGE ALLISON MOORE, JR., GEORGE ALAN<br>MOORE AND JOHN SMITHERLINE,<br>DBA QUICKSILVER ENTERPRISES<br>816 Elm St. #472<br>Manchester, New Hampshire 03102<br><br>and<br><br>AMAZING INTERNET PRODUCTS, LLC<br>561 Montgomery Street<br>Manchester, NH<br><br>and<br><br>INTERCOSMOS MEDIA GROUP INC.<br>113 Barksdale Professional Center<br>Newark, DE 19711-3258<br>  Serve:<br>  Delaware Intercorp, Inc.<br>  113 Barksdale Professional Center<br>  Newark, DE 19711-3258<br><br>and<br><br>DAVIS WOLFGANG HAWKE AKA DAVE BRIDGER<br>(and formerly known as ANDREW GREENBAUM) | "From: Dave Bridger"<br><br>or else in the message body:<br><br>jesitack.com<br>cinpling.com<br>prosize-health.biz<br>3buymeripren.biz<br>iomegaone.com<br>greatsize.biz<br>1buymeripren.biz |

| | | | |
|---|---|---|---|
| | 248505-V | 561 Montgomery Street<br>Manchester, New Hampshire 03102<br><br>and<br><br>BRADEN BOURNIVAL<br>561 Montgomery Street<br>Manchester, New Hampshire 03102<br><br>and<br><br>DON MOORE<br>816 Elm Street<br>Manchester, New Hampshire 03102<br><br>and<br><br>JOHN DOE<br>816 Elm Street<br>Manchester, New Hampshire 03102<br><br><br>ALSO OF INTEREST:<br><br>1.<br>"Hosts-Inc, Sole Proprietorship" of Aurora, CO<br><br><br>2.<br>[*** Redacted, pending clarification. ***] | biogen4u.biz<br>safelistsmart.com<br>payunow.com<br>nobulldlc.com<br>411printerinks.com<br>emaildeals4u.com<br>pleasurelight.com<br><br>and other spamvertised domains registered with Intercosmos |
| #17 | CCMC<br>248508-V | Realtime Gaming Holding Company, LLC<br>270 Carpenter Drive, NE Ste 250<br>Atlanta, Georgia 30328<br>Serve:<br>  Michael Staw<br>  270 Carpenter Drive, NE #250<br>  Atlanta, Georgia 30328<br> and<br>KDMS International, L.L.C.<br>270 Carpenter Drive, NE Ste 250<br>Atlanta, Georgia 30328<br>Serve:<br>  Michael Staw<br>  270 Carpenter Drive, NE #250<br>  Atlanta, Georgia 30328<br> and<br>John Doe<br>270 Carpenter Drive, NE Ste 250<br>Atlanta, Georgia 30328<br><br>ALSO OF INTEREST: | goldenrhinocasino.com<br>windowscasino.com<br>wincasinoclicks.com<br>bigbonus-casino.com<br>bigbonus-casino.net<br>sharkcasino.com<br>kscasino.com<br>cirruscasino.com<br>crystalpalacecasino.com<br>goldkeycasino.com<br>veguslucky.com<br><br>and other Realtime Gaming casino "clients" |

| | | | |
|---|---|---|---|
| | | 1.<br>travis thom<br>5545 Eakes rd nw<br>Albuquerque, NM 87107<br>travisthom@msn.com<br>+1.5054635592 | |
| #18 | CCMC<br>248429-V | Sanzus, Ltd.<br>709 Colleen Drive<br>Gardener, KS 66030<br>Serve: Andy Duncan<br> 709 Colleen Drive<br> Gardener, Kansas 66030<br>and<br>John Doe<br>709 Colleen Drive<br>Gardener, KZ 66030 | safelistservices.com<br>snazzypromotions.com |
| #19 | CCMC<br>248506-V | Securemedical, Inc.<br>5801 S McClintock Dr<br>Suite 109<br>Tempe, Arizona 85283<br>Serve:<br> Professional Legal Assistors<br> 500 N Rainbow Blvd<br> Suite 300<br> Las Vegas, Nevada 89107<br>and<br>Low Cost Pharmacy, Inc.<br>5801 S McClintock Dr<br>Suite 109<br>Tempe, Arizona 85283<br>Serve:<br> Professional Legal Assistors<br> 500 N Rainbow Blvd<br> Suite 300<br> Las Vegas, Nevada 89107<br>and<br>John Doe<br>5801 S McClintock Dr<br>Suite 109<br>Tempe, Arizona 85283<br><br>Also,<br><br>AYERS & HOUG, INC.<br>1640 S. Stapley Drive, Suite 211<br>Mesa, Arizona 85204<br><br>and<br><br>JOHN KEITH AYERS, PRESIDENT/CEO<br>Ayers & Houg, Inc. | losdgfpxnist.com<br>bestdrugstore.biz<br>bestrxmeds.com<br>pouvr1.biz |

| | | | |
|---|---|---|---|
| | | 1640 S. Stapley Drive, Suite 211<br>Mesa, Arizona 85204<br><br>and<br><br>TRENT HOUG<br>1640 S. Stapley Drive, Suite 211<br>Mesa, Arizona 85204<br><br>and<br><br>JOHN DOE<br>380 E. Benrich Drive<br>Gilbert, Arizona 85296<br><br>Leap Lab [(888) 857-6394,<br>http://www.vivaprescription.com] is a trade<br>name owned by Ayers & Houg, Inc. A&H self-<br>describes A&H's main<br>activity to be "Internet marketing". | |
| #20 | CCMC<br>248507-V | SRE, Inc.<br>305 Indiana Street<br>Golden, Colorado 80401<br>Serve:<br>  Steven R. Elisberg<br>  1153 Bergen Pkwy # 456<br>  Evergreen, Colorado 80439-9501<br> and<br>Steven R. Elisberg<br>1153 Bergen Pkwy # 456<br>Evergreen, Colorado 80439-9501<br>Serve:<br>  Steven R. Elisberg<br>  1153 Bergen Pkwy # 456<br>  Evergreen, Colorado 80439-9501<br> and<br>John Doe<br>305 Indiana St<br>Golden, Colorado 80401<br><br>ALSO OF INTEREST:<br><br>1.<br>John P Ferry<br>1420 Meredith Hts Apt 201<br>Colorado Springs, CO 80919-5573<br>DATES Aug 02 - Oct 03<br><br>John P Ferry<br>7700 S Homesteader Dr | adjustmentsworld.biz<br>cheaptrips.com |

| | | | |
|---|---|---|---|
| | | Morrison, CO 80465-2807<br>DATES Apr 02 - Aug 03<br><br>John P Ferry might have once been a principal<br>and/or registered agent<br>for SRE.<br><br>SRE is AKA Air Courier Association and<br>cheaptrips.com. | |
| #21 | CCMC<br>242779-V | World Wide Consumer Direct, Inc.<br>dba "Consumer Direct, Inc." and "CDI"<br>14800 Landmark Boulevard, Suite 550<br>Dallas, Texas 75254-7565<br><br>and<br><br>William F. Wolpmann, Jr.<br>607 Pocahontas Street<br>Williamsburg, Virginia 23185<br><br>and<br><br>John Doe<br>14800 Landmark Boulevard, Suite 550<br>Dallas, Texas 75254-7565 | globalteam1.net<br>globalwealthteam.com |
| | | Kennedy-Western University,<br>a Wyoming corporation,<br>200 West 17th Street<br>Cheyenne, WY 82001-4412<br><br>Corporation<br>KENNEDY-WESTERN UNIVERSITY<br>Number: C2259977 Date Filed: 8/29/2000 Status:<br>active<br>Jurisdiction: WYOMING<br>Address<br>30301 AGOURA RD<br>AGOURA HILLS, CA 91301<br>Agent for Service of Process<br>ROBERT L KEHR<br>KEHR SCHIFF & CRANE LLP<br>12400 WILSHIRE BLVD 13TH FL<br>LOS ANGELES, CA 90025<br><br>ALSO OF INTEREST:<br><br>1.<br>LP/LLC<br>PEAK ADVERTISING, LLC<br>Number: 200404210049 Date Filed: 2/9/2004 | |

| | | | |
|---|---|---|---|
| #22 | Originally filed as 261591-V in CCMC. Removed to US District Court, Southern Div.; now USDC No. 05-CV-2446-DKC | Status: active<br>Jurisdiction: CALIFORNIA<br>Address<br>12740 LANDALE STREET<br>STUDIO CITY, CA 91604<br>Agent for Service of Process<br>BUSINESS FILINGS INCORPORATED<br>(C211348)<br><br>Steve Berns, President<br>tel: 818-766-0171<br>fax: 818-766-0371<br><br><br>2.<br>Contour Media Group<br>Contact: Steve Williams<br>3200 NE 14 Street - Suite 271<br>Pompano Beach FL 33062  USA<br>Phone: 954-783-3065 x 305<br>Website: http://www.contourmediagroup.com<br><br>Registered Agent<br>Name & Address<br>GRAHAM, GREG<br>995 SW 13 DRIVE<br>BOCA RATON FL 33486<br><br><br>3.<br>Boca Networks.com, LLC<br>3500 NW Boca Raton Blvd.<br>Suite 706<br>Boca Raton, FL  33431<br><br>Registered Agent<br>Name & Address<br>PAUL, A<br>3500 NW BOCA RATON BLVD., SUITE 706<br>BOCA RATON FL 33431 | kennedy-western<br>kw.edu<br>bargain-warrior.com |
| | | ALSO OF INTEREST:<br><br>1.<br>KRAFT FOODS, INC., a Virginia Corporation,<br><br>2.<br>VICTOR TH. ENGWALL & CO., INC., a Delaware Corporation<br><br>Corporation<br>VICT. TH. ENGWALL & CO., INC. (a.k.a. "Gevalia" -- joe) | |

| #23 | N/A | Number: C1537578 Date Filed: 7/24/1986 Status: active<br>Jurisdiction: DELAWARE<br>Address<br>THREE LAKES DRIVE<br>NORTHFIELD, IL 60093<br>Agent for Service of Process<br>C T CORPORATION SYSTEM<br>818 WEST SEVENTH STREET<br>LOS ANGELES, CA 90017<br><br>Victor Th. Engwall, & Co., Inc. is the owner of the Gevalia brand name<br>and uses the domain names Gevalia.com and JoinGevalia.com for its online<br>promotions. The domain names, Gevalia.com and JoinGevalia.com, are<br>registered to Kraft Foods, Inc. | gevalia |

**Paul Wagner, 01:01 AM 8/12/2004 -0700, deceptive spam advertising "kennedy-western" and "kw.edu"**

Date: Thu, 12 Aug 2004 01:01:53 -0700
To: abuse@hypertouch.com
From: Paul Wagner <wagner@beyondsystems.net>
Subject: deceptive spam advertising "kennedy-western" and "kw.edu"
X-SpamPal: PASS

Joe,

FYI, lately we seem to be getting a lot of deceptive spam through
Hypertouch's servers advertising "kennedy-western" and "kw.edu". These
spams exhibit false info in the headers concerning their origin or path of
transmission and, in these and other ways, appear to violate MD, CA and US
law.

We are interested in pursuing legal claims against those who are
responsible.

-- Paul

Paul A. Wagner

President
Beyond Systems, Inc.



**Paul Wagner, 01:59 AM 12/15/2004 -0800, KWU & Gevalia**

Date: Wed, 15 Dec 2004 01:59:11 -0800
To: Joe Wagner <joew@cdr.stanford.edu>
From: Paul Wagner <wagner@ai.mit.edu>
Subject: KWU & Gevalia
X-SpamPal: PASS

Joe,

Do you have any more investigative findings I should put in my affidavits
for KWU and Gevalia?

Thx.
Paul

| From: | Paul Wagner <wagner@ai.mit.edu> |
|---|---|
| Sent: | Friday, December 3, 2004 3:59 AM |
| To: | Joe Wagner <joew@cdr.stanford.edu> |
| Subject: | my tally of emails advertising Gevalia (Kraft) and KWU |

Joe,

FYI, I counted and categorized the emails received by Beyond Systems through 11/30/2004 that advertised "Gevalia" and those that advertised "kw.edu" or "Kennedy-Western". Here are my findings:

### On Beyond Systems' server (Ema)...

| string in email | sent to safemailbox.com or .net | sent to hypertouch.com |
|---|---|---|
| "gevalia" | 74 (7 are deceptive) | 1306 (1277 are deceptive) |
| "kennedy-western" or "kw.edu" | 22 (3 are deceptive) | 876 (781 are deceptive) |

### On Hypertouch's server (Athy)...

| string in email | sent to safemailbox.com or .net | sent to hypertouch.com |
|---|---|---|
| "gevalia" | N/A | 1325 (1287 are deceptive) |
| "kennedy-western" or "kw.edu" | N/A | 1110 (1004 are deceptive<*>) |

    <*>  = includes 8 emails with "Subject: Flexible degr.ee programs for busy adults" but no other apparent deception

BSI is missing a few emails, due to its server being down at and

CONFIDENTIAL

BSI-K0002952

around the time of transmission. But I have downloaded copies from Athy.

Hence, all together, 1294 deceptive emails advertise Gevalia (Kraft), and 1007 advertise KWU.

-- Paul

CONFIDENTIAL

BSI-K0002963

| | |
|---|---|
| **From:** | Joe Wagner <joew@cdr.stanford.edu> |
| **Sent:** | Friday, December 3, 2004 10:28 AM |
| **To:** | Paul Wagner <wagner@ai.mit.edu> |
| **Subject:** | Re: diversifying (i.e., sharing) recovery from KWU and Gevalia |

&lt;x-flowed&gt;
At 04:01 AM 12/3/2004 -0800, you wrote:
>(FYI -- I called your cell phone several times tonight, but only reached
>your voicemail.)
Sorry, I went to be early, except for a drink of water, where I mailed out
the sample spam.
> Wouldn't that recovery be twice as large if we teamed up?
>I forget the logic behind his possible reluctance, to sharing recovery...
Tentatively, we could get $1375 per spam. BS should get $500. So that's
100% of 1375, versus 50% of $1875 (i.e. = %100 of $937.5) or roughly 1/3
less if we split 50-50% than if we get 100% and we get award the max damages.
Joe
&lt;/x-flowed&gt;

CONFIDENTIAL

BSI-K0002960

**Paul Wagner, 12:02 AM 12/17/2004 -0800, Re: Kennedy-western sample spam**

Date: Fri, 17 Dec 2004 00:02:42 -0800
To: Joe Wagner <joew@hypertouch.com>
From: Paul Wagner <wagner@ai.mit.edu>
Subject: Re: Kennedy-western sample spam
X-SpamPal: PASS

Joe.

I chose two other sample spams, other than what you suggested in your email below, because I thought one could plausibly argue that BSI is not a rightful recipient of either of your example emails – which were addressed to "joew@hypertouch.com" and "dnsbill@hypertouch.com".

I will forward you a draft of my Affidavit shortly, tonight.

-- Paul

At 12:30 AM 12/3/2004 -0800, Joe Wagner wrote:
  Attached is a copy of the sample spams that I sent to Kennedy-western when I had contacted them to
  see if they wished to settle.  Figured you might as well use it in your guys' complaint -- as we will in ours.

  Joe

**Paul Wagner, 04:28 PM 12/16/2004 -0800, CommuniGate Pro issue**

Date: Thu, 16 Dec 2004 16:28:39 -0800
To: Joe Wagner <joew@cdr.stanford.edu>
From: Paul Wagner <wagner@al.mit.edu>
Subject: CommuniGate Pro issue
X-SpamPal: PASS


Joe,

What is it that Hypertouch's CommuniGate Pro server, as well as BSI's CommuniGate Pro server, appear not to verify the HELO parameter given to it from the preceding server? Both servers put the IP address of the previous server in square brackets, suggesting that the HELO parameter was not verified; see text highlighted in red below.

I understand that when the Stalker SMTP Server does not write "] verified)", that is a bad thing; but the CommuniGate Pro server may not check or indicate this in the same way.

Thanks for any plausible explanation,
Paul




Sample email advertising "kw.edu" or "Kennedy-Western":

Return-Path: <maf@bargain-warrior.com>
Received: from [69.33.227.202] (HELO mail.reasonabledoubt.com)
  by beyondsystems.net (CommuniGate Pro SMTP 4.1.8)
  with ESMTP id 4353402 for support@beyondsystems.net; Thu, 10 Jun 2004 22:02:19 -0400
Received: from <joepublic@flunky.hypertouch.com>
  by mail.reasonabledoubt.com (CommuniGate Pro RULES 4.1.8)
  with RULES id 10398184; Thu, 10 Jun 2004 19:02:15 -0700
X-Autogenerated: Mirror
X-Mirrored-by: <joepublic@flunky.hypertouch.com>
Received: from [69.33.227.203] (HELO mail.hasit.com)
  by mail.reasonabledoubt.com (CommuniGate Pro SMTP 4.1.8)
  with SMTP id 10398183 for joepublic@flunky.hypertouch.com; Thu, 10 Jun 2004 19:02:14 -0700
Received: from [200.30.214.32] (HELO mail.hasit.com (Stalker SMTP Server 1.8b9d14)
  by mail.hasit.com (Stalker SMTP Server 1.8b9d14)
  with SMTP id S.0003700391 for <bob52@hypertouch.com>; Thu, 10 Jun 2004 19:02:18 -0700
Date: Thu, 10 Jun 2004 23:13:50 +0000
From: Cease Moment <maf@bargain-warrior.com>
Subject: Distance-learning, at your own pace
To: Bob52 <bob52@hypertouch.com>
References: <9F3893759AB0H6B1@hypertouch.com>
In-Reply-To: <9F3893759AB0H6B1@hypertouch.com>
Message-ID: <FF9CL72EH8ACIFC3@bargain-warrior.com>

Paul Wagner, 04:28 PM 12/16/2004 -0800, CommuniGate Pro issue

MIME-Version: 1.0
Content-Type: text/html
Content-Transfer-Encoding: 8bit

"This message was transferred with a trial version of CommuniGate(tm) Pro"

Click here to unsubscribe from receiving Kennedy Western University emails

Kennedy-Western University
200 West 17th Street
Cheyenne, WY 82001-4412

P.O. Box 7897 G.P.O. Shah Alam · 40722 Shah Alam · Selangor D.E. Malaysia

**Paul Wagner, 05:18 PM 12/16/2004 -0800, Re: CommuniGate Pro issue**

Date: Thu, 16 Dec 2004 17:18:56 -0800
To: Joe Wagner <joew@cdr.stanford.edu>
From: Paul Wagner <wagner@ai.mit.edu>
Subject: Re: CommuniGate Pro issue
X-SpamPal: PASS

P.S. Also, why do you say in your complaint, '    Plaintiffs further allege that the defendant sent
electronic mail to the plaintiffs
    that had no valid physical postal address of the sender. Said conduct was in violation of 15 U.S.C
§7704(a)(5)(iii)."?
    That would meab KWU had included false or misleading info as to origin in the message body. On
the other hand,
    Accurint does list "5 employees" as being associated with the Cheyenne address (out of a total of
"100 employees"
    nationwide). Odd, because it looks like a Mail depot...


At 04:28 PM 12/16/2004 -0800, Paul Wagner wrote:

Joe,

What is it that Hypertouch's CommuniGate Pro server, as well as BSI's CommuniGate Pro
server, appear not to verify the HELO parameter given to it from the preceding server?
Both servers put the IP address of the previous server in square brackets, suggesting that
the HELO parameter was not verified; see text highlighted in red below.

I understand that when the Stalker SMTP Server does not write "] verified)", that is a bad thing;
but the CommuniGate Pro server may not check or indicate this in the same way.

Thanks for any plausible explanation,
Paul




Sample email advertising "kw.edu" or "Kennedy-Western":

Return-Path: <maf@bargain-warrior.com>
Received: from [69.33.227.202] (HELO mail.reasonabledoubt.com)
 by beyondsystems.net (CommuniGate Pro SMTP 4.1.8)
 with ESMTP id 4353402 for support@beyondsystems.net; Thu, 10 Jun 2004 22:02:19 -0400
Received: from <joepublic@flunky.hypertouch.com>
 by mail.reasonabledoubt.com (CommuniGate Pro RULES 4 1.8)
 with RULES id 10399184; Thu, 10 Jun 2004 19:02:15 -0700

**Paul Wagner, 05:18 PM 12/16/2004 -0800, Re: CommuniGate Pro Issue**

X-Autogenerated: Mirror
X-Mirrored-by: <joepublic@flunky.hypertouch.com>
Received: from [69.33.227.203] (HELO mail.hasit.com)
 by mail.reasonabledoubt.com (CommuniGate Pro SMTP 4.1.8)
 with SMTP id 10398183 for joepublic@flunky.hypertouch.com; Thu, 10 Jun 2004 19:02:14 -0700
Received: from [200.30.214.32] (HELO mail.bargain-warrior.com)
 by mail.hasit.com (Stalker SMTP Server 1.8b9d14)
 with SMTP id S.0003700391 for <bob52@hypertouch.com>; Thu, 10 Jun 2004 19:02:18 -0700
Date: Thu, 10 Jun 2004 23:13:50 +0000
From: Cease Moment <maf@bargain-warrior.com>
Subject: Distance-learning, at your own pace
To: Bob52 <bob52@hypertouch.com>
References: <9F3893759AB0H8B1@hypertouch.com>
In-Reply-To: <9F3893759AB0H8B1@hypertouch.com>
Message-ID: <FF9CL72EH8ACIFC3@bargain-warrior.com>
MIME-Version: 1.0
Content-Type: text/html
Content-Transfer-Encoding: 8bit

*This message was transferred with a trial version of CommuniGate(tm) Pro*

Click here to unsubscribe from receiving Kennedy-Western University emails.
Kennedy-Western University
200 West 17th Street
Cheyenne, WY 82001-4412

P.O. Box 7897 G.P.O. Shah Alam - 40732 Shah Alam - Selangor D.E. Malaysia.

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I
CONDUCTED ON TUESDAY, OCTOBER 28, 2008

1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4

         ─────────────────────────────
                                          )
5   BEYOND SYSTEMS, INC., a        )    Civil Action
    Maryland Corporation,          )
6                                  )    Case No. CV08-01039
         Plaintiff,                )           RGK (PLAx)
7                                  )
    vs.                            )
8                                  )
    CONNEXUS CORP. (f/k/a          )    CONFIDENTIAL
9   VANDARE MEDIA and NetBlue,     )
    Inc.), a Delaware Corporation; )
10  HYDRA MEDIA GROUP, INC., a     )
    California Corporation;        )
11  MAILCOMPANYX (d/b/a Internet   )
    Endeavors, Inc.), a Nevada     )
12  Corporation, including         )
    SEBASTIAN BARALE, in his       )
13  individual capacity; and       )
    Does 1 through 10, inclusive,  )
14                                 )
         Defendants.               )
15  ─────────────────────────────  )
16
17                 Volume 1
18              DEPOSITION OF
19             PAUL A. WAGNER
20            Washington, D.C.
21        Tuesday, October 28, 2008
22               9:39 a.m.



### CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I
### CONDUCTED ON TUESDAY, OCTOBER 28, 2008

2

1    Job No.:  1-140781

     Pages 1 through 296

2    Reported by:  John L. Harmonson, RPR

3

4

5

6                          Deposition of

7                         PAUL A. WAGNER

8

9

10   Held at the offices of:

11           VENABLE, LLP

12           575 Seventh Street, N.W.

13           Washington, D.C.   20004

14           (202) 344-4000

15

16

17       Taken pursuant to the Federal Rules of Civil

18   Procedure, before John L. Harmonson, Registered

19   Professional Reporter, Notary Public in and for the

20   District of Columbia, who officiated in administering

21   the oath to the witness.

22

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

3

```
 1                          APPEARANCES

 2

 3    ON BEHALF OF PLAINTIFF:

 4            ANTHONY A. ONORATO, ESQUIRE
              Steptoe & Johnson, LLP
 5            750 Seventh Avenue
              New York, New York  10019
 6            (212) 506-3933

 7            JENNIE L. KNEEDLER, ESQUIRE
              Steptoe & Johnson, LLP
 8            1330 Connecticut Avenue, N.W.
              Washington, D.C.  20036
 9            (202) 429-8124

10

11

12    ON BEHALF OF DEFENDANTS:

13            J. DOUGLAS BALDRIDGE, ESQUIRE
              ARI N. ROTHMAN, ESQUIRE
14            LISA JOSE FALES, ESQUIRE
              Venable, LLP
15            575 Seventh Street, N.W.
              Washington, D.C.  20004
16            (202) 344-4000

17

18

19

20

21

22
```

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I
CONDUCTED ON TUESDAY, OCTOBER 28, 2008

9

1    cases.

2        Q.    Is it your testimony under oath that my

3    client sent e-mail directly to you at that e-mail

4    address?

5        A.    At that e-mail address, I'm not sure.

6        Q.    So it could have come from somewhere else,

7    right?

8        A.    It certainly has come from other places.

9        Q.    In fact, a lot of spam is sent to BSI from

10   HyperTouch, correct?

11               MR. ONORATO:  Objection to form.

12               THE WITNESS:  Again, I'm using the sense of

13   send as one server retransmits to another.  So

14   HyperTouch delivers e-mail to BSI, so BSI receives

15   from HyperTouch.

16   BY MR. BALDRIDGE:

17        Q.    HyperTouch --

18        A.    Server, excuse me.  From a server that

19   belongs to HyperTouch.

20        Q.    The HyperTouch server is the initial

21   recipient of that spam, and then that server

22   automatically forwards it on to BSI, right?

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

                                                                    18

1      A.    No.

2      Q.    And HyperTouch -- What is HyperTouch?

3      A.    That's a company headed by my brother, Joe

4   Wagner.

5      Q.    Do you have any ownership interest in

6   HyperTouch?

7      A.    No.

8      Q.    Does BSI have any ownership interest in

9   HyperTouch?

10     A.    No.

11     Q.    Is HyperTouch a business that is completely

12  independent from BSI?

13     A.    Yes.

14     Q.    When were you deposed in the

15  Kennedy-Western case?

16     A.    There too, I don't recall the exact date.

17     Q.    Two times?

18     A.    Pardon?

19     Q.    You said there were two times?

20     A.    No, I don't think so.

21     Q.    Oh, I thought you said there were two.

22     A.    There as well.  I mean, I don't recall the

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

32

1    The zip code is 20817.

2         Q.    **Is that a residence?**

3         A.    I think it's a multiuse building, but there

4    is a residence there.

5         Q.    **Does somebody live at that address?**

6         A.    Yes.

7         Q.    **Who?**

8         A.    Alton Burton.

9         Q.    **Who is Alton Burton?**

10        A.    He is an attorney and an accountant for

11   BSI.

12        Q.    **Now, do you have like a physical office you**

13   **do work out of for BSI?**

14        A.    Yes.

15        Q.    **Where is that?**

16        A.    I sometimes use Alton's office.  There are

17   also offices in Rockville and Silver Spring, Maryland.

18        Q.    **These are Alton Burton's offices in**

19   **Rockville and Silver Spring?**

20        A.    No, his is in Bethesda.

21        Q.    **What are these offices in Rockville and**

22   **Silver Spring?**

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**



33

1      A.    As I understand it, BSI maintains offices

2  in Rockville and Silver Spring.

3      Q.    **What are the Rockville and Silver Spring**

4  **addresses?**

5  ███████████████████████████████

6  ███████████████████████████████████

7  ████████████████████████████

8  █████████████████████████████████

9  ██████████████████████████████████

10 ██████████

11 ███████████████████████████████████

12 ███████████████████████

13     A.    Yes.

14     Q.    **Who resides there?**

15     A.    It's owned by my parents.

16     Q.    **Is it a rental place?  What is it?**

17     A.    It's a house.

18     Q.    **Who actually puts their head on the pillow**

19  **there at night?**

20     A.    We have a family friend who is living there

21  now.

22     Q.    **And what's that person's name?**

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

34

```
 1        A.    Haley is her first name.   I forget her last

 2    name.

 3        Q.    Does Haley work for BSI?

 4        A.    No.

 5        Q.    Does Haley provide any services to BSI?

 6        A.    She turns computers on and off for us

 7    occasionally.

 8    ████████████████████████████████████████

 9    ████████████

10        A.    Yes.   The servers.

11        Q.    What servers?

12        A.    There are e-mail web and DNS servers there.

13        Q.    How long have they been there?

14        A.    Probably at least ten years.   There have

15    been servers there, not those particular ones.

16        Q.    Now, I think you said BSI was formed in

17    1996; is that correct?

18        A.    Yes.

19        Q.    So sometime a couple of years after you

20    ████████████████████████████████████

21        A.    Yes.   And there might have been servers

22    there in 1996.   I'm sure there -- yeah.
```

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

36

1    thought you were asking.

2    BY MR. BALDRIDGE:

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    **also a residence?**

5        A.    Yes.

6        Q.    **Who lives there?**

7        A.    My parents.

8        Q.    **And what are your parents' names, full**

9    **name?**

10       A.    William John Wagner and Diane Marie Wagner.

11       Q.    **What work or services are provided out of**

12   **this Rockville address for BSI?**

13       A.    By whom?

14       Q.    **You said it's a BSI office.  I'm trying to**

15   **figure out how is it a BSI office.  What does it**

16   **function as in the BSI family?**

17       A.    Well, BSI maintains servers at that address

18   as well.

19       Q.    **Any other BSI business interests affiliated**

20   **with that address in Rockville other than the**

21   **existence of these servers?**

22       A.    BSI provides Internet access there as well.

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

69

1     that it would forward those e-mails to BSI?

2          A.     No.

3                 MR. ONORATO:  Objection to form.

4     BY MR. BALDRIDGE:

5          Q.     How did BSI come into possession of the

6     e-mails at issue in this case?

7          A.     HyperTouch servers that deliver the e-mails

8     to BSI.

9          Q.     And that's the proper technological

10    description, the HyperTouch servers deliver them?

11         A.     That's one description.  I don't know

12    specifically how HyperTouch configures its servers.  I

13    imagine it routes them somehow, but I don't know

14    specifically.

15         Q.     Are you aware of any e-mails at issue in

16    this case that were not routed from HyperTouch to BSI?

17         A.     Yes.

18         Q.     How many in number?

19         A.     I don't recall.

20         Q.     Do you have a volume, a relative volume?

21         A.     No, I don't know exactly.

22         Q.     Do you know percentagewise?

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

88

```
 1              MR. ONORATO:  Objection to form.

 2   BY MR. BALDRIDGE:

 3        Q.    Do you recall that?

 4        A.    No.

 5        Q.    Do you recall mid-2003 being a point at

 6   which HyperTouch servers were configured so that

 7   e-mail would end up with BSI?

 8              MR. ONORATO:  Objection to form.

 9              THE WITNESS:  I know in 2003 HyperTouch

10   servers were delivering or routing -- I believe

11   routing e-mail to BSI.

12   BY MR. BALDRIDGE:

13        Q.    And that happened in mid-2003?

14        A.    I think it commenced before that.  At least

15   that early, maybe before.

16        Q.    Do you know when the HyperTouch server

17   first routed an e-mail to BSI that is now at issue in

18   this case?

19        A.    Probably in 2005.

20        Q.    2005?

21        A.    February 15, 2005.

22        Q.    February 15, 2005?
```

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

89

1      A.    Right.

2      Q.    **What sticks out in your mind about that?**

3      A.    That was three years before the date we

4   filed suit.

5      Q.    **And why is that important, three years**

6   **before?**

7      A.    I understood there is no way to defend

8   against e-mails more than three years ago.

9      Q.    **Who told you that?**

10          MR. ONORATO:  Objection to the extent it

11  calls for attorney/client communications or calls for

12  a legal conclusion.

13          THE WITNESS:  I don't recall how I first

14  learned of that.  And it's possible we've discussed

15  that since I first learned of it with attorneys, but I

16  guess that would be privileged.

17  BY MR. BALDRIDGE:

18      Q.    **Now, you testified a few minutes ago that**

19  **you thought there was some kind of written**

20  **communication early on that I believe was with lawyers**

21  **regarding the possibility of a claim against Connexus**

22  **or Hydra?**

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

142

1          THE WITNESS:  I don't recall sitting here

2     today if that's the case.  I understand that Connexus

3     and earlier entities have sent e-mails themselves, and

4     I don't recall which of the e-mails at issue might

5     have been sent by Connexus.

6     BY MR. BALDRIDGE:

7          Q.    So as you sit here today, though -- I just

8     want to make sure -- your understanding is that all

9     e-mails at issue in this case were either routed from

10    HyperTouch or came into BSI's possession through a

11    subaffiliate of Connexus or Hydra; is that right?

12          MR. ONORATO:  Objection to form.

13          THE WITNESS:  That doesn't sound right.

14    BY MR. BALDRIDGE:

15          Q.    You've got 100 percent -- put all the

16    e-mails together, that's 100 percent, right?

17          A.    True.

18          Q.    What percentage of all the e-mails in this

19    case were routed to BSI from HyperTouch?

20          A.    I don't know.  We were discussing that, and

21    I don't remember the percentage that involved --

22          Q.    Can you give me a range?

**CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME I**
**CONDUCTED ON TUESDAY, OCTOBER 28, 2008**

143

1    A.    I think I said it was more than 90 -- I'm

2    sorry, less than 99 percent but more than half.  The

3    majority of the e-mails came through HyperTouch.

4    Q.    Now, majority is different than less than

5    99 percent.  Was it more than 90 percent came through

6    HyperTouch?

7    A.    I don't know.  The majority came through

8    HyperTouch.  Less than 99 percent came through

9    HyperTouch.

10   Q.    So beyond it being greater than 50 percent

11   and less than 99 percent, you don't know?

12   A.    I just don't know the number right now.

13   It's easy to check, but I don't know that number right

14   now.

15   Q.    And if I wanted you to check for the exact

16   number, that would come out of the spreadsheet you

17   produced in this case?

18   A.    I don't know if it would come out of

19   e-mails themselves.  I'm not sure --

20   Q.    You said it's easy to check.  How would you

21   check that to find out the percentage?

22   A.    So I would look in the e-mails themselves,

1

```
 1                    UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA
 3
 4    BEYOND SYSTEMS, INC., A          )
      MARYLAND CORPORATION,            )
 5                                     )
                    PLAINTIFFS,        )
 6                                     )
           VS.                         ) NO. CV08-01039 RGK(PLAX)
 7                                     )
      CONNEXUS CORP. (F/K/A VENDARE    )
 8    MEDIA AND NETBLUE, INC.), A      )
      DELAWARE CORPORATION; HYDRA      )
 9    MEDIA GROUP, INC., A CALIFORNIA) )
      CORPORATION; MAILCOMPANYX        )
10    (D/B/A INTERNET ENDEAVORS, INC.) )
      A NEVADA CORPORATION, INCLUDING) )
11    SEBASTIAN BARALE, IN HIS         )
      INDIVIDUAL CAPACITY; AND DOES 1) )
12    THROUGH 10, INCLUSIVE,           )
                                       )
13                  DEFENDANTS.        )
      _____)
14
15
16
17           DEPOSITION OF JAMES JOSEPH WAGNER
18              LOS ANGELES, CALIFORNIA
19              TUESDAY, OCTOBER 7, 2008
20                     VOLUME
21
22
23    REPORTED BY:
      MARIA A. HASAKIAN
24    CSR NO. 8469
      JOB NO. 189768
25
```

James Joseph Wagner

2

```
 1                 UNITED STATES DISTRICT COURT.
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4     BEYOND SYSTEMS, INC., A        )
       MARYLAND CORPORATION,          )
 5                                    )
                    PLAINTIFFS,       )
 6                                    )
            VS.                       ) NO. CV08-01039 RGK(PLAX)
 7                                    )
       CONNEXUS CORP. (F/K/A VENDARE  )
 8     MEDIA AND NETBLUE, INC.), A    )
       DELAWARE CORPORATION; HYDRA    )
 9     MEDIA GROUP, INC., A CALIFORNIA)
       CORPORATION; MAILCOMPANYX      )
10     (D/B/A INTERNET ENDEAVORS, INC.)
       A NEVADA CORPORATION, INCLUDING)
11     SEBASTIAN BARALE, IN HIS       )
       INDIVIDUAL CAPACITY; AND DOES 1)
12     THROUGH 10, INCLUSIVE,         )
                                      )
13                  DEFENDANTS.       )
       _____)
14
15
16              VIDEOTAPED DEPOSITION OF JAMES JOSEPH
17     WAGNER, VOLUME 1, TAKEN ON BEHALF OF DEFENDANTS, AT
18     2049 CENTURY PARK EAST, SUITE 2100, LOS ANGELES,
19     CALIFORNIA, BEGINNING AT 10:16 A.M. AND ENDING AT
20     5:53 P.M. ON TUESDAY, OCTOBER 7, 2008, BEFORE MARIA A.
21     HASAKIAN, CERTIFIED SHORTHAND REPORTER NO. 8469.
22
23
24
25
```

James Joseph Wagner

3

```
 1    APPEARANCES:

 2

 3    FOR PLAINTIFF:

 4         STEPTOE & JOHNSON, LLP
           BY:  LYNN R. LEVITAN

 5    ATTORNEY AT LAW
           633 WEST FIFTH STREET, SUITE 700

 6    LOS ANGELES, CALIFORNIA 90071-3500
           213.439.9431

 7    LLEVITAN@STEPTOE.COM

 8    FOR DEFENDANTS:

 9         VENABLE LLP
           BY:  ARI N. ROTHMAN AND JOHN B. WILLIAMS, III

10    ATTORNEYS AT LAW
           575 SEVENTH STREET, NW

11    WASHINGTON, DC 20004
           202.344.4380

12    ANROTHMAN@VENABLE.COM

13

14    VIDEOGRAPHER:

15         LEE BOSSET
           ESQUIRE DEPOSITION SERVICES

16    523 WEST SIXTH STREET, 10TH FLOOR
           LOS ANGELES, CALIFORNIA 90071

17    213.443.4060

18

19

20

21

22

23

24

25
```

**James Joseph Wagner**

149

1    WERE NO SERVERS THAT WERE INVOLVED WITH --

2        A    THERE COULD -- SO THERE WERE NO -- THERE COULD

3    BE NO MAIL SERVERS OWNED BY HYPERTOUCH THAT WERE INVOLVED

4    IN THOSE LAWSUITS.

5        Q    YOU MEAN IN MARYLAND?

6        A    IN MARYLAND.  SORRY.  IN MARYLAND.

7        Q    OKAY.  SO ALL OF THE MAIL SERVERS INVOLVING THE

8    E-MAILS AT ISSUE THAT HIT A HYPERTOUCH SERVER WERE ALL

9    LOCATED IN CALIFORNIA?

10       A    YES.

11            MR. ROTHMAN:  ALL RIGHT.  I'M GOING TO PUT

12   BEFORE YOU WHAT'S BEEN MARKED AS EXHIBIT 63.

13            (EXHIBIT 63 WAS MARKED FOR

14            IDENTIFICATION BY THE COURT REPORTER

15            AND IS ATTACHED HERETO.)

16   BY MR. ROTHMAN:

17       Q    AND DO YOU RECOGNIZE EXHIBIT 63, MR. WAGNER?

18       A    YES.

19       Q    ALL RIGHT.  WHAT IS IT?

20       A    IT APPEARS TO BE A COPY OF MY -- OF THE /LEGAL

21   HTML PAGE.

22            THE REPORTER:  I'M SORRY.  "LEGAL"?

23            THE WITNESS:  /LEGAL.HTML PAGE.

24   BY MR. ROTHMAN:

25       Q    OKAY.  AND YOU DRAFTED THE LANGUAGE THAT

**James Joseph Wagner**

184

1            AND THEN ALL -- AND THEN AT THE END, ALL OTHER

2    E-MAIL ADDRESSES ARE ROUTED TO BEYOND SYSTEMS -- OR -- OR

3    BEYOND SYSTEMS -- IN THE ROUTING TABLE.  THEN ALL

4    OTHER -- ALL OTHER E-MAILS THAT ARE NOT SPECIFICALLY

5    ROUTED TO A USER ARE ROUTED TO BEYOND SYSTEMS.

6        Q    OKAY.  SO AN E-MAIL THAT IS NOT ADDRESSED TO

7    ONE OF THE FIFTEEN OR SO USERS THAT YOU TESTIFIED ABOUT,

8    AND THAT HAS NOT BEEN EXCLUDED BY A RULE THAT YOU

9    TESTIFIED ABOUT, FOR EXAMPLE, THE AFFECTED -- OR INFECTED

10   MACHINE --

11       A    UH-HUH.

12       Q    -- ALL OF THE OTHER E-MAILS THAT ARE ADDRESSED

13   TO HYPERTOUCH.COM E-MAIL ADDRESSES ARE SENT TO

14   BEYOND SYSTEMS?

15       A    CORRECT.

16       Q    OKAY.  ALL RIGHT.  WHY DID YOU CONFIGURE THE

17   TABLE SO THAT ALL OF THESE E-MAILS WOULD GO TO

18   BEYOND SYSTEMS?

19       A    SOMETIME AROUND -- IN 2002 OR -3, I -- THE

20   E-MAIL LOAD GOING TO THAT END WILD CARD ACCOUNT, WHICH I

21   WAS ARCHIVING AND -- WAS ABLE TO ARCHIVE, BECAME TOO

22   GREAT.  AND BEYOND SYSTEMS DID HAVE THE EXCESS -- OR NOT

23   THE EXCESS, BUT HAD THE SUFFICIENT STORAGE CAPACITY AND

24   INFRASTRUCTURE TO HANDLE ARCHIVING THOSE E-MAILS.

25            MR. ROTHMAN:  ALL RIGHT.  CAN WE STOP THERE?  I

James Joseph Wagner

189

1    SPAMMER.

2        Q    OKAY.  SO HOW DO YOU KNOW THAT SOME OF THE

3    E-MAIL THAT YOU WERE ARCHIVING WAS SPAM?

4        A    BECAUSE IT WAS.

5            I'M NOT SURE WHAT YOU MEAN.

6        Q    WELL, YOU SAID THAT SOME OF THE E-MAIL --

7    STRIKE IT.

8            YOU SAID THAT YOU WERE ARCHIVING SPAM UP UNTIL

9    2003; RIGHT?

10       A    NO.  I SAID I WAS ARCHIVING ALL E-MAILS.

11       Q    OKAY.  WELL, THAT INCLUDED SPAM; RIGHT?

12       A    CORRECT.

13       Q    OKAY.  SO YOU WERE ARCHIVING SPAM IN 2003 -- UP

14   TO 2003; CORRECT?

15       A    OKAY.  YES.

16       Q    ALL RIGHT.  HOW DO YOU KNOW THAT THE E-MAILS

17   THAT YOU WERE ARCHIVING, THAT YOU ARE CALLING "SPAM,"

18   WERE, IN FACT, SPAM?

19       A    SO IF I WOULD HAPPEN TO VIEW A PARTICULAR

20   E-MAIL AND IT WOULD SAY -- ADVERTISED VIAGRA, AND PERHAPS

21   IT WASN'T A -- A MISSPELLING OF A USER OR SOMETHING, BUT

22   IT WAS SENT TO MY DOMAIN REGISTRATION E-MAIL ADDRESS,

23   THEN I WOULD BE -- THEN -- THEN I WOULD KNOW THAT THAT IS

24   SPAM.

25           I -- I GUESS, MOST OFTEN, YOU KNOW SPAM WHEN

**James Joseph Wagner**

190

```
 1    YOU SEE IT.  AND THAT'S -- THAT'S -- I MEAN, THAT'S --

 2    THAT'S THE ANSWER, I GUESS.

 3         Q    CAN YOU ESTIMATE HOW MUCH SPAM YOU ARCHIVED UP

 4    UNTIL 2003?

 5              MS. LEVITAN:  FOR HYPERTOUCH?

 6              MR. ROTHMAN:  CORRECT.

 7         Q    AND THESE ARE THE E-MAILS THAT ARE ADDRESSED TO

 8    HYPERTOUCH.COM, THAT DON'T GO TO THE 15 USERS --

 9    RIGHT? --

10         A    YES.

11         Q    -- THAT WE'RE TALKING ABOUT?

12              OKAY.  SO --

13         A    THAT WENT TO THE CATCHALL ACCOUNT, YES.

14         Q    YEAH.  WE'LL CALL IT THE "CATCHALL ACCOUNT."

15         A    OR, I MEAN -- I'M SORRY.  THE WILD CARD

16    ACCOUNT.  SORRY.

17         Q    WE'LL CALL IT "WILD CARD" OR "CATCHALL"?

18         A    I GUESS IT'S THE WILD CARD.

19         Q    ALL RIGHT.  SO WE'LL CALL IT THE "WILD CARD

20    ACCOUNT."

21              HOW MANY E-MAILS WERE SPAM THAT WERE ADDRESSED

22    TO THE WILD CARD ACCOUNT?

23         A    I HONESTLY -- I MEAN, I -- LET'S SEE.

24              I -- I WOULD JUST BE GUESSING AT THIS POINT.  I

25    DON'T REMEMBER.
```

James Joseph Wagner

191

1     Q     YOU CAN'T EVEN ESTIMATE?

2     A     I THINK THE SPAM LOAD -- OR THE TOTAL E-MAIL

3 LOAD, MOST -- YOU KNOW, MOST OF IT BEING SPAM, WOULD -- I

4 THINK MAYBE 5,000 A DAY, PLUS OR MINUS.  I'M NOT SURE.

5 I -- I JUST DON'T -- I HONESTLY DON'T REMEMBER.

6     Q     CAN -- CAN YOU EXPRESS IT AS A PERCENTAGE OF

7 TOTAL E-MAIL?

8           IN OTHER WORDS, WAS IT 5 PERCENT SPAM,

9 95 PERCENT NOT SPAM?  95 PERCENT SPAM, 5 PERCENT NOT

10 SPAM?

11    A     I WOULD THINK, AT THAT POINT IN TIME, THE LARGE

12 MAJORITY OF THE ONES THAT MADE IT TO THAT ACCOUNT WOULD

13 BE SPAM.

14    Q     OKAY.  WELL, LARGE MAJORITY -- 60?  80?  90?

15 95?

16    A     I WOULD THINK OVER 90.

17    Q     OKAY.  WOULD YOU SAY OVER 95?

18    A     I'M --

19          MS. LEVITAN:  WITHOUT GUESSING.

20          THE WITNESS:  I WOULDN'T BE SURPRISED IF THAT

21 WAS THE CASE.

22 BY MR. ROTHMAN:

23    Q     ALL RIGHT.

24    A     BUT -- YEAH.

25    Q     OKAY.  SO IN 2003, AT LEAST 90 PERCENT OF THE

James Joseph Wagner

192

1    E-MAILS ADDRESSED TO THE WILD CARD ACCOUNT WERE SPAM;

2    RIGHT?

3        A    THAT WERE -- THAT WERE, YEAH, ROUTED TO --

4        Q    OKAY.

5        A    -- THROUGH THE WILD CARD ACCOUNT, YES.

6        Q    AND THEN HYPERTOUCH COULD NOT HANDLE THE

7    CAPACITY OF THAT SPAM -- RIGHT? -- COULD NOT ARCHIVE IT

8    ROBUSTLY?

9        A    CORRECT.  YES.

10       Q    AND SO THEN IT ROUTED THE E-MAILS TO

11   BEYOND SYSTEMS?

12       A    SO THEN I -- SO THEN HYPERTOUCH ASKED

13   BEYOND SYSTEMS IF IT WOULD MIND ARCHIVING THE -- THE

14   E-MAILS THAT ARE, YOU KNOW -- OR IF IT WOULD BE ABLE TO

15   ARCHIVE THE E-MAILS THAT ARE BEING SENT TO ITS DOMAIN,

16   AND THEY SAID, "YES."

17       Q    OKAY.  SO STARTING IN 2003, BEYOND SYSTEMS

18   STARTED ARCHIVING THE E-MAILS SENT TO THE WILD CARD

19   ACCOUNT?

20       A    THAT WERE ROUTED TO THE WILD CARD ACCOUNT, YES.

21       Q    AND THAT WAS FOR WHOSE BENEFIT?

22            IN OTHER WORDS, WAS IT FOR HYPERTOUCH'S BENEFIT

23   THAT BEYOND SYSTEMS AGREED TO RECEIVE THESE E-MAILS, OR

24   WAS IT FOR BEYOND SYSTEMS' BENEFIT, OR WAS IT FOR

25   SOMEBODY ELSE'S BENEFIT?

James Joseph Wagner

195

1   MORE?

2        HOW ABOUT THIS:  BEFORE OR AFTER FEBRUARY 2005?

3   A   I WOULD THINK BEFORE THEN.

4   Q   OKAY.

5   A   IT PROBABLY WAS THAT.

6   Q   SO LET'S STICK WITH JANUARY 1, 2005, THROUGH

7   THE PRESENT.

8        IS IT YOUR TESTIMONY THAT THE SPAM RATIO OF

9   E-MAILS SENT TO THE WILD CARD ACCOUNT IS 99 PERCENT?

10  A   IT'S AT LEAST THAT, YES.

11  Q   AT LEAST THAT?

12  A   YES.

13  Q   SO IT COULD BE 100 PERCENT?

14  A   NO, IT'S NOT 100 PERCENT.

15  Q   OKAY.  99 PERCENT?

16  A   AT LEAST 99 PERCENT.

17  Q   OKAY.  NOW, YOU TESTIFIED EARLIER THAT

18  HYPERTOUCH ENCOUNTERED CRASHES?

19  A   YES.

20  Q   DID ANY OF --

21  A   OR I SHOULD SAY I -- I DON'T REMEMBER IF I

22  TESTIFIED ABOUT CRASHES.  BUT OKAY.

23  Q   I -- I THINK YOU DID.

24  A   OKAY.

25  Q   IF YOU DIDN'T, THEN I APOLOGIZE.  I THOUGHT I

James Joseph Wagner

198

1        SOME OF MY USERS, WITH THEIR OWN DOMAINS,

2   MIGHT -- MIGHT HAVE -- HAD BEEN -- HAD BEEN ON A

3   SECONDARY MAIL SERVER. I DON'T QUITE RECALL.

4        BUT -- BUT FOR, I BELIEVE, MOST OF MY USERS,

5   THEN -- IF THEY WEREN'T ON MY SECONDARY MAIL SERVER, THEN

6   IT IS COMPLETELY UP TO THE SENDER'S MAIL SERVER WHETHER

7   OR NOT THEY GOT THAT INFORMATION.

8        AND MANY SERVERS -- I THINK EARTHLINK IS A

9   NOTORIOUS EXAMPLE. IF IT GETS A FAILURE, IT DOESN'T

10  ACTUALLY -- I HAD HEARD THAT IT DOESN'T ACTUALLY OBEY AND

11  DO RETRIES, THAT IT WILL JUST SUMMARILY DISCARD. AND I

12  HEARD THAT THE DISCARDS CAN BE DONE SILENTLY. AND SO

13  USERS WOULDN'T KNOW THEY DIDN'T GET DELIVERED.

14       BUT, IN ANY CASE -- SO I -- I HAVE NO WAY OF

15  KNOWING IF THAT DID -- THERE -- THERE WAS A -- LET ME

16  THINK.

17       DO I KNOW THAT OR NOT?

18       YEAH. I JUST DON'T KNOW IF, IN FACT, THERE WAS

19  A BACKLOG THAT THEN WAS TAKEN CARE OF OR PEOPLE

20  DISCARDED.

21   Q   OKAY. NOW, I WANT TO GO BACK TO A COUPLE OF

22  THINGS YOU JUST SAID.

23       SO YOU TESTIFIED THAT YOU ASKED BEYOND SYSTEMS

24  IF IT COULD ARCHIVE E-MAILS SENT TO THE WILD CARD ACCOUNT

25  FOR HYPERTOUCH?

**James Joseph Wagner**

199

1     A     FOR HYPERTOUCH.COM.

2     Q     YES.

3     A     CORRECT.

4     Q     OKAY.  AND YOU ASKED BEYOND SYSTEMS TO DO THAT;

5     RIGHT?

6     A     ME, AS PRESIDENT --

7     Q     HYPERTOUCH ASKED BEYOND SYSTEMS --

8     A     YES.

9     Q     -- TO ARCHIVE E-MAILS ADDRESSED TO THE WILD

10    CARD ACCOUNT --

11    A     IF IT COULD TAKE OVER THE ARCHIVING, YES.

12    Q     OKAY.  AND WAS THAT PURSUANT TO SOME SORT OF

13    AGREEMENT THAT BEYOND SYSTEMS HAD WITH HYPERTOUCH?

14          MS. LEVITAN:  OBJECTION.  FORM.

15    BY MR. ROTHMAN:

16    Q     WAS THERE A CONTRACT FOR THAT SERVICE THAT

17    BEYOND SYSTEMS AGREED TO PROVIDE?

18    A     NO.  THAT'S WHAT THE REQUEST WAS.  I ASKED IF

19    HE WOULD, AND HE SAID, "YES."

20    Q     WAS IT A FAVOR?

21          I MEAN, I'M JUST TRYING TO GET MY ARMS AROUND

22    IF IT WAS A BUSINESS TRANSACTION, OR IT'S JUST, YOU KNOW,

23    A FAVOR BETWEEN ENTITIES, OR -- OR WHAT -- HOW IT CAME TO

24    BE THAT BEYOND SYSTEMS AGREED TO TAKE OVER THE ARCHIVING

25    ROLE.

James Joseph Wagner

200

```
1        A    I GUESS, BEYOND SYSTEMS AVERAGE -- WE COOPERATE

2    ON, YOU KNOW, LENDING EACH OTHER ROBUSTNESS.  SO IT'S --

3    IT'S, I GUESS, PART OF THAT ONGOING COOPERATION.

4        Q    ALL RIGHT.  AND YOU TESTIFIED -- IN RESPONSE TO

5    MY QUESTION AS TO WHO BENEFITS FROM THE ARCHIVING, YOU

6    TESTIFIED -- I THINK YOU SAID EVERYBODY; RIGHT?

7        A    YES.

8        Q    OKAY.  HOW DOES BEYOND SYSTEMS BENEFIT FROM

9    TAKING OVER THE ARCHIVING DUTIES?

10        A    BEYOND SYSTEMS ALSO USES HYPERTOUCH.COM E-MAIL

11

12

13

14

15

16

17

18

19

20

21             HERE'S WHAT I'M TRYING TO ASK, THEN:  IN 2005

22    TO THE PRESENT DAY, YOU SAID THAT AT LEAST 99 PERCENT OF

23    THE E-MAIL SENT TO THE WILD CARD ACCOUNT WAS SPAM;

24    CORRECT?

25        A    CORRECT.
```

James Joseph Wagner

205

1    DISCUSSED THAT.  WE DID -- WOULD DISCUSS THAT THE SPAM

2    LOAD THAT EVERYBODY IS GETTING, INCLUDING US, IS

3    INCREASING.  BUT, I -- I GUESS, I DON'T THINK WE -- I

4    DON'T KNOW IF WE EVER HAD ANY -- RECALL DOING AN ANALYSIS

5    OR BREAKDOWN FOR HIM.

6        Q    OKAY.  BUT DID YOU COMMUNICATE WITH BEYOND --

7    OR STRIKE IT.

8             DID YOU TELL BEYOND SYSTEMS THAT IT WAS GOING

9    TO BE ARCHIVING SPAM?

10       A    WELL, I HAD ASKED IT TO ARCHIVE ALL E-MAILS.

11   SO I'M NOT SURE.

12       Q    WELL --

13       A    AND IT, PRESUMABLY, WAS AWARE THAT A LOT OF THE

14   E-MAILS WERE SPAM.  SO I DON'T KNOW.

15       Q    WHY DO YOU SAY "PRESUMABLY"?

16       A    BECAUSE EVERYBODY GETS SPAM.  AND, CERTAINLY,

17   ONCE IT STARTED RECEIVING THESE E-MAILS -- YOU KNOW, I

18   DON'T KNOW WHAT INVESTIGATIONS IT'S DONE ON THAT, BUT IT

19   WOULD PRESUMABLY -- YOU KNOW, IF IT EXAMINED IT, IT WOULD

20   SEE THE -- THE RATIO OF SPAM.

21       Q    OKAY.  BUT -- BUT YOU KNEW THAT THERE WAS SPAM

22   IN -- IN THE FILES, OR IN THE ARCHIVES, WHEN YOU ASKED

23   BEYOND SYSTEMS TO TAKE OVER THE ARCHIVING DUTIES?

24       A    I KNEW THAT -- THAT THAT WOULD INCLUDE SPAM.

25       Q    OKAY.  ALL RIGHT.  NOW, GOING BACK TO CRASHES,

James Joseph Wagner

301

1    certain of the hasit.com e-mails would go to Beyond

2    Systems?

3         A    I think -- yes.

4         Q    Did Beyond Systems ask you to send those

5    e-mails to it?

6         A    I -- I'm not sure.  Beyond Systems had agreed

7    to archive.  When Beyond Systems had agreed to archive

8    e-mails -- so no.  I guess they -- they did not

9    specifically ask me to route those.

10        Q    Did you ask Beyond Systems if it would archive

11   e-mails addressed to hasit.com?

12        A    Not specifically.

13        Q    So how did it come to pass that you entered

14   into an agreement, to use your phrase, with

15   Beyond Systems regarding archiving e-mails addressed to

16   hasit.com?

17        A    Well, because back in 2002 or 2003 when

18   Hypertouch could no longer archive all the e-mails that

19   were sent and BSI was able to, then at some point in

20   time -- and I don't recall if it was our decision or

21   not -- but when I -- when I was routing the -- the -- the

22   catchall for hasit, I believe, that goes -- for -- or

23   some portion of the catchall, I think, I -- I -- I --

24   that goes now to BSI.

25        Q    Okay.  So is this the same idea that you

James Joseph Wagner

302

1    described with respect to the e-mails that Beyond Systems

2    agreed to archive that were addressed to hypertouch.com?

3        A    When -- in the 2002 or '1, when we did that, it

4    was a very explicit, "Would you archive for

5    hypertouch.com?"  And so it is not -- so to the extent it

6    is a -- a different domain and it's not a domain known by

7    BSI, I guess, it is a -- a service that BSI is -- is

8    doing for Hypertouch in that sense.  But it's -- I don't

9    recall ever explicitly discussing it or talking about

10   that.

11       Q    Okay.  So e-mails that are addressed to

12   hasit.com, do they first hit Hypertouch's servers?

13       A    Yes.

14       Q    And then they're routed to Beyond Systems, some

15   of them?

16       A    Then some, yes, I believe so.

17       Q    Okay.  Are the e-mails that are routed to

18   Beyond Systems spam?

19            MS. LEVITAN:  Objection.  Form.  I'm sorry.

20   Restate the question.  Are the e-mails?

21   BY MR. ROTHMAN:

22       Q    Are the e-mails that are routed by Hypertouch

23   that contain hasit.com spam?

24            MS. LEVITAN:  Objection.  Form.

25            To that the extent that that question might

James Joseph Wagner

309

1    don't believe any other domain names.

2    BY MR. ROTHMAN:

3        Q    Okay.  Has Beyond Systems ever asked you or

4    Hypertouch to send Beyond Systems e-mails?

5            MS. LEVITAN:  On behalf of Beyond Systems?

6            MR. ROTHMAN:  Yes.

7            MS. LEVITAN:  Is that what you're asking?

8            THE WITNESS:  I --

9            MS. LEVITAN:  Objection.  Form.

10           THE WITNESS:  I don't -- I guess I don't recall

11   or I don't know what you mean by that.

12   BY MR. ROTHMAN:

13       Q    Okay.  So, for instance, these e-mails that

14   you're delivering to Beyond Systems that have

15   hypertouch.com in them, your testimony was that

16   Beyond Systems agreed to do that; correct?

17       A    Yes.

18       Q    And that was because Hypertouch reached out to

19   Beyond Systems and said, "Would you archive certain of

20   the e-mails addressed to hypertouch.com"; correct?

21       A    Yes.

22       Q    What I'm looking for is the reverse.

23           Did Beyond Systems ever reach out to you or

24   Hypertouch and say, "Please deliver or send me certain

25   e-mails"?



Printed on: Thursday, October 08, 2009

# Real Property Estimated Tax
## and Other Non-tax Charges
### a new owner will pay
### in the first full fiscal year of ownership

| ACCOUNT NUMBER: | | 01116453 | | |
|---|---|---|---|---|
| **PROPERTY:** | OWNER NAME | WAGNER, WILLIAM J & D M | | |
| | ADDRESS | 1612 SHERWOOD RD<br>SILVER SPRING, MD 20902-3961 | | |
| | TAX CLASS | 38 | | |
| | REFUSE INFO | Refuse Area: R4L<br>Refuse Unit: 1 | | |

**TAX INFORMATION:**

| TAX DESCRIPTION | FY11 PHASE-IN VALUE$_1$ | FY10 RATE$_2$ | ESTIMATED FY11 TAX/CHARGE |
|---|---|---|---|
| **STATE PROPERTY TAX** | 409,760 | .112 | 458.93 |
| **COUNTY PROPERTY TAX$_3$** | 409,760 | .916 | 3,753.40 |
| **SOLID WASTE CHARGE$_4$** | | 378.81 | 378.81 |
| **WATER QUAL PROTECT CHG (RSFD)$_4$** | | | 45.50 |
| **ESTIMATED TOTAL$_6$** | | | **4,636.64** |

1.  Phase in value comes from the data base at the Maryland Department of Assessments and Taxation http://www.dat.state.md.us/, Real Property Data Search. The phase in value is for the next fiscal year, if available, otherwise the phase in value is for current fiscal year.

2.  Tax rates come from the current property tax bill, which also may include several non-tax charges, at the web page of the County Government's Department of Finance: http://www.montgomerycountymd.gov/finance. Look for a link to "Pay or view your property tax bill on line".

3.  County Property Tax is the sum of the General Fund tax and several special fund taxes.

4.  All non-tax charges (for example Solid Waste, Water Quality Protection, Bay Restoration Fund, WSSC) are the charges in the current fiscal year. These charges may be different in the next fiscal year.

5.  This property is located in an **existing** development district. Each year a special development district assessment must be paid. Effective every July 1st, the rate will change based on changes in the property assessment and debt service requirements  More information is available in the FAQ section of this website.

6   You must update the estimate for the property taxes and other non-tax charges

   a.   Every July 1, because the tax rates, phase-in values, and other non-tax charges will or may change; AND ALSO

   b.   In early January if the calculation used the phase-in value for the current fiscal year instead of the phase-in value for the next fiscal year, because SDAT had not yet specified the phase in value for the next fiscal year. This occurs in the period July 1 - early January in the third year of the three year assessment cycle.

7.  This property is located in a **proposed** development district  At some date in the future, development district taxes may be levied to pay debt service on bonds issued to build infrastructure in the district. It is important that property owners recognize that this additional tax may be levied in the future. The rate indicated above is an

EXHIBIT
1

Case 1:09-mc-00557-HHK    Document 1    Filed 10/19/2009    Page 128 of 192

estimate and will change once the district is created and bonds are issued. More information is available in the FAQ section of this website.

8. The Proposed Estimated Total includes all actual and proposed taxes and non-tax charges relative to this property.

Printed on: Thursday, October 08, 2009



# Real Property Estimated Tax
# and Other Non-tax Charges
## a new owner will pay
## in the first full fiscal year of ownership

| ACCOUNT NUMBER: | | 03593156 |
|---|---|---|
| **PROPERTY:** | OWNER NAME | WAGNER, WILLIAM J & DIANE M |
| | ADDRESS | 38 MARYLAND AVE #333<br>ROCKVILLE, MD 20850-0341 |
| | TAX CLASS | 5 |
| | REFUSE INFO | Refuse Area: R42<br>Refuse Unit: 1 |

**TAX INFORMATION:**

| TAX DESCRIPTION | FY11 PHASE-IN VALUE$_1$ | FY10 RATE$_2$ | ESTIMATED FY11 TAX/CHARGE |
|---|---|---|---|
| **STATE PROPERTY TAX** | 547,900 | .112 | 613.65 |
| **COUNTY PROPERTY TAX$_3$** | 547,900 | .826 | 4,525.65 |
| **ROCKVILLE PROPERTY TAX** | 547,900 | .397 | 2,175.16 |
| **SOLID WASTE CHARGE$_4$** | | 16.42 | 16.42 |
| **ROCKVILLE STORMWATER MGMT FEE** | | | 7.07 |
| **ESTIMATED TOTAL$_6$** | | | **7,337.95** |

1.  Phase in value comes from the data base at the Maryland Department of Assessments and Taxation http://www.dat.state.md.us/, Real Property Data Search  The phase in value is for the next fiscal year, if available, otherwise the phase in value is for current fiscal year.

2.  Tax rates come from the current property tax bill, which also may include several non-tax charges, at the web page of the County Government's Department of Finance: http://www.montgomerycountymd.gov/finance. Look for a link to "Pay or view your property tax bill on line".

3.  County Property Tax is the sum of the General Fund tax and several special fund taxes.

4.  All non-tax charges (for example Solid Waste, Water Quality Protection, Bay Restoration Fund, WSSC) are the charges in the current fiscal year. These charges may be different in the next fiscal year.

5.  This property is located in an **existing** development district. Each year a special development district assessment must be paid. Effective every July 1st, the rate will change based on changes in the property assessment and debt service requirements. More information is available in the FAQ section of this website.

6.  You must update the estimate for the property taxes and other non-tax charges

    a.  Every July 1, because the tax rates, phase-in values, and other non-tax charges will or may change; AND ALSO

    b   In early January if the calculation used the phase-in value for the current fiscal year instead of the phase-in value for the next fiscal year, because SDAT had not yet specified the phase in value for the next fiscal year. This occurs in the period July 1 - early January in the third year of the three year assessment cycle.

7.  This property is located in a **proposed** development district. At some date in the future, development district

Case 1:09-mc-00557-HHK    Document 1    Filed 10/19/2009    Page 130 of 192

taxes may be levied to pay debt service on bonds issued to build infrastructure in the district. It is important that property owners recognize that this additional tax may be levied in the future. The rate indicated above is an estimate and will change once the district is created and bonds are issued. More information is available in the FAQ section of this website.

8.   The Proposed Estimated Total includes all actual and proposed taxes and non-tax charges relative to this property.

**Verizon**
**Legal Compliance**

**verizon**

August 13, 2009

Legal Compliance
TXD01613
2701 S. Johnson St.
San Angelo, TX 76904
Voice: 888-483-2600
Fax 325-949-6916

Re: United States District Court, Southern Division of Maryland, Subpoena, Dated July 24, 2009, and in the Matter of Case No.: PJM 08 cv 0921, Beyond Systems, Inc. v. World Avenue USA, LLC, et al. (Verizon Case: 09288569)

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

VOL Account Number:      0052107986327
Account Creation Date:   12/21/2005

Business Name:           BEYOND SYSTEMS INC
Customer Name:           WILLIAM WAGNER
Account Address:         1612 SHERWOOD RD
                         SILVER SPRING, MD 209020000

Daytime TN:              3016813891
EMail:                   NOSPAM_VERIZONFIOS2@BEYO.US

Payment Method: CreditCard
VZ Fios Bus Mass Market Static/ Active

Service Address Information
BEYOND SYSTEMS INC
WILLIAM WAGNER
1612 SHERWOOD RD
SILVER SPRING, MD 209020000
Primary TN:  2000000000
EMail:  nospam_verizonfios@beyo.us

Shipping Address Information
BEYOND SYSTEMS INC
WILLIAM WAGNER
1612 SHERWOOD RD
SILVER SPRING, MD 209020000
Primary TN:  3019338070
EMail:  nospam_verizonfios@beyo.us

| Type    | User ID  | User Name    |
|---------|----------|--------------|
| Primary | bizs13js | beyondsystems |

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●



EXHIBIT
K

SSP Detail
VOL Account Number:        RS01443565
Account Creation Date:      05/31/2002

Customer Name:             Paul Wagner
Account Address:           1837 R ST NW
                           WASHINGTON, DC 200091603

Daytime TN:                2022348244 Ext:
Evening TN:                2022344444 Ext:
EMail:                     vze43vfu@verizon.net
Payment Method:            LECBilling

CONSUMER VOL DSL/2022348244 Deactivated
Service End Date  03/14/2006

Service Address Information
Paul Wagner
1837 R ST NW
WASHINGTON, DC 200091603
Primary TN:  3013513668
EMail:  vze43vfu

Shipping Address Information
Paul Wagner
1837 R ST NW
1837 R ST NW
WASHINGTON, DC 200091603
Primary TN:  2022348244
EMail:  vze43vfu

| Type | User ID | User Name | Alias |
|------|---------|-----------|-------|
| Primary | vze43vfu | paulandrewwagner | p.wagner9 |

*******************************END OF RECORDS*******************************

REDACTED



REDACTED

REDACTED







NS&S 3.10 (Invoice - 1945537)

File Menu Invoice Accounts Remittance Window



NETWORK
SOLUTIONS™

**INVOICE**

Page 1 of 1
Number: 1945537
Date Created: 22-Jul-1998

**Billing Contact**
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

**Phone:** 301 555-1212

**Account Number:**

**Fax:**

**Status:** PAID

**Status Date:** 28-Aug-1998

**Orig Due:** 23-Aug-1998

**Date Due:** 08-Sep-1998

**Source:** OPS

**Gross Due:** $70.00

**Net Due:** $0.00

(UC)

| Item # | Quant. | Units | Description | Unit Price | Total |
|--------|--------|-------|-------------|-----------|-------|
| 1 | 2.0000 | YR | Domain Subscription<br>CASTALIA.NET<br>Coverage: 19-Jul-1998 to 18-Jul-2000 | $35.00 | $70.00 |

NS0065-S.1.0 - [Invoice - 24356747]

File  View  Invoice  Accounts  Remittance  Window

**NETWORK SOLUTIONS**

**INVOICE**

Page  1  of  1
Number:  24356747
Date Created:  19-Jun-2000

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

**Billing Contact**
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

**Phone:**  301 555-1212

**Fax:**

**Status Date:**  03-Jul-2000

**Source:**  Renewal

**Status:**  PAID

**Account Number:**

**Orig Due:**  21-Jul-2000

**Date Due:**  21-Jul-2000

**Gross Due:** $35.00

**Net Due:**  $0.00

| Item # | Quant. | Units | Description | Unit Price | Total |
|--------|--------|-------|-------------|------------|-------|
| 1 | 1.0000 | YR | Domain Subscription<br>CASTALIA.NET<br>Coverage: 19-Jul-2000 to 19-Jul-2001 | $35.00 | $35.00 |
| | | | | | (UC) |

**NETWORK SOLUTIONS**

**INVOICE**

| | |
|---|---|
| Page | 1 of 1 |
| Number: | 4187/8156 |
| Date Created: | 25-Jul-2001 |

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

Billing Contact
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

**Phone:**    301 555-1212

**Fax:**

**Orig Due:**

**Gross Due:** $35.00

**Account Number:**

**Status:**    PAID

**Date Due:**

**Net Due:**    $0.00

**Status Date:** 25-Jul-2001

**Source:**    Demand Renewal

(UC)

| Item # | Quant. | Units | Description | Unit Price | Total |
|---|---|---|---|---|---|
| 1 | 1.0000 | YR | Domain Subscription CASTALIA.NET Coverage: 19-Jul-2001 to 19-Jul-2002 | $35.00 | $35.00 |

BASS-3.1.0 - [Invoice - 2054177]

File  View  Invoice  Accounts  Remittances  Window

**NETWORK SOLUTIONS**

| | | |
|---|---|---|
| **INVOICE** | Page 1 of 1 | |
| | Number: 2054177 | |
| | Date Created: 02-Aug-1998 | |

**Billing Contact**
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

**Phone:** 301 555-1212

**Account Number:**

**Fax:**

| Status: | PAID | Status Date: | 28-Aug-1998 |
|---|---|---|---|

| Orig Due: | 04-Sep-1998 | Date Due: | 04-Sep-1998 | Source: | OPS |
|---|---|---|---|---|---|

| Gross Due: $70.00 | | Net Due: | $0.00 | | (UC) |
|---|---|---|---|---|---|

| Item # | Quant. | Units | Description | Unit Price | Total |
|---|---|---|---|---|---|
| 1 | 2.0000 | YR | Domain registration (prepay or wholesale) WEPA.NET Coverage: 29-Jul-1998 to 28-Jul-2000 | $35.00 | $70.00 |

NETWORK SOLUTIONS

**INVOICE**

Page 1 of 1
Number: 24994131
Date Created: 10-Jul-2000

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

Billing Contact
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

| | |
|---|---|
| Phone: | 301 555-1212 |
| Fax: | |
| Orig Due: | 11-Aug-2000 |
| Gross Due: $35.00 | |

| | |
|---|---|
| Account Number: | |
| Status: | PAID |
| Date Due: | 11-Sep-2000 |
| Net Due: | $0.00 |

| | |
|---|---|
| Status Date: | 31-Aug-2000 |
| Source: | Renewal |
| | (UC) |

| Item # | Quant. | Units | Description | Unit Price | Total |
|---|---|---|---|---|---|
| 1 | 1.0000 | YR | Domain registration (prepay or wholesale) WEPA.NET Coverage: 29-Jul-2000 to 29-Jul-2001 | $35.00 | $35.00 |

SANS 310 - [Invoice - 27212842]

File  Edit  View  Invoices  Accounts  Remittance  Window



NETWORK
SOLUTIONS®

**RETAIL INVOICE**

Page  1  of  1
Number:  27212842
Date Created:  14-Sep-2000

**Billing Contact**
Beyond Systems, Inc.
Paul Wagner
1612 Sherwood Road
Silver Spring, MD 20902 USA

**Remittance Address**
Network Solutions, Inc.
PO Box 17305
Baltimore, MD 21297-0525

Phone:  301 555-1212

**Account Number:**

Fax:

Status:  PAID

**Status Date:**  14-Sep-2000

Orig Due:

Date Due:

Source:  Demand Renewal

Gross Due: $35.00

Net Due:  $0.00

| Item # | Quant. | Units | Description | Unit Price | Total |
|--------|--------|-------|-------------|------------|-------|
| 1 | 1.0000 | YR | Domain registration (prepay or wholesale)<br>WEPA.NET<br>Coverage: 29-Jul-2001 to 29-Jul-2002 | $35.00 | $35.00 |
| | | | (UC) | | |

contained subject lines that a person knows would likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message....

*Business & Professions Code* §17529.5 states:

(a) It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances:

(1) The e-mail advertisement contains or is accompanied by a third party's domain name without the permission of the third party.

(2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information. This paragraph does not apply to truthful information used by a third party who has been lawfully authorized by the advertiser to use that information.

(3) The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

(b)(1)(A) In addition to any other remedies provided by any other provision of law, the following may bring an action against a person or entity that violates any provision of this section:

(i) The Attorney General.

(ii) An electronic mail service provider.

(iii) A recipient of an unsolicited commercial e-mail advertisement, as defined in Section 17529.1.

(B)    A person or entity bringing an action pursuant to subparagraph (A) may recover either or both of the following:

(i) Actual damages.

(ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident.

(C) The recipient, an electronic mail service provider, or the Attorney General, if the prevailing plaintiff, may also recover reasonable attorney's fees and costs.

(D) However, there shall not be a cause of action under this section against an electronic mail service provider that is only involved in the routine transmission of the e-mail advertisement over its computer network.

(2) If the court finds that the defendant established and implemented, with due care, practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of this

4

1     section, the court shall reduce the liquidated damages recoverable under
    paragraph (1) to a maximum of one hundred dollars ($100) for each

2     unsolicited commercial e-mail advertisement, or a maximum of one hundred
    thousand dollars ($100,000) per incident.

3     (3)(A) A person who has brought an action against a party under this section

4     shall not bring an action against that party under Section 17529.8 or 17538.45
    for the same commercial e-mail advertisement, as defined in subdivision (c) of

5     Section 17529.1.

6     (B) A person who has brought an action against a party under Section 17529.8
    or 17538.45 shall not bring an action against that party under this section for

7     the same commercial e-mail advertisement, as defined in subdivision (c) of
    Section 17529.1.

8     (c) A violation of this section is a misdemeanor, punishable by a fine of not
    more than one thousand dollars ($1,000), imprisonment in a county jail for not

9     more than six months, or both that fine and imprisonment.

10

11 First, at the outset, while the Complaint alleges that Defendants sent 45,000 e-mails, Plaintiff

12 can identify no more than 23 coming from Defendants. As James Joseph Wagner, the owner

13 and operator of Plaintiff Hypertouch, testified at his deposition:

14     Q: Other than the 23 e-mails listed on Chart 7, are there any of the 45,000 or so
    e-mails that you contend are at issue in this case that you coned were sent by one

15     of the ValueClick defendants?

16     A: I personally have not identified any others that I know of. I don't recall. I am

17     still doing investigation, investigation, and I don't know what's been produced
    recently.

18     Q: Okay. But sitting here today, you aren't aware of any others than this 23?

19

20     A: Correct. [See *Declaration of Ash lie Beringer, Exhibit D, page 208, lines 12-
    23 and Defendants' Separate Statement of Undisputed Material Facts, No. 21]*

21

22 However, moving party indicates that 24 of the e-mails at issue were sent by

23 Hi-Speed Media, a subsidiary of ValueClick. See *Defendants' Separate Statement of*

24 *Undisputed Material Facts, No. 23 and evidence attached thereto.*

25 The Court notes that Plaintiff has disputed Defendant's Separate Statement of Undisputed

26 Material Facts, No. 21 wherein Defendants contend that only 23 of the 45,000 e-mails at

27 issue were sent out by Defendants. Plaintiff's evidence in support, though, does not defeat

28 Defendant's fact. Specifically, Plaintiffs point to the deposition of Farshad Fardad, page 30,

lines 1-16, page 88; line 23 through page 89, line 16, page 176, line 1 through page 177, line 16 and page 205, lines 1-12; the deposition testimony of Tanya Brown, page 59, line 11 through page 61, line 1 and Exhibit 18, Chart 7. See *Plaintiff's Separate Statement of Undisputed Material Facts, No. 21.* The court finds that Defendants have shifted the burden of proof to Plaintiff and none of the Plaintiff's evidence (indeed, there is no page 59, 60 or 61 attached to the deposition transcript of Tanya Brown) in support of the opposition indicates that any more than 24 e-mails were sent by Defendant. Therefore, Plaintiff has failed to carry its burden of proof as to the referenced 24 e-mails.

Accordingly, for purposes of this motion, only 24 e-mails were sent by Defendants. Thus, instead of exposure to damages of $45 million, this case, as against the ValueClick defendants, is no more than $24,000.00 (without actual damages). As *Business & Professions Code* §17529.5 notes:

> Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident.

Defendants claim that this California statute, with a limited fraud exception, is preempted by the 2004 federal enactment of the CAN-SPAM Act set forth in 15 U.S.C. §7701 (A)(11) and (B) which states:

> The Congress finds the following:...
>
> Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.
>
> (b) Congressional determination of public policy
>
> On the basis of the findings in subsection (a) of this section, the Congress determines that--
>
> (1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis;

1

2    (2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and

3    (3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

4 As further noted in 15 U.S.C. §7707(b)(1):

5    (b) State law

6    (1) In general

7

8    This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send

9    commercial messages, <u>except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic</u>

10    <u>mail message or information attached thereto.</u>

11 As noted in the moving papers:

12    Section 17529.5 was enacted in 2003. One year later, Congress passed the CAN-

13    SPAM Act, recognizing that there was a substantial federal interest in regulating commercial emails, and that the existing patchwork of state regulations was

14    ineffective. 15 U.S.C. § 7701(A)(11), (B). In particular, Congress recognized that because "an electronic mail address does not specify a geographic location, it can be

15    extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply." Id. To ensure American businesses

16    had clear guidance on commercial email advertising, Congress included in CAN-SPAM an explicit provision preempting "all state laws expressly regulating the use of

17    electronic mail to send commercial messages, except to the extent that [the state

18    statute] prohibits falsity or deception in any portion" of a commercial email. 15 U.S.C. § 7707(b)(1) (emphasis added). Courts repeatedly have held that the

19    preemption clause in CAN-SPAM "left states room only to extend their traditional fraud prohibitions and deception prohibitions into cyberspace." *Kleffman v. Vonage*

20    *Holdings Corp.*, 2007 WL 1518650, at *5 (C.D. Cal. May 23, 2007).

21    By contrast, statutes that reach "beyond common law fraud or deceit," and are "not

22    limited to inaccuracies in transmission information that were material, [that] led to detrimental reliance by the recipient, and were made by a sender who intended that

23    the misstatements be acted upon and either knew them to be inaccurate or was reckless about their truth," are preempted by the CAN-SPAM Act. *Omega World*

24    *Travel, Inc. v. Mummagraphics, Inc.*, 469 F. 3d 348, 353-56 (4th Cir. 2006)....

25    Because Plaintiff cannot establish any of the traditional fraud elements for even a

26    single Asserted Email, CAN-SPAM's preemption clause mandates dismissal of Plaintiff's §.17529.5 claims. [See *Moving Papers, page 5, line 17 through page 6,*

27    *line 5 and page 6, lines 24-25*]

28

In response, Plaintiff asserts:

Implicitly, the ValueClick Defendants argue that fraud must be established in order to avoid any preemptive effect of CAN-SPAM, the federal law regulating commercial e-mail. However, the plain language of CAN-SPAM, its legislative history, and case law interpreting the California anti-spam statute, and other similar statutes, makes clear that CAN-SPAM does not preempt state law that is directed to false and deceptive content in e-mail transmissions, such as California's anti-spam statute. [See *Opposition Papers, page 4, lines 7-12*]

The doctrine of preemption is explained in *Naranjo v. Spectrum Sec. Services, Inc.* (2009) 172 Cal.App.4th 654, wherein the Court noted:

"The supremacy clause of the United States Constitution ... makes federal law paramount, and vests Congress with the power to preempt state law. (U.S. Const., art. VI, cl. 2;....) There are four species of federal preemption: express, conflict, obstacle, and field. [Citations.] First, express preemption arises when Congress 'define[s] explicitly' the extent to which its enactments pre-empt state law....' [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" [Citations.] Finally, field preemption, i.e., 'Congress' intent to preempt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' [Citations.]" (*Viva! Internet Voice For Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935-936, 63 Cal.Rptr.3d 50, 162 P.3d 569.) Generally, " ' "[c]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' " (*Ibid.*, quoting *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815, 135 Cal.Rptr.2d 1, 69 P.3d 927.)

Here, the express preemption is noted in 15 U.S.C. §7707(b)(1):

This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, **except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.**

As noted in *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977-978:

When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (DuBois v. Workers' Comp. Appeals Bd. (1993) 5 Cal4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) The words of the statute are the starting point. "Words used in a statute ... should be given

8

ORDER GRANTING SUMMARY JUDGMENT

the meaning they bear in ordinary use. [Citations.] If the language is clear and
unambiguous there is no need for construction, nor is it necessary to resort to
indicia of the intent of the Legislature ...." (Lungren v. Deukmejian (1988) 45
Cal.Sd 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] (Lungren).) If the language
permits more than one reasonable interpretation, however, the court looks "to a
variety of extrinsic aids, including the ostensible objects to be achieved, the
evils to be remedied, the legislative history, public policy, contemporaneous
administrative construction, and the statutory scheme of which the statute is a
part." (People v. Woodhead (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656,
741 P.2d 154].) After considering these extrinsic aids, we "must select the
construction that comports most closely with the apparent intent of the
Legislature, with a view to promoting rather than defeating the general
purpose of the statute, and avoid an interpretation that would lead to absurd
consequences." (People v. Jenkins (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d
903, 893 P.2d 1224].)

As noted in *Lonicki v. Sutter Health Cent.* (2008) 43 Cal.4th 201, 209-210:

To determine the merits of plaintiff's argument, we need to examine the
statutory language. "Our task is to discern the Legislature's intent. The
statutory language itself is the most reliable indicator, so we start with the
statute's words, assigning them their usual and ordinary meanings, and
construing them in context. If the words themselves are not ambiguous, we
presume the Legislature meant what it said, and the statute's plain meaning
governs. On the other hand, if the language allows more than one reasonable
construction, we may look to such aids as the legislative history of the
measure and maxims of statutory construction. In cases of uncertain meaning,
we may also consider the consequences of a particular interpretation,
including its impact on public policy." ( Wells v. One2One Learning
Foundation (2006) 39 Cal.4th 1164, 1190.48Cal.Rptr.3d 108, 141 P.3d 225;
see also Palmer v. GTE California, Inc. (2003) 30 Cal.4th 1265, 1271, 135
Cal.Rptr.2d 654, 70P.3d 1067.)

In arguing preemption, moving party relies on *Hoang v. Reunion.Com, Inc.*, 2008 WL

4542418 (N.D. Cal., October 6, 2008), wherein the Court notes:

Plaintiffs further allege that one email was "deceptively accompanied by and/or
contained a third-party's domain name, 'yahoo.com,' without the permission of
that third party." ( See id. ¶ 33.) Based on such allegations, plaintiffs allege
three causes of action, each arising under § 17529.5(a) of the California
Business & Professions Code, a statute that makes unlawful the sending of
certain commercial emails....

CAN-SPAM preempts state statutes that "expressly regulate[ ] the use of
electronic mail to send commercial messages," except to the extent such statutes
prohibit."falsity or deception in any portion of a commercial electronic mail
message or information attached thereto." See 15 U.S.C. § 7707(b)(1). Section

9

7701(b)(1) has been interpreted to preempt state law claims: unless such claims are for "common law fraud or deceit." See Omega World Travel, Inc. v. Mummagraphics, Inc., 469 F.3d 348, 353-56 (4th Cir.2006) (affirming dismissal of claim under Oklahoma statute based on defendant's having sent email containing "immaterial" false statement, because common law fraud claim cannot be based on "immaterial" false statement); Kleffman v. Vonage Holdings Corp., 2007 WL 1518650, (C.D.Cal.2007) (holding claim under § 17529.5(a) preempted, where claim not based on "traditional tort theory" of "fraud and deceit")....

"The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 1239, 44 Cal.Rptr.2d 352, 900 P.2d 601 (1995) (internal quotation and citation omitted). Here, plaintiffs fail to allege facts to support a claim of fraud, which must be alleged with particularity. See Fed.R.Civ.P. 9(b): In that regard, plaintiffs fail to allege with the requisite specificity why the statements at issue were false and why defendant knew they were false when made. Further, plaintiffs fail to allege plaintiffs relied to their detriment on any misrepresentation and that, as a result of such reliance, they incurred damage....

Under such circumstances, the Court finds that affording plaintiffs leave to amend would not necessarily be futile, and, accordingly, plaintiffs will be afforded leave to allege a common law fraud claim and/or a claim under § 17529.5(a) of the California Business & Professions Code, to the extent such statutory claim is based on a theory of fraud.

By contrast, the recent decision of *Asis Internet Services v. Consumerbargaingiveaways, LLC*, 2009 WL 1035538 (N.D. Cal, April 17, 2009), upon which Plaintiff relies, held otherwise. In that case, the District Court held indicated that no appellate decision (as opposed to a district court decision) has limited the phrase "falsity or deception" to only common law fraud actions. As the Asis decision notes:

This order rejects the preemption challenge. The text and structure of the provision indicate that defendants interpret the savings clause too narrowly: "falsity or deception" is not limited just to common-law fraud and other similar torts... .On its own terms, the savings clause exempts from preemption not only "fraud" claims but rather laws that proscribe "falsity or deception" in email advertisements. The Act does not define the words "falsity" and "deception." Congress, however, is certainly familiar with the words "fraud" and choose not to use it; the words "falsity or deception" suggest broader application...

Interestingly, this issue was recently certified to the California Supreme Court by the 9th Circuit Court of Appeal in the case of *Kleffman v. Vonage Holdings Corp.*, 551 F.3d 847 (9th Cir. (Cal.) Dec 19, 2008):

> Does sending unsolicited commercial e-mail advertisements from multiple domain names for the purpose of bypassing spam filters constitute falsified, misrepresented, or forged header information under Cal. Bus. & Prof.Code § 17529.5(a)(2)?...
>
> The question presented in Section III is worthy of certification because the issue is likely to emerge again in cases governed by § 17529.5, and the court's answer may be dispositive in this case. The relevant provision in § 17529.5 was effective January 1, 2004, and has not been interpreted by the California Courts of Appeal or the California Supreme Court. The position the California Supreme Court will take regarding the certified question is uncertain. We therefore respectfully request that the California Supreme Court accept certification and resolve this question.

Despite this uncertainty, the fact that there is no California case law on this matter, and the fact that the District Courts are in complete disagreement on this issue, this Court will, and must, come to a decision. In making this decision, this Court notes that opinions of the lower federal courts, interpreting federal law, while persuasive, are not binding on California state courts. *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352.

Whether preemption lies depends on the phrase "falsity or deception." Again, 15 U.S.C. §7707(b)(1) notes:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, **except** to the extent that any such statute, regulation, or rule prohibits **falsity or deception** in any portion of a commercial electronic mail message or information attached thereto.

The phrase "falsity" has been utilized in California courts in conjunction with fraud claims. Byway of example, in *Starbucks Corp. v. Superior Court* (2008) 168 Cal.App.4th 1436, 1446-1447:

> By analogy, California does not sanction lawsuits for fraudulent misrepresentations brought by persons who, rather than having been deceived, act for the sole purpose of bringing a lawsuit against "potential targets for litigation." (*Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 807, 66 Cal.Rptr.3d 543 (*Buckland*).)" The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held

11

liable in damages for its **falsity**." (Id, at p. 808, 66 Cal.Rptr.3d 543.)

Indeed, "falsity" is an element of fraud. As noted in BAJI 12.31:

> The essential elements of a claim of fraud by an intentional misrepresentation are:
> 1 The defendant made a representation as to a past or existing material fact;
> 2 The representation was false;
> 3 The defendant must have known that the representation was false when made [or must have made the representation recklessly without knowing whether it was true or false];
> 4 The defendant made the representation with an intent to defraud the plaintiff, that is, [he] [she] must have made the representation for the purpose of inducing the plaintiff to rely upon it and to act or to refrain from acting in reliance thereon;
> 5 The plaintiff was unaware of the **falsity** of the representation; must have acted in reliance upon the truth of the representation and must have been justified in relying upon the representation;
> 6 And, finally, as a result of the reliance upon the truth of the representation, the plaintiff sustained damage.

As noted in BAJI 12.45:

> The essential elements of a claim of fraud by a negligent misrepresentation are:
> 1 The defendant made a representation as to a past or existing material fact;
> 2 The representation was untrue;
> 3 Regardless of [his] [her] actual belief the defendant made the representation without any reasonable ground for believing it to be true;
> 4 The representation was made with the intent to induce plaintiff to rely upon it;
> 5 The plaintiff was unaware of the **falsity** of the representation must have acted in reliance upon the truth of the representation and was justified in relying upon the representation;
> 6 And, finally, as a result of the reliance upon the truth of the representation, the plaintiff sustained damage.

Moreover, deception is defined by dictionary.com as "something that deceives or is intended to deceive; **fraud**; artifice." As noted in *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818:

> In order to recover for fraud, as in any other tort, the plaintiff must plead and prove the "detriment proximately caused" by the defendant's tortious conduct. (Civ.Code, § 3333.) **Deception without resulting loss is not actionable fraud.** ( Hill v. Wrather (1958) 158 Cal.App.2d 818, 825; 323 P.2d 567.)

Thus, in the opinion of this court, the term "falsity or deception" both sound in fraud, but the Court notes that the phrase is used in the disjunctive. While *Asis Internet Services v. Consumerbargaingiveaways, LLC.*, supra, asserts that this disjunctive usage suggests that the actions were not limited to common law fraud claims:

> True, the report referred to "fraudulent or deceptive" conduct rather than "falsity or deception." Although this arguably suggested that the Senate intended to equate "falsity" with "fraud," as some district courts have suggested, it does not account for the additional reference (in the disjunctive) to "deception." Nor do the report's policy concerns necessitate limiting the phrase to fraud alone: a "legitimate business trying to comply with relevant laws" would not be engaged in "deceptive" practices in contravention of the FTC Act or state law.

> For these reasons, this order will not confine the phrase "falsity or deception" to strict common-law fraud such that anti-deception state actions not insisting on every element of common-law fraud are preempted. Plaintiffs' claims are not preempted merely because the complaint fails to plead, or Section 17529.5 fails to require, reliance and/or damages. Defendants' motion to dismiss the complaint on preemption grounds is denied.

This Court disagrees to the extent the Court in *Asis Internet Services v. Consumerbargaingiveaways, LLC.*, supra, holds that the usage of the phrase "falsity or deception", while both meaning fraud, somehow allows causes of action not based on common law fraud. As noted in the reply:

> Although one recent decision took a slightly broader view of the types of claims that survive CAN-SPAM, it held that a plaintiff asserting Section 17529.5 claims must establish either the elements of "fraud" or of a claim for "deception as utilized in the FTC Act" - elements Plaintiff admits it cannot establish here. Asis Internet Services v. Consumerbargaingiveaways, LLC, 2009 WL 1035538, at *6 [See *Reply, page 8, line 28 through page 9, line 3*]

Indeed, as explained in *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 354 (4th Cir.(Va.) Nov 17, 2006):

> The exception, as noted, allows states to prohibit "falsity or deception" in commercial e-mail messages. Those terms are not defined in the statute. However, "deception" requires more than bare error, and while "falsity" can be defined as merely "the character or quality of not conforming to the truth or facts," it also can convey an element of tortiousness or wrongfulness, as in "deceitfulness, untrustworthiness, faithlessness." Webster's Third New International Dictionary Unabridged 820 (1971); see also Oxford English Dictionary Vol. V 697 (2d ed.1989) (defining false as "erroneous, wrong," but also as "mendacious, deceitful, treacherous," and "[p]urposely untrue"); see

also Black's Law Dictionary 635 (8th ed.2004) (defining "false" as "untrue" but
also as "deceitful; lying").

Since the word "falsity" considered in isolation does not unambiguously
establish the scope of the preemption clause, we read "falsity" in light of the
clause as a whole. Reading "falsity" as referring to traditionally tortious or
wrongful conduct is the interpretation most compatible with the maxim of
noscitur a sociis, that a word is generally known by the company that it keeps.
See, e.g., Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6
L.Ed.2d 859 (1961); Neal v. Clark, 95 U.S. 704, 708-09, 24 L.Ed. 586 (1877).
The canon applies in the context of disjunctive lists. See Neal, 95 U.S. at 706,
709; Jarecki, 367 U.S. at 304 n. 1, 307, 81 S.Ct. 1579. Here, the pre-emption
clause links "falsity" with "deception"-one of the several tort actions based upon
misrepresentations. Keeton et al., Prosser and Keeton on the Law of Torts § 105,
at 726-27 (5th ed.1984) (defining deceit as species of false-statement tort);
Restatement (Second) of Torts § 525 (describing elements of deceit). **This
pairing suggests that Congress was operating in the vein of tort when it
drafted the pre-emption clause's exceptions, and intended falsity to refer
to other torts involving misrepresentations, rather than to sweep up
errors that do not sound in tort.**

The Court finds this reasoning persuasive and rejects the distinction made in *Asis Internet*
*Services v. Consumerbargaingiveaways, LLC.*, supra, wherein the Court held that the
reasoning of *Omega World Travel, Inc. v. Mummagraphics, Inc.*, supra, was limited to
"immaterial errors" and other public policy concerns. Indeed, the reasoning of *Asis Internet*
*Services v. Consumerbargaingiveaways, LLC.*, supra, allows a loophole the Court rejected in
*Omega World Travel, Inc. v. Mummagraphics, Inc.*, supra at p. 356:

Mummagraphics' reading of the preemption clause would upend this balance
and turn an exception to a preemption provision into a loophole so broad that it
would virtually swallow the preemption clause itself. While Congress
evidently believed that it would be undesirable to make all errors in
commercial e-mails actionable, Mummagraphics' interpretation would allow
states to bring about something very close to that result.

Indeed, allowing such a loophole would undermine the express federal preemption,
including allowing claims based on negligence and inadvertence. For instance, under the
exception asserted by Plaintiff and the Court in *Asis Internet Services v.*
*Consumerbargaingiveaways, LLC.*, supra, would create an exception that allows lawsuits
involving the misspelling of names, improper links, and using old addresses where there was
no intent to deceive.

However, in California, statutory interpretation is to prevent an exception from swallowing a rule stating a public policy. As the Supreme Court noted in *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 902 [Exemption from res judicata for declaratory judgments applies only when the first action is purely for declaratory relief, and not when a party also seeks other relief arising from the same cause of action]:

> Under MPS's interpretation of the language of section 1062, however, the reference to judgments 'under this chapter' would seem to include all remedies that can be awarded by a court along with declaratory relief, including damages. This reading of the statute would provide parties with an easy way to escape the res judicata bar. By attaching a prayer for declaratory relief in the complaint, a party could evade the effect of res judicata in virtually every lawsuit. Clearly, this is not what the Legislature intended. The res judicata exception afforded by section 1062 is a narrow one, meant to provide parties with a quick way of resolving disputes without the need to assert all claims based on the same cause of action. Any broader reading of this exception would swallow the rule of res judicata at the expense of judicial economy and fairness to the parties.

As noted in *People v. Landis* (2007) 156 Cal.App.4th Supp. 12 [Statute should be interpreted so that the exception does not swallow the rule]:

> This case presents an issue on which this court has found little published authority: whether a police officer may stop and cite a motorist for a minor traffic infraction committed in his or her presence but outside his or her territorial jurisdiction, pursuant to the provision in Penal Code section 830.1, subdivision (a)(3) that an officer's authority extends to any place in the state, "[a]s to any public offense committed ... in the peace officer's presence, and with respect to which there is immediate danger... of the escape of the perpetrator of the offense."
>
> While we conclude that a literal interpretation of the word "escape" could suggest that an officer's authority is sufficiently broad to encompass the citation at issue herein, we find such an interpretation would allow the statutory exception to swallow the rule that a peace officer's authority is limited to the territorial jurisdiction he or she serves. We therefore reverse the judgment of the trial court.

As noted in *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (April 17, 2009) 2009 WL 1026837 [Plaintiff challenged lawfulness of ordinance on the basis that it was preempted by alleged exception in Civil Code]:

> We cannot, conversely, consider Civil Code section 1954.52, subdivision (a)(1) as an exception to section 7060.2, subdivision (d) because the exception would swallow

the rule. (Cf. Mycogen Corp. v. Monsanto Co. (2002) 28 Cal.4th 888, 902, 123 Cal.Rptr.2d 432, 51 P.3d 297 [rejecting a proposed statutory interpretation when the "exception would swallow the rule"].) This is because many cities, including Los Angeles (see L.A. Mun.Code, § 12.26, subd. (E)), require a landlord to obtain a certificate of occupancy before a tenant may occupy newly constructed real property. (See 7 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 19.224, p. 710.) In such cities, all newly constructed residential properties that fall within the parameters of 7060.2, subdivision (d) would not be subject to rent control under Civil Code section 1954.52, subdivision (a)(1). Such an interpretation does not harmonize the two statutes. Instead, it renders section 7060.2, subdivision (d) nugatory.

As noted in *People v. Blick* (2007) 153 Cal.App.4th 759, 774-775 [Imputing intent is a matter of statutory interpretation consistent with the goals of the legislation]:

> The Attorney General argues that the Legislature's failure to include specific intent language in subsection (b)(3) indicates the Legislature did not intend to impose such a requirement. As noted above, however, such an interpretation is unreasonable when subsection (b)(3) is read in the context of section 550 as a whole. ( People v. Hudson, supra, 38 Cal.4th at p. 1009, 44 Cal.Rptr.3d 632, 136 P.3d 168 [statutory language must be construed in context].) Here, the penalty subsection (c)(3) specifically references fraud, so at best, subsection (b)(3) is ambiguous with respect to its intent requirement, permitting our construction. (. . Torres v. Parkhouse Tire Service, Inc., supra, 26 Cal.4th at p. 1003, 111 Cal.Rptr.2d 564, 30 P.3d 57 [if statutory language is ambiguous "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute].) Our interpretation is faithful to the purpose of the statute and the evil which it seeks to remedy—to criminalize and punish the making of false or fraudulent claims to obtain benefits. Also, imputing a specific intent to defraud avoids absurd results, whereas under the Attorney General's argument, any intentional concealment or knowing failure to disclose amounts to a violation of subsection (b)(3) if it affects benefits, even if disclosure would have increased benefits." (Ibid, [courts must avoid a statutory interpretation "that would lead to absurd consequences."]) Accordingly, we conclude section 550(b)(3) requires a specific intent to defraud. Therefore, the section 550(b)(3) instruction was erroneous, and we now consider whether the error was prejudicial.

As noted in *Vera v. W.C.A.B.* (2007) 154 Cal.App.4th 996, 1010, fn. 16 [New 2005 permanent disability rating schedule applied to applicant's pre-2005 injury]:

> The interpretation of the statute advanced by Vera would also make the statutory exception to the application of the old schedule at issue here so broad that it would cease to function as an exception... If the old schedule were to apply in every case where an employer has made a payment of temporary disability benefits, an exception to the application of the new schedule would apply in a large number of cases in which an employee is seeking permanent disability benefits. In short, the exception would swallow the rule. (Cf.

16

Mycogen Corp. v. Monsanto Co. (2002) 28 Cal.4th 888, 902, 123 Cal.Rptr.2d 432, 51 P.3d 297 [rejecting a proffered statutory interpretation when the exception would swallow the rule].) We reject an interpretation of the statute that would lead to such a result.

See also *People v. Lozano* (1987) 192 Cal.App.3d 618, 627 [Escaping with force or violence applies equally to those who use only slight force or violence as those who use forcible means].

This Court notes that the federal legislation expressly indicates that the federal law was to preempt all state law except where "falsity or deception" is utilized. An exception which allows for claims based on negligence and inadvertence would create an exception so broad that it would defeat the federal preemption statute, and the public policy behind the preemption rule. Indeed, the Senate Committee Report on the federal legislation notes:

> [A] State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted. By contrast, a State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted.... [I]n contrast to telephone numbers, e-mail addresses do not reveal the State where the holder is located. As a result, a sender of e-mail has no easy way to determine with which State law to comply. Statutes that prohibit fraud and deception in e-mail do not raise the same concern, because they target behavior that a legitimate business trying to comply with relevant laws would not be engaging in anyway. [S.Rep. No. 108-102, at 21-22]

Congress intended that businesses would not have to guess at the meaning of various state laws when the sent out advertising campaigns by way of e-mail. It left states room only to extend their traditional fraud prohibitions to the realm of commercial e-mails. As noted in the reply (emphasis in original):

> The very Congressional Committee language that is quoted and underlined by Plaintiff in its brief states this expressly: *"A State law prohibiting fraudulent or deceptive headers, subject lines, or content in commercial e-mail would not be preempted," "Statutes that prohibit fraud and deception in e-mail* do not raise the same concerns that prompted preemption]. . . ." Opp. at 6-7, citing S. Rep. No. 108-02, at 21-22 (emphasis added); see *also* Req. for Jud. Ntc., Ex. A [Cong. Rec. H12186-H12198 (daily ed. Nov. 21, 2003)] (CAN-SPAM Act was intended to preempt the patchwork of disparate and ineffective state laws regulating spam with a *"uniform national standard... [that] still allows for State laws that deal with fraud and computer crimes")* Thus, the legislative

history is consistent with unanimous California authority holding that claims under Section 17529.5 must sound in "fraud" or "deception" to avoid preemption by CAN-SPAM. See, supra, pp. 8-9. [See *Reply, page 9, lines 14-23*]

Accordingly, for all the foregoing reasons, the Court finds *Omega World Travel, Inc. v. Mummagraphics, Inc.*, supra, and *Hoang v. Reunion.Com, Inc.*, supra, to be persuasive, and finds that under federal law, Section 7701 (b)(1) preempts state law claims, including California laws, unless such claims are for "common law fraud or deceit." *Hoang v. Reunion.Com, Inc.*, supra. Accordingly, any claim must be based on fraud. Again, as noted in *Hoang v. Reunion.Com, Inc.*, supra:

> ...the Court finds that affording plaintiffs leave to amend would not necessarily be futile; and, accordingly, plaintiffs will be afforded **leave to allege a common law fraud claim and/or a claim under § 17529.5(a) of the California Business & Professions Code**, to the extent such statutory claim is **based on a theory of fraud**.

Defendants Valueclick, Inc., E-Babylon, Inc., Hi-Speed Media, Inc., VC E-Commerce Solutions, Inc. and Web Clients, LLC claim that "[b]ecause Plaintiff cannot establish any of the traditional fraud elements for even a single Asserted Email, CAN-SPAM's preemption clause mandates dismissal of Plaintiff's §17529.5 claims." See *Moving Papers, page 6, lines 24-25*. Specifically, Defendants claim that fraud cannot be established because (1) lack of reliance, (2) lack of injury, and (3) no showing that Valueclick had knowledge of any misleading information in the email headers. See *Moving Papers, page 6, line 26 through page 9, line 10*. As the Moving Papers assert:

> Critically, Plaintiff admits that neither it nor its end users relied on the alleged false or deceptive information contained in a single Asserted Email. (UF ¶¶ 14-15.) Wagner testified on behalf of Plaintiff that he could not identify any action that he or any recipient of the Asserted Emails took, or refrained from taking, as a result of the purportedly "false" information contained in the emails. (UF ¶ 14.) Likewise, Wagner could not identify a single email that he or any other recipient relied on or was deceived by (or even read). (Id.) In fact, Plaintiff admits that over 43,600 of the emails at issue were sent to non-existent email addresses associated with "dummy" or "test" accounts, and not to any end user. (UF ¶ 18)...

1   Plaintiff argues that these emails contributed to the overall volume of emails
2   processed by its servers, creating general administrative costs having nothing to
    do with any alleged falsity or the specific emails at issue. (¶¶ 19-20.) Because
3   Plaintiff cannot demonstrate any injury resulting from reliance on the
    purportedly false information contained in the Asserted Emails, its claims
4   cannot survive summary judgment for this independent reason...

5   Plaintiff also concedes that it has no evidence that ValueClick had knowledge
    of any of the allegedly "deceptive" information contained in the headers of the
6   Asserted Emails. The undisputed facts establish that over 99.9% of the
    Asserted Emails were sent by third-party, and not by ValueClick.
7
8   Significantly, all of the information alleged to be "deceptive" in the Asserted
    Emails (e.g. the "From" lines, the "To" lines and the "Subject" lines) is
9   contained in the "header" of the email, and not in the advertisement contained
    in the body of the email. As Plaintiff has acknowledged, the "header" of each
10   email is created by the actual sender when the email is sent, and there is no
    reason that anyone other than the sender (and recipient) would know the
11   header's contents...,[See *Moving Papers, page 6, line 27 through page 8, line*
12   *18]*

13  As Wagner testified at his deposition:

14   Q: Okay. And can you identify any specific email contained Exhibit 28, Chart 3,
    for which you or any third person attempted to participate in the terms of the
15   incentive reward offered?

16   A: Not that I can think of. [See *Declaration of Ashlie Beringer, Exhibit C,*
    *page 740, lines 9-13 and Defendants' Separate Statement of Undisputed*
17   *Material Facts, No. 14]...*
18
19   Q: I'm asking whether you actually were deceived by any information
    contained in this email in the domain name?

20   A: I do not know when I first received this email what my reaction was, so I can't
21   answer that.

22   Q: Any you don't even know whether you opened this email; correct?

23   A: I guess I - -1 know it's been opened because - - but at the time when it came in, I
24   do not know if it was opened then.

25   Q: You know it's been opened in the course of searching for emails for litigation;
    correct?
26
    A: I know it's been opened in the course of litigation; correct.
27
    Q: But you don't know whether or not in the ordinary course when you received this
28   email you actually opened it and reviewed it; correct?...

1  A: I don't know. [See *Declaration of Ashlie Beringer, Exhibit B, page 395, line 23*
2  *through page 396, line 17 and Defendants' Separate Statement of Undisputed*
3  *Material Facts, No. 15]...*

4  Q: And can you identify any specific email for which you or any end-user of
   Hypertouch relied on the mistaken belief that the HELO information was accurate
5  when, in fact, it was not?...

6  A: No. [See *Declaration of Ashlie Beringer, Exhibit C, page 643, lines 9-14, and*
7  *Defendants' Separate Statement of Undisputed Material Facts, No. 15]...*

8  Q: With respect to any of the emails listed on Chart 3, Exhibit 28, can you identify a
   single email that you or any other person received who was deceived in any way by
9  the contents of the subject line?

10  A: I do not have the full exhibit, but I cannot. [See *Declaration of Ashlie Beringer,*
11  *Exhibit C, page 738, line 5 through page 739, line 6, and Defendants' Separate*
    *Statement of Undisputed Material Facts, No. 15]...*

12  Indeed, it appears that over 95% of the e-mails were sent to e-mail addresses not being

13  utilized by a "bona fide recipient." See *Defendants' Separate Statement of Undisputed*

14  *Material Facts, No. 9.* As noted in the declaration of Scott Mellon, paragraphs 13 and 14:

15  I have reviewed the deposition testimony of Joe Wagner. From this testimony,
16  I understand that Plaintiff uses so-called "wild card" email addresses to collect
    commercial electronic mail sent to nonexistent email addresses (i.e., email
17  addresses that were not created by Hypertouch for its end users). I have further
    reviewed Exhibit 1 to Plaintiff's Confidential Response to Defendant E-
18  Commerce Solution's Special Interrogatory Nos. 32-35, which purports to
    identify the account names and user names Plaintiff assigned to Joe Wagner,
19  Lisa Wagner, Paul Wagner, and Beyond Systems (the purported recipients of
20  the Asserted Emails).

21  Using the Concordance database and Microsoft Excel, I have analyzed the
    "To" lines of the Asserted Emails and have determined that over 43,500 (97%)
22  were sent to non-existent "wild card" email addresses that bear no relationship
23  to any of the account names or user names created by Plaintiff for its end users.

24  As for damage, Wagner testified as follows:

25  Q: But I'm asking whether any specific e-mail in this case caused
    Hypertouch to suffer an injury that's unique to that email.
26
27  A: No. Each e-mail uniquely takes up space and bandwidth and so on, and each
    email has different sizes and so object. But nothing -- I guess the actual
28  damages are similar in nature for all the emails.

20
ORDER GRANTING SUMMARY JUDGMENT

Q: Well, let me repeat my question. Is there any specific e-mail that you can point to and state, for example, Hypertouch incurred, you know, $4.36 of damages because it took some action or didn't take some action when it received that e-mail?

A: I can point to these e-mails and say in order to hand - - handle the spam load which includes these e-mails, I had to purchase more robust software, I had to purchase additional servers and I had to purchase additional bandwith and so on... [See *Declaration of Ashlie Beringer, Exhibit D, page 265, lines 3-21, and Defendants' Separate Statement of Undisputed Material Facts, Nos. 19 and 20]*

Plaintiff, by arguing against preemption, has failed to show fraud. As noted in the opposition papers:

The plain language of section 17529.5 - unlike common *law* fraud - does not require Hypertouch to prove reliance or show that Hypertouch or its end-user's reliance was a substantial factor in causing harm... Nor does Section 17529.5 require that Hypertouch show that defendants had actual knowledge of the false representations. *[See Opposition, page 4, lines 23-27]*

As explained above, Plaintiff has neither adduced evidence nor even attempted to show, that any elements of fraud exist in this case. Specifically, the Court finds the wording of 15 U.S.C. §7707(b)(1) with respect to "falsity or deception" at least means intent to deceive as in a common law fraud action. Therefore, the Court's construction of this statute is limited to the element of intent, and even if the Court ignores all the other elements of fraud, Plaintiff's complaint is preempted by federal law since Plaintiff's complaint omits intent to deceive or intent to cause deception. Accordingly, the Court grants the motion for summary judgment. For all the foregoing reasons, the Court also grants the joinder motion by Defendant PrimaryAds, Inc.

The remaining issues raised by the parties are moot.

///
///
///
///
///

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CASE NO. PJM 08 cv 0921
UNITED STATES DISTRICT COURT FOR MARYLAND
SOUTHERN DIVISION

BEYOND SYSTEMS, INC.

        Plaintiff,

vs.

WORLD AVENUE USA, LLC, et al,

        Defendants.

_____/

## SUBPOENA DUCES TECUM IN A CIVIL CASE

TO:    **WILLIAM J. WAGNER**
       **1612 SHERWOOD ROAD SILVER SPRING, MARYLAND 20902, OR**
       **38 MARYLAND AVENUE, UNIT 333, ROCKVILLE, MARYLAND 20850-0341**

| | |
|---|---|
| ☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case. | |
| ☐  **YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.** | |
| **PLACE OF TESTIMONY:** | **DATE /TIME:** |
| ☒  **YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):** | |
| **DOCUMENTS:**   **See Attached Schedule A** | |
| **PLACE OF PRODUCTION:**  Greenberg Traurig, LLP<br>2101 L St., NW, Suite 1000<br>Washington, DC 20037 | **DATE /TIME:**<br>Friday, August 10, 2009<br>at 9:00 a.m. (E.S.T.) |
| ☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below. | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE : ATTORNEYS FOR DEFENDANT<br>WORLD AVENUE USA, LLC<br><br>X _____ | DATE AND TIME:<br><br>July 20, 2009 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND TELEPHONE NUMBER: | Sanford M. Saunders, Jr.<br>**GREENBERG TRAURIG LLP**<br>**2101 L St. NW, Suite 1000**<br>**Washington, DC 20037**<br>**(202) 331-3130** |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D below)
[1] If action is pending in district other than district of issuance, state district under case number.



## PROOF OF SERVICE

| SERVED: | DATE | PLACE |
|---|---|---|
| | | |

| SERVED ON (PRINT NAME)MANNER OF SERVICE | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

EXECUTED ON _____

SIGNATURE OF SERVER    _____

ADDRESS OF SERVER    _____

_____

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)    A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance;
(ii)    requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)    requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)    subjects a person to undue burden.

(B)    If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)    requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii)    requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim

CASE NO.

CASE NO.: PJM 08 CV 0921

## SCHEDULE "A"

## I. INSTRUCTIONS

1.      In accordance with Fed. R. Civ. P. 26(b)(5), where a claim of privilege is asserted

in objecting to any document request, or part thereof, and information is not provided on the

basis of such assertion:

i.      The party asserting the privilege shall, in the objection to the interrogatory,

document request, or part thereof, identify with specificity the nature of the privilege

(including work product) that is being claimed;

ii.      The following information should be provided in the objection, if known or

reasonably available, unless divulging such information would cause disclosure of the

allegedly privileged information;

a.      For documents:

i.      the type of document;

ii.      the general subject matter of the document;

iii.      the date of the document; and

iv.      such other information as is sufficient to identify the document,

including, where appropriate, the author, addressee, custodian, and

any other recipient of the document, and, where not apparent, the

relationship of the author, addressee, custodian, and any other

recipient to each other.

- 1 -

CASE NO.: PJM 08 CV 0921

## II. DEFINITIONS

1.      "BSI" shall mean Beyond Systems, Inc., located at one or more of the Addresses, its shareholders, directors, officers, employees, representatives, agents, managers, accountants, and all staff.

2.      The "Addresses" shall mean one or more of the following:  1612 Sherwood Road, Silver Spring, Maryland 20902; 417 Oak Grove Avenue, Apartment A, Menlo Park, California 94025-3246; 1837 R Street N.W., Washington, D.C.; 9501 Anchorage Place, Bethesda, Maryland 20817, Suite L15-1000; 11160 Veirs Mill Road, Wheaton, MD 20902; 801 Woodside Rd. #14-235, Redwood City, CA 94061-3758; 359 Port Royal Avenue, Foster City, CA 94404; 235 Belmont Ave, Redwood City, CA 94061; 751 Upland Road, Redwood City, CA 94062, and any other place where BSI or Hypertouch conduct business.

3.      "WAUSA" shall mean World Avenue USA, LLC, its shareholders, directors, officers, employees, representatives, agents, managers, accountants, and all staff.

4.      "Hypertouch" shall mean Hypertouch, Inc., located at one or more of the Addresses, its shareholders, directors, officers, employees, representatives, agents, managers, accountants, and all staff.

5.      "Communication" shall mean any oral statement, dialogue, conversation, written notation, document or other transfer of thoughts or ideas between persons by any means.

6.      "Computer" means microchips, microcomputers (commonly referred to as "personal computers" or "PCs"), laptop computers, notebook computers, portable computers,

- 2 -

palmtop computers (commonly referred to as "personal digital assistants" or "PDAs"),

minicomputers and mainframe computers.

7.      "Correspondence" shall mean all letters, e-mails, telegrams, notices, messages,

memoranda, writing, or other written Communication, or other records of conversations,

meetings, conferences or other oral Communications.

8.      "Document" shall mean the original, all non-identical copies and all drafts of any

book, pamphlet, letter, telegraph, telex, cable, report, study, memorandum, note, telephone

message, form, chart, drawing, financial record, calendar, diary, time record, phone bills,

computer materials or other verbal, numerical or pictorial recording whether printed, typed,

handwritten, drawn, recorded on film or tape or within any data processing system, or recorded,

transcribed or memorialized by any other means, and shall include any internal document and be

otherwise construed as broadly as permitted by the Federal Rules of Civil Procedure.

9.      The term "computer materials" shall mean any and all files from any personal

computer, notebook, or laptop computer, file server, minicomputer, main-frame computer, or

other storage device, including but not limited to hard drive disk drives or backup or retrieved

electronic information, including but not limited to e-mail.  All relevant files that are still on the

storage media, but are identified as "erased but recoverable", are to be included.

10.     "Person" or "Persons" means all natural persons or entities, including, without

limitation, individuals, associations, corporations, or other business organization, government

entities and any attorneys, agents, representatives, employees, or other persons acting, or

purporting to act, on behalf of such person.

11.    "Relating to," "reflecting" or "concerning" a subject includes to refer to, regard,

mention, discuss, describe, constitute, evidence, reflect, be directly relevant to or contain any

information concerning the subject.

12.    "Rotation" or "rotation policy" means any plan, policy or scheme for the re-use of

any electronic media after it has already been used to store electronic data if such re-use may

result in the alteration and/or destruction of the electronic data stored in the media prior to its re-

use.

13.    The "Domains or Domain Names" shall mean one or more of the following

domain names domain names, including all email addresses that have ever existed and exist

today at any sub-domains/host names of the below, whether BSI or Hypertouch is acting as the

primary mail server or secondary (backup) mail server: iepadvocate.com, beyo.us, bihn.org,

colorverde.com, colorvivofilms.com, hypertouch.com, stlukeshouse.com, beyond-systems.com,

beyondspam.com, beyondspam.net, beyondsys.net, beyondsystems.net, castalia.net,

colorvivofilms.net, dceventslist.com, latindancer.com, legal.hypertouch.com, linkcenter.net,

safemailbox.com, safemailbox.net, sherwoodroad.com, stockgard.com, stopbrowserwise.com,

stopxupiter.com, videocastle.com, videofeast.com, videopalette.com, wepa.net, bihn.com,

brianmangino.com, hasgreatfood.com, has-great-food.com, hasit.com, has-it.com, hoadley.org,

hyperbackup.com, hypertouch.net, hypertouch.org, ibismed.com, jasonvenner.com, katka-

steve.com, keewon.org, sticksoftware.com, matthewmcqueen.com, metrikproperties.com,

mibed.com, motiongranted.com, ohcopyboy.com, peterwagner.com, peterwagner.org,

- 4 -

princehotelhanoi.com, prontolabels.com, reasonabledoubt.com, rehabrobotics.org, ringlaw.us,

smaby.org, susan-jaime.us, vassallo.org, vietnamforum.com, and ryanfitzgerald.org.

14.    The "IP Addresses" shall mean one or more of the following Internet Protocol

Addresses:  66.88.123.229, 66.93.97.100, 67.115.175.254, 68.120.0.0-68.127.255.255,

68.127.102.0.1, 68.127.102.0-68.127.103.255, 68.127.102.94, 69.33.19.190, 69.33.19.128.26,

71.126.162.32-61.126.162.47, 71.126.162.32.1, 71.126.162.41, 71.126.162.40, , 74.95.0.24 -

74.95.0.31, 75.16.30.104.1, 75.16.30.104-75.16.30.111.

15.    "You" or "your" shall mean William Wagner and his representatives, agents, and

attorneys.

16.    "Specifications" shall mean the brand, series, model, recommended usage,

processor, processor features, memory, memory capacity, hard drive, hard drive capacity, backup

media, optical drive, graphics, audio, Ethernet, current and past IP Addresses assignments, power

supply, operating system, installed software, purpose of the installed software, motherboard and

chipset, CPU type, number of installed CPUs, CPU speed, cache per CPU, dimensions, weight

and peripheral devices of the Server or Computer.

17.    The time frame for this Request shall be from January 1, 2004 until present.

CASE NO.: PJM 08 CV 0921

### III. DOCUMENTS TO BE PRODUCED

1.    Documents reflecting all services provided by BSI and/or Hyptertouch to you, or by you to any of the above, including service commencement date and contract/agreement and including services relating to the Domain Names and IP Addresses.

2.    Documents reflecting information relevant to the Server(s) resident at the Addresses (the "Servers") including, but not limited to:

    (a)    Documents evidencing ownership and possession, title, and operation of the Servers;

    (b)    Documents evidencing the Specifications for the Servers;

    (c)    Documents evidencing rotation, reuse, recycling, and electronic shredding of information contained on the Servers;

    (d)    All server log files for the mail Servers that received the emails alleged in this case, to wit, for the period of time from July 20, 2004 to September 3, 2005, and continuing to date; and

    (e)    All server files evidencing any accounts at beyondsystems.net or at hypertouch.net, as well as any other e-mail accounts serviced by the Servers.

3.    Documents reflecting contact person(s) on file for BSI and/or Hypertouch and their contact information with regard to the Servers.

4.    Documents reflecting method(s) of payment for services, including receipts/invoices/fee structure, relating to the Servers; including lease of the real property owned by you at 1612 Sherwood Road, Silver Spring, Maryland 20902.

5.    Documents reflecting all email accounts that have ever existed and exist now for you at the Domains, if any, and what type of accounts are they (e.g. forward, POP3, IMAP, etc.).

6.    Documents reflecting who specifically maintains the creation/update/deletion of the email accounts at the Domains.

7.    Documents reflecting recipient e-mails if an email account at the Domains forwards messages to another email account (within the beyondsystems.net domain or not).

8.     Documents reflecting who configured the forwarding if an email account at the Domains forwards messages to another email account.

9.     Documents reflecting any "catchall" email accounts configured (email directed at undefined users are delivered) at the Domains.

10.    Documents reflecting any "mirror" email accounts configured (emails directed at any defined or undefined users are delivered and mirrored to another email address) at the Domains.

11.    All email correspondence, including tech support, between you, BSI and/or Hypertouch, relating to the Servers or Internet connectivity located 1612 Sherwood Road, Silver Spring, Maryland 20902.

12.    All BSI and/or Hypertouch service notifications received by your account, if any, at the Domains, including service disruptions/outages/upgrades and dates of such notifications.

13.    Documents reflecting your reporting of service outages relating to the Domains, Internet connectivity located at 1612 Sherwood Road, Silver Spring, Maryland 20902 and date(s) of occurrence.

14.    All reports sent to any entity regarding receipt of unsolicited email during your service tenure with BSI and/or Hypertouch.

15.    Documents reflecting the owner of the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902.

16.    Documents reflecting the type of property located at 1612 Sherwood Road, Silver Spring, Maryland 20902

17.    Documents reflecting the person or persons that have unrestricted physical access to the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902.

18.    Documents reflecting the person or persons that have restricted physical access to the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902.

19.    Documents reflecting the person or persons currently residing at the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902 and their tenure of occupancy.

20.    Documents reflecting any fire suppression systems, access control systems, HVAC systems, backup power systems and intrusion detection and prevention

systems installed at the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902.

21.     Documents reflecting the physical location, within the property located at 1612 Sherwood Road, Silver Spring, Maryland 20902, where any computer, computer network or server network exists.

22.     Documents reflecting all Internet connectivity and/or broadband services currently in use and used in the past, by any computer, computer network or server network located at 1612 Sherwood Road, Silver Spring, Maryland 20902, person or persons residing at 1612 Sherwood Road, Silver Spring, Maryland 20902 and service commencement date(s) and contract(s)/agreement(s) applicable to such services.

23.     A copy of the business or occupational license for all work performed at 1612 Sherwood Road, Silver Spring, Maryland 20902.

24.     All files, correspondence, letters, faxes, evidence, and documents containing or likely to contain information relevant to items 1 through 23 above.

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beyond Systems, Inc. | ) |
| | ) |
| | ) |
| | ) |
| **Plaintiff** | ) **Case No.: PJM08cv0921** |
| | ) |
| **v.** | ) |
| World Avenue USA, LLC, et al. | ) |
| | ) |
| | ) |
| **Defendant** | ) |

## AFFIDAVIT OF SERVICE

I, Frederick Parsons, Jr., a Private Process Server, being duly sworn, depose and say, I have been duly authorized to make service of the documents listed herein in the above entitled case, I am over the age of eighteen years and am not a party to or otherwise interested in this matter.

DOCUMENT(S) SERVED:  Subpoena Duces Tecum with Schedule A

SERVE TO:  William J. Wagner
SERVICE ADDRESS:  38 Maryland Avenue, Unit 333, Rockville, Maryland 20850

DATE SERVED:  July 25, 2009   TIME SERVED:  4:05 PM

PERSON SERVED:  William J. Wagner, personally

Described herein:
Gender: Male    Race/Skin: White    Hair: Gray/Balding    Age: 60    Height: 5'7"    Weight: 175

I declare under penalty of perjury that I have read the foregoing information contained in the Affidavit of Service and that the facts stated in it are true and correct.

**7.30.09**

Executed on:

Frederick Parsons, Jr.
CAPITOL PROCESS SERVICES, INC.
1827 18th Street, NW
Washington, DC 20009-5526
(202) 667-0050

August 6, 2009

To: Sanford M. Saunders, Jr.
Fax #: 202-331-3101
Re: Beyond Systems, Inc.
    vs.
    World Avenue USA, LLC, et al.

Mr. Saunders,

I have reviewed the subpoena and I have no materials that you asked for.

Sincerely,

William J. Wagner

WILLIAM J. WAGNER

EXHIBIT



**GT** GreenbergTraurig

John L. McManus
Tel. 954.768.8291
Fax 954.765.1477
mcmanusj@gtlaw.com

August 19, 2009

**VIA FEDEX**

Mr. William J. Wagner
1612 Sherwood Road
Silver Spring, Maryland 20902

Mr. William J. Wagner
38 Maryland Avenue
Unit 333
Rockville, Maryland 20850-0341

<div align="right">

ALBANY

AMSTERDAM

ATLANTA

AUSTIN

BERLIN*

BOSTON

BRUSSELS*

CHICAGO

DALLAS

DELAWARE

DENVER

FORT LAUDERDALE

HOUSTON

LAS VEGAS

LONDON*

LOS ANGELES

MIAMI

MILAN*

NEW JERSEY

NEW YORK

ORANGE COUNTY

ORLANDO

PALM BEACH COUNTY

PHILADELPHIA

PHOENIX

ROME*

SACRAMENTO

SHANGHAI

SILICON VALLEY

TALLAHASSEE

TAMPA

TOKYO

TYSONS CORNER

WASHINGTON, D.C.

WHITE PLAINS

ZURICH

*STRATEGIC ALLIANCE

</div>

    Re: *Beyond Systems, Inc. v. World Avenue USA, LLC, et al.*
       Case No. PJM 08 cv 0921
       <u>U.S. District Court for Maryland (Southern Division)</u>

Dear Mr. Wagner:

  This law firm represents the Defendant, World Avenue USA, LLC, in the above-styled Action pending in the federal court in the District of Maryland. On July 20, 2009, Sanford M. Saunders, Jr. of this firm, issued on behalf of the District Court, a Subpoena for production of documents to you, requiring the production of documents on August 20, 2009.

  On August 6, 2009, we received a fax from you that you have "no materials that [World Avenue] asked for."

  We would like to avoid having to litigate the issue, but first we need to understand your reasons for not producing any documents in response to the Subpoena. This is particularly so since a residence owned by you is allegedly a place of business for the Plaintiff in this case.

  Please contact me or let me know of a convenient time in the next day or two that we can discuss this matter. In the event that you are represented by counsel, kindly forward a copy of this letter to his or her attention and provide me with contact information for such counsel.

GREENBERG TRAURIG, P.A. ▪ ATT&#8203;&#8203;&#8203;&#8203;COM
401 East Las Olas Boulevard ▪ Suite  ▪ Tel 954.765.0500 ▪ Fax 954.765.1477

William J. Wagner, Esq.
August 19, 2009
Page 2

In the event that I do not hear from you by the close of business on Friday, I will assume that you do not intend to reconsider your decision to produce no documents in response to the Subpoena.

Sincerely,

John L. McManus

JLM/ay
cc:    Sanford M. Saunders, Jr., Esq.
       Kenneth A. Horky, Esq.

GREENBERG TRAURIG, P.A. ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM

08/21/2009 16:15 IFAX ftloffserv@gtlaw.com → Fax ☑001/001
Aug 21 09 04:10p p.1
Case 1:09-mc-00557-HHK Document 1 Filed 10/19/2009 Page 177 of 192

August 21, 200[

To: John L. McManus

Fax: 954-765-1477

Re: Beyond Systems, Inc.
          vs.
     World Avenue USA, LLC, et al.


Mr. McManus,

Per your letter to me dated August 19, 2009,
I confirm that I have received the
subpoena and I have no materials that
Mr. Saunders asked for.


Please direct any future inquiries
to my attorney Steve Wagner at,
202-473-9507.

                        Sincerely,

                        William J. Wagner
                        WILLIAM J. WAGNER

CC: Steven Wagner, Esq.



1  LEONARD S. MACHTINGER (SBN 66668)
   KENOFF & MACHTINGER, LLP
2  1901 Avenue of the Stars, Suite 1775
   Los Angeles, California 90067
3  (310) 552-0808 (telephone)
   (310) 277-0653 (facsimile)
4
   Attorneys for Defendant
5  PRIMARYADS, INC.

6

**FILED**
LOS ANGELES SUPERIOR COURT

JUN 18 2009

JOHN A. CLARKE, CLERK

BY F. GOLDENHAR, DEPUTY

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10

11  HYPERTOUCH, INC.,                    ) Case No.: LC081000
                                         )
12                Plaintiff,             ) Assigned to Judge Richard Adler
                                         )
13        vs.                            ) NOTICE OF ENTRY OF ORDER
                                         ) GRANTING SUMMARY JUDGMENT
14  VALUECLICK, INC., a Delaware         )
    corporation; E-BABYLON, INC., a      )
15  Delaware corporation; HI-SPEED       )
    MEDIA, INC., a Delaware              )
16  corporation; VC E-COMMERCE           )
    SOLUTIONS, INC., a Delaware          )
17  corporation; WEBCLIENTS, INC.,       )
    a Pennsylvania corporation;          )
18  PRIMARYADS.COM, INC., a Nevada       )
    corporation; and DOES 1-30,         )
19                                       )
                  Defendants.            )
20  _____ )

21

22

23        PLEASE TAKE NOTICE that an Order granting summary judgment

    in this action was entered on June 16, 2009, in favor of
24
    Defendant PrimaryAds, Inc. and against Plaintiff Hypertouch,
25
    Inc.  A true and correct copy of the aforesaid Order is attached
26

27  / / /

28  / / /

                                   1.

          NOTICE OF ENTRY OF ORDER GRANTING SUMMARY JUDGMENT



EXHIBIT
2

1 │ hereto and incorporated herein by this reference.

2 │ DATED: June 18, 2009

3 │             KENOFF & MACHTINGER, LLP

4

5

6 │ By: _____

7 │        Leonard S. Machtinger
       Attorneys for Defendant
       PRIMARYADS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2.

Rec'd NW Y

ORIGINAL FILED
Los Angeles Superior Court

MAY 07 2009

JUN 16 2009

John A. Clarke, Clerk
By A. Kidder, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

HYPERTOUCH, INC.,

        Plaintiff,

    vs.

VALUECLICK, INC., a Delaware corporation;
E-BABYLON, INC., a Delaware corporation;
HI-SPEED MEDIA, INC., a Delaware
corporation; VC E-COMMERCE
SOLUTIONS, INC., a Delaware corporation;
WEBCLIENTS, INC., a Pennsylvania
corporation; PRIMARYADS.COM, INC., a
Nevada corporation; and DOES 1 to 30,

        Defendants.

CASE NO.: LC081000

ORDER GRANTING SUMMARY
JUDGMENT

The motion of Defendant PrimaryAds, Inc. for summary judgment (or, alternatively, for summary adjudication) came on regularly for hearing on May 4, 2009, before this Court in Department NW-Y, the Honorable Richard Adler, Judge Presiding, and Lawrence P. Riff, Esq. and Carla A. Veltman, Esq., of Steptoe & Johnson LLP, appeared as attorneys for Plaintiff Hypertouch, Inc., and Leonard S. Machtinger, Esq., of Kenoff & Machtinger, LLP, appeared as attorney for Defendant PrimaryAds, Inc. and Ashlie Beringer, Esq., of Gibson, Dunn & Crutcher, appeared as attorney for Defendants ValueClick, Inc., E-Babylon, Inc., Hi-Speed Media, Inc., VC E-Commerce Solutions, Inc., WebClients, Inc. and Commission Junction.

1

ORDER GRANTING SUMMARY JUDGMENT

After considering the papers filed in support of and in opposition to the aforesaid motion for summary judgment, including the separate statements of each party and the authorities submitted on behalf of each party, the Court finds that there is no triable issue of material fact in this action and that the moving party, Defendant PrimaryAds, Inc., is entitled to summary judgment as a matter of law for the following reasons:

GRANT FOR ALL THE REASONS SET FORTH IN THE MOVING PAPERS, SEPARATE STATEMENT AND EVIDENCE ATTACHED THERETO.

DEFENDANT VALUECLICK, INC. TO FILE AND SERVE A PROPOSED ORDER AND JUDGMENT BY NOON ON MAY 7, 2009. THE PROPSED ORDER SHALL INCORPORATE THIS RULING IN FULL.

At the oral argument, Plaintiff stipulated that Defendant PrimaryAds, Inc. could join in the motion, as it applied to the issue of preemption, filed by Defendants Valueclick, Inc., E-Babylon, Inc., Hi-Speed Media, Inc., VC E-Commerce Solutions, Inc. and Web Clients, LLC.

At the outset, the Court OVERRULES the objections filed by Plaintiff and Defendants. The Court GRANTS Plaintiff and Defendant's request for Judicial Notice.

"[S]ummary judgment 'motions are to expedite litigation and eliminate needless trials. [Citation.]'" *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1142. In *Aguilar v. Atlantic Richfield Company* (2001) 25 Cal.4th 826, 854-855, Justice Mosk noted the following:

> To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: If a party moving for summary judgment in any action, including an antitrust action for unlawful conspiracy, would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment. In such a case, as Justice Chin stated in his concurring opinion in *Guz,* the "court should grant" the motion "and avoid a ... trial" rendered "useless" by nonsuit or directed verdict or similar device. *(Guz v. Bechtel National, Inc., supra,* 24 Cal.4th 317,

374, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (conc. opn. of Chin, J.); see *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at pp. 768-769, 107 Cal.Rptr.2d 617, 23 P.3d 1143.)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." *Aguilar v. Atlantic Richfield Co., supra* 25 Cal.4th at 850. Furthermore, in moving for summary judgment, "all that the defendant need do is show that the plaintiff cannot establish at least one element of the cause of action — for example, that the plaintiff cannot prove element X." *Aguilar v. Atlantic Richfield Co., supra* 25 Cal.4th at 850, fn. omitted. Indeed, "the court's sole function on a motion for summary judgment is to determine from the submitted evidence whether there is a 'triable issue as to any material fact' (§ 437c, subd. (c)), and to be 'material' a fact must relate to some claim or defense in issue under the pleadings (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 3 (The Rutter Group 1997) ¶¶ 10:270 to 10:271)." *Zavala v. Arce* (1997) 58 Cal.App.4th 915, 926.

On April 3, 2008, Plaintiff Hypertouch filed the instant action alleging violations of *Business & Professions Code* §17200 and 17529.5. As paragraphs 55, 56, 57 and 58 of the operative Complaint state:

> Between at least April 2, 2004 and the present, inclusive, ValueClick and/or its agents, including but not limited to the other Defendants herein, sent or caused to be sent at least 45,000 false and/or deceptive commercial e-mail advertisements to Plaintiff's servers...
>
> The e-mail advertisements received from Defendant and/or their agents contained or were accompanied by a third-party's domain name without the permission of the third party...
>
> The e-mail advertisements received from Defendants and/or their agents contained and/or were accompanied by falsified, misrepresented, or forged header information...
>
> The e-mail advertisements received from Defendants and/or their agents

3

1       IT IS THEREFORE ORDERED that the motion for summary judgment of Defendant

2 PrimaryAds, Inc. is GRANTED and that judgment shall be entered forthwith in favor of Defendant

3 PrimaryAds, Inc. and against Plaintiff Hypertouch, Inc.

4

5 DATED: _____, 2009          **RICHARD ADLER**
              JUN 1 6 2009

6                      Judge of the Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

### HYPERTOUCH, INC. v. VALUECLICK, INC., et al.
Los Angeles Superior Court Case No. LC081000

3

4    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 1775, Los Angeles, California 90067.

5

6    I hereby certify that on May 7, 2009, a copy of the following document described as **ORDER GRANTING SUMMARY JUDGMENT** was transmitted via e-mail in PDF format to the e-mail addresses listed on the attached Service List. A copy of the above-described document

7    was also mailed via First Class United States Mail to the parties on the attached Service List.

8    **SEE ATTACHED SERVICE LIST**

9    ☒    **BY MAIL:** The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under

10    that practice, mail is deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion

11    of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing.

12    ☐    **BY PERSONAL SERVICE:** I hereby certify that on _____, 2009, I delivered a

13    copy of the above-described documents by hand to the parties listed on the attached Service List.

14    ☐    **BY FEDERAL EXPRESS:** By placing a true copy thereof in sealed envelopes and causing them to be deposited in the Federal Express Depository located at 1901 Avenue of the

15    Stars, Los Angeles, CA 90067. The envelopes were sent with Federal Express fees therefor fully paid, with written instructions for "next-day" delivery.

16    ☐    **BY FACSIMILE:** I arranged for the facsimile transmission of the above document to the

17    fax numbers listed in the attached service list on this date prior to 6:00 p.m. Each facsimile transmission was reported as complete and without error by the transmitting facsimile machine

18    (fax number (310) 277-0653).

19    ☒    **BY PDF FORMAT:** I caused each such document to be transmitted in PDF format, via e-mail, to the e-mail addresses listed on the attached service list.

20

21    ☒    (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

22    ☐    (Federal) I declare that I am employed in the office of a member of the bar of this court at

23    whose direction the service was made.

24    Executed on May 7, 2009, at Los Angeles, California.

25    _Cynthia A. Knight_                         _Cynthia A. Knight_
     Type or Print Name                         Signature

26

27

28

1

1

**PROOF OF SERVICE**
Hypertouch, Inc. v. ValueClick, Inc., et al
(LASC Case No. LC081000)

2

3   Carla A. Veltman, Esq.
    STEPTOE & JOHNSON LLP
4   2121 Avenue of the Stars
    Suite 2800
5   Los Angeles, CA 90067
    Telephone (310) 734-3200
6   Facsimile (310) 734-3300
    E-mail: cveltman@steptoe.com

7

8   Lawrence P. Riff, Esq.
    STEPTOE & JOHNSON LLP
9   633 W. Fifth Street
    Suite 700
10  Los Angeles, CA 90071
    Telephone (213) 439-9400
11  Facsimile (213) 439-9599
    lriff@steptoe.com

11  *Attorneys for Plaintiff HYPERTOUCH, INC.*

12

13  Kevin S. Rosen, Esq.
    Ashlie Beringer, Esq.
    Scott H. Mellon, Esq.
14  GIBSON, DUNN & CRUTCHER LLP
    333 S. Grand Avenue
15  Los Angeles, CA 90071-3197
    Telephone (213) 229-7000
16  Facsimile (213) 229-7520
    E-mail: aberinger@gibsondunn.com
17  *Attorneys for Defendants VALUECLICK, INC., et al.*

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**PROOF OF SERVICE**

HYPERTOUCH, INC. v. VALUECLICK, INC., et al.
LASC Case No.: LC081000

</div>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I declare: I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 1775, Los Angeles, California 90067.

    I hereby certify that on June 18, 2009, I delivered a copy of the following document described as **NOTICE OF ENTRY OF ORDER GRANTING SUMMARY JUDGMENT** by hand to the following interested party in this action:

Carla A. Veltman, Esq.
STEPTOE & JOHNSON LLP
2121 Avenue of the Stars
Suite 2800
Los Angeles, CA 90067
Telephone (310) 734-3200
Facsimile (310) 734-3300
E-mail: cveltman@steptoe.com
*Attorneys for Plaintiff HYPERTOUCH, INC.*

☐    **BY MAIL:** Each envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, mail is deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing.

☒    **BY PERSONAL SERVICE:** I personally delivered the aforesaid document to the person listed above, at the address indicated.

☐    **BY FACSIMILE:** I arranged for the facsimile transmission of the above document to the fax numbers listed in the attached service list on this date prior to 6:00 p.m. Each facsimile transmission was reported as complete and without error by the transmitting facsimile machine (fax number (310) 277-0653).

☒    (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Executed on June 18, 2009, at Los Angeles, California.

Edgar Oliva
Type or Print Name

Signature

**PROOF OF SERVICE**

**HYPERTOUCH, INC. v. VALUECLICK, INC., et al.**
Los Angeles Superior Court Case No. LC081000

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 1775, Los Angeles, California 90067.

I hereby certify that on June 18, 2009, a copy of the document described as **NOTICE OF ENTRY OF ORDER GRANTING SUMMARY JUDGMENT** was served by first-class United States mail on the interested parties in this action by placing the true copy(s) thereof enclosed in sealed envelopes addressed to all interested parties as follows:

Kevin S. Rosen, Esq.
Ashlie Beringer, Esq.
Scott H. Mellon, Esq.
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
Telephone (213) 229-7000   Facsimile (213) 229-7520
*Attorneys for Defendants VALUECLICK, INC., et al.*

☒    **BY MAIL:** The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, mail is deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing.

☐    **BY FEDERAL EXPRESS:** By placing a true copy thereof in sealed envelopes and causing them to be deposited in the Federal Express Depository located at 1901 Avenue of the Stars, Los Angeles, CA 90067. The envelopes were sent with Federal Express fees therefor fully paid, with written instructions for "next-day" delivery.

☐    **BY FACSIMILE:** I arranged for the facsimile transmission of the above document to the fax numbers listed in the attached service list on this date prior to 6:00 p.m. Each facsimile transmission was reported as complete and without error by the transmitting facsimile machine (fax number (310) 277-0653).

☒    (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☐    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on June 18, 2009, at Los Angeles, California.

Cynthia A. Knight                                      *Cynthia A. Knight*
Type of Print Name                                      Signature

1

 **DomainTools**





– Back Scope
**Who Owns This Domain**
Find Out Who Owns the Domain
You Want. Purchase or Make an
Offer!
Register.com

**Free Domain Registration**
Free Domain with Annual
Hosting from Network Solutions-ICANN
Accred
NetworkSolutions.com/
Domains

Google _____ [Search]

**IP Information for 71.126.148.133**

**IP Location:** 🇺🇸 United States Silver Spring William Wagner
**Resolve Host:** static-71-126-148-133.washdc.fios.verizon.net
**IP Address:** 71.126.148.133  [W] [R] [P] [D] [T]
**SSL Cert:** updates.hypertouch.com SSL Certificate has expired
**Reverse IP:** 7 other sites hosted on this server.
**Blacklist Status:** Clear

**Whois Record**
```
OrgName:    Verizon Internet Services Inc.
OrgID:      VRIS
Address:    1880 Campus Commons Dr
City:       Reston
StateProv:  VA
PostalCode: 20191
Country:    US

NetRange:   71.96.0.0 - 71.127.255.255
CIDR:       71.96.0.0/11
NetName:    VIS-71-96
NetHandle:  NET-71-96-0-0-1
Parent:     NET-71-0-0-0-0
NetType:    Direct Allocation
NameServer: NS1.BELLATLANTIC.NET
NameServer: NS2.BELLATLANTIC.NET
NameServer: NS2.VERIZON.NET
NameServer: NS4.VERIZON.NET
Comment:
RegDate:    2005-01-18
Updated:    2005-08-15

OrgAbuseHandle: VISAB-ARIN
OrgAbuseName:   VIS Abuse
OrgAbusePhone:  +1-214-513-6711
OrgAbuseEmail:   security@verizon.net

OrgTechHandle: ZV20-ARIN
OrgTechName:   Verizon Internet Services
OrgTechPhone:  800-243-6994
OrgTechEmail:   ipnmc@gnilbnk.net

CustName:   WILLIAM WAGNER
Address:    1612 SHERWOOD RD
City:       SILVER SPRING
StateProv:  MD
PostalCode: 20902
Country:    US
RegDate:    2008-09-18
Updated:    2008-09-18

NetRange:   71.126.148.128 - 71.126.148.143
CIDR:       71.126.148.128/28
NetName:    FTTP
NetHandle:  NET-71-126-148-128-1
Parent:     NET-71-96-0-0-1
NetType:    Reassigned
Comment:
RegDate:    2008-09-18
Updated:    2008-09-18

OrgAbuseHandle: VISAB-ARIN
OrgAbuseName:   VIS Abuse
OrgAbusePhone:  +1-214-513-6711
OrgAbuseEmail:   security@verizon.net

OrgTechHandle: ZV20-ARIN
OrgTechName:   Verizon Internet Services
OrgTechPhone:  800-243-6994
OrgTechEmail:   ipnmc@gnilbnk.net
```



EXHIBIT 3

**DomainTools**

Whois | Domain Search | Domain Suggestions | For Sale | Sales History | Auction Search | Domain Monitor | Domain History
Ping | Traceroute | My IP Address | Domain Parking | Cheap Domain Name Registration | Bulk Check | Domain Typo Generator | Sample

**Power Tools:** Reverse IP | Domain History | Mark Alert | Name Server Spy | Hosting History | Registrant Search | Registrant Alert

Ads by Google

**Southeast Toyota Dealers**
Toyota Quality and Dependability -
Request a Quote and Find a Dealer!
www.SETbuyatoyota.com

**Verizon**
Shop Smart. Save Big. Find Verizon at
Bing™ cashback!
Bing.com/cashback

QUALITY SINCE 2002  **spry**

Google [                    ]    Search

---

**IP Information for 71.126.148.133**

**IP Location:** United States Silver Spring Beyond Systems Inc

**Resolve Host:** static-71-126-148-133.washdc.fios.verizon.net

**IP Address:** 71.126.148.133 W R P D T

**SSL Cert:** updates.hypertouch.com SSL Certificate has expired.

**Reverse IP:** 7 other sites hosted on this server.

**Blacklist Status:** Clear

```
OrgName:    Verizon Internet Services Inc.
OrgID:      VRIS
Address:    1880 Campus Commons Dr
City:       Reston
StateProv:  VA
PostalCode: 20191
Country:    US

NetRange:   71.96.0.0 - 71.127.255.255
CIDR:       71.96.0.0/11
NetName:    VIS-71-96
NetHandle:  NET-71-96-0-0-1
Parent:     NET-71-0-0-0-0
NetType:    Direct Allocation
NameServer: NS1.BELLATLANTIC.NET
NameServer: NS2.BELLATLANTIC.NET
NameServer: NS2.VERIZON.NET
NameServer: NS4.VERIZON.NET
NameServer: NS5.VERIZON.NET
NameServer: NS6.VERIZON.NET
Comment:
RegDate:    2005-01-18
Updated:    2009-09-15

OrgAbuseHandle: VISAB-ARIN
OrgAbuseName:   VIS Abuse
OrgAbusePhone:  +1-214-513-6711
OrgAbuseEmail:  security@verizon.net


OrgTechHandle: IV20-ARIN
OrgTechName:   Verizon Internet Services
OrgTechPhone:  800-243-6994
OrgTechEmail:  ipnmc@gnilink.net


CustName:   BEYOND SYSTEMS INC
Address:    1612 SHERWOOD RD
City:       SILVER SPRING
StateProv:  MD
PostalCode: 20902
Country:    US
RegDate:    2008-09-18
Updated:    2009-09-02

NetRange:   71.126.148.128 - 71.126.148.143
CIDR:       71.126.148.128/28
NetName:    FTTP
NetHandle:  NET-71-126-148-128-1
Parent:     NET-71-96-0-0-1
NetType:    Reassigned
Comment:
RegDate:    2008-09-18
Updated:    2009-09-02

OrgAbuseHandle: VISAB-ARIN
OrgAbuseName:   VIS Abuse
OrgAbusePhone:  +1-214-513-6711
OrgAbuseEmail:  security@verizon.net


OrgTechHandle: IV20-ARIN
OrgTechName:   Verizon Internet Services
OrgTechPhone:  800-243-6994
OrgTechEmail:  ipnmc@gnilink.net
```



16527.txt

```
0001
 1                U.S. DISTRICT COURT FOR MARYLAND
 2                     SOUTHERN DIVISION
 3      ----------------------------X
 4    Beyond Systems, Inc.,        :
 5              Plaintiff,          :
 6          v.                     :    Case No. PJM 08 CV 0921
 7    World Avenue USA, LLC, et    :
 8    al.,                         :
 9              Defendants.        :
10      ----------------------------X
11             DESIGNATED CONFIDENTIAL IN PART
12                          Washington, D.C.
13                          Thursday, September 17, 2009
14             30(b)(6) Videotape deposition of Paul Wagner,
15    a witness herein, called for examination by counsel for
16    the World Avenue Defendants in the above-entitled matter,
17    pursuant to notice, the witness being duly sworn by
18    DENNIS A. DINKEL, a Notary Public in and for the District
19    of Columbia, taken at the offices of Greenberg Traurig,
20    LLP, 2101 L Street, N.W., Suite 1000, Washington, D.C. at
21    9:59 a.m., Thursday, September 17, 2009, and the
22    proceedings being taken down by Stenotype by DENNIS A.
0002
 1    DINKEL, FAPR, CRR, and transcribed under his direction.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
0003
 1    APPEARANCES:
 2
 3          On behalf of the Plaintiff:
 4                STEPHEN HOWARD RING, ESQ.
 5                Stephen H Ring, P.C.
 6                506 Main Street, Suite 215
 7                Gaithersburg, MD 10878
 8                301-563-9249
 9
10          On behalf of the World Avenue Defendants:
11                SANFORD M. SAUNDERS, JR., ESQ.
12                NICOLETA BERLACU, ESQ.
13                Greenberg Traurig, LLP
14                2101 L Street, N.W., Suite 1000
15                Washington, DC 20037
16                202-331-3100
```

Page 1

EXHIBIT
5

16527.txt

18      Q.      And what is 38 Maryland Avenue, unit 33?
19      A.      That is a condominium, belongs to my
20  parents.
21      Q.      Is it a residential condominium?
22      A.      Yes.
0056
1      Q.      Where within the condominium are the
2  servers located?
3      A.      Those servers are in -- primarily in an
4  office in that condominium.
5              MR. RING:  Can I interrupt for a second?
6              MR. SAUNDERS:  Sure.
7              MR. RING:  Could we go off the record?
8              (Discussion off the record.)
9              THE VIDEOGRAPHER:  We're going off the
10  record.  The time on the video is 11:22 a.m.
11              (Recess.)
12              THE VIDEOGRAPHER:  We're back on the
13  record.  The time on the video is 11:27 a.m.
14              BY MR. SAUNDERS:
15      Q.      Mr. Wagner, let me go back to the Sherwood
16  Road residence for a second.  Is anybody currently
17  living in 1612 Sherwood Road?
18      A.      No.  It is still owned by my parents, but
19  nobody is living there at the moment.
20      Q.      When is the last time somebody lived in
21  the 1612 Sherwood Road residence?
22      A.      We had a family friend living there within
0057
1  the last year, I think, or even earlier this year.
2  She was staying for a year or two.
3      Q.      Prior to that, was anybody residing in the
4  1612 Sherwood Road residence?
5      A.      My parents were, I believe, up until late
6  2007.  If I'm not mistaken.
7      Q.      Going back to 1997, were they living there
8  continuously between 1997 and roughly 2006?
9      A.      Yes.
10      Q.      At any point, were you living in the 1612
11  Sherwood Road residence during that period?
12      A.      No.  Not in that time period.
13      Q.      And I take it while they were -- while
14  your parents were living in the house, they had
15  access to the mail servers?
16      A.      Yes.  Sometimes they would reboot servers
17  for BSI, so it was actually an advantage to have them
18  with access to the servers.
19      Q.      I know this is beyond the scope, but did
20  you put them on the payroll?
21      A.      No.
22      Q.      Was BSI paying the rent for putting the
0058
1  servers in the house?
2              MR. RING:  Is that within our scope here?
3  Objection.
4              BY MR. SAUNDERS:
5      Q.      You can go ahead and answer.
6              MR. RING:  Let me note an objection.  Are
7  we going within one of these categories or are we
8  going outside?
9              MR. SAUNDERS:  Well, it goes to the
10  location of the servers.
11              MR. RING:  Well, you established the
                        Page 21

16527.txt

```
12  location.  It doesn't talk about rent or leases or
13  anything like that.
14              MR. SAUNDERS:  If he doesn't want to
15  answer whether they paid rent, that's --
16          BY MR. SAUNDERS:
17      Q.     Did you have a lease for the -- did you
18  have a lease to put the servers in the house?
19      A.     No.  There was no lease.  No rent checks.
20      Q.     Okay.  Going to the 38 Maryland Avenue
21  condo, when did you start -- let me back up, so I am
22  clear.  So there have been servers in the Sherwood
0059
1   Road property since 1997?
2       A.     Right.  Actually before then.
3       Q.     BSI servers?  So since 1996?
4       A.     I think BSI's first mail server was there
5   in '97, 1997.
6       Q.     Mail server, correct.  When did BSI put a
7   mail server in the Maryland Avenue condo?
8       A.     Either in late 2007 or early 2008.
9       Q.     Your folks move out of the Sherwood Road
10  house into the condo?
11      A.     That's right.
12      Q.     The mail servers that are now -- and you
13  still have mail servers currently located in the
14  Maryland Avenue condo?
15      A.     Yes.
16      Q.     You mentioned the office -- the mail
17  servers were located in an office in the condo.
18              Were they always located in the office
19  since they've been in the condo?
20              MR. RING:  Objection.  Go ahead.
21              THE WITNESS:  I don't know if I ever moved
22  it out for a moment for maintenance.  There was a
0060
1   server in the living room as well next to the TV,
2   sort of video, among other things, other Internet
3   services.  There's a closet where we intend to put
4   some servers, but I don't think we've put them there
5   yet.
6           BY MR. SAUNDERS:
7       Q.     And I was referring to the -- the question
8   was referring to BSI mail servers; so is that
9   potentially a BSI mail server that's next to the TV?
10      A.     I'm trying to think whether it provides
11  secondary services.  Not to my knowledge.  It
12  provides DNS potentially, but not mail service.
13      Q.     The mail servers that are located in the
14  -- the BSI mail servers located in the Maryland
15  Avenue condo, I take it they're not in a secured
16  setting?
17      A.     I think it is similar to the house, so
18  yes, they are.  The condo is kept locked.
19      Q.     Anybody in the condo would have access to
20  the servers?
21      A.     Yes.  Correct.
22      Q.     And you have a key to the condo?
0061
1       A.     Yes.
2       Q.     As to the Sherwood Road property, is there
3   any fire suppression system there?
4       A.     Yes, there are.  There are sprinklers and
5   alarms.
```

Page 22